UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------X
LORETTA M. CERBELLI, in her individual
capacity and as the ADMINISTRATRIX
of the ESTATE of KEVIN E. CERBELLI,
deceased,                                                              MEMORANDUM
                                                                               AND ORDER
                                    Plaintiff,                        99 CV 6846 (ARR)(RML)

            -against-

THE CITY OF NEW YORK, *et al.*,

                                    Defendants.
--------------------------------------------------------X

LEVY, United States Magistrate Judge:

            Defendants City of New York, the New York City Police Department, Police

Officer James Williams, Police Officer Paul Valdes, Police Officer Robert Ehmer, Sgt. Michael

Baretto, and Lt. William McBride (collectively, the "police defendants") move to preclude

portions of the reports and testimony of plaintiff's experts Katherine Falk, M.D. and John

Pritchard III.  For the reasons stated below, the motion is granted in part and denied in part.

## BACKGROUND

            For purposes of the pending motion, familiarity with the allegations in plaintiff's

complaint is assumed.  Briefly, however, this case arises out of an incident that occurred on

October 25, 1998, during which Kevin Cerbelli, a 30-year-old man with paranoid schizophrenia,

was shot and killed by defendant police officers inside the 110th Precinct in Queens, New York.

Plaintiff's complaint challenges the policies and practices of the New York City Police

Department ("N.Y.P.D.") concerning interactions with emotionally disturbed persons ("EDPs")

and, in particular, the N.Y.P.D.'s training, policies, and practices for dealing with dangerous

EDPs.  In support of her claims, plaintiff has named as experts, *inter alia*, Dr. Katherine Falk, a

psychiatrist, and John Pritchard III, a law enforcement specialist. This court conducted <u>Daubert</u> hearings on March 7, 2006 and June 1, 2006, at which these experts testified.

**DISCUSSION**

Rule 702 of the Federal Rules of Evidence provides that:

> if scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.

In <u>Daubert v. Merrell Dow Pharms., Inc.</u>, 509 U.S. 579 (1993), the Supreme Court stated that, before admitting evidence under Rule 702, the trial judge is required to ensure that the scientific testimony or evidence is both reliable and relevant. <u>Id.</u> at 589. The court must assess whether the expert's opinion is grounded in "methods and procedures of science," whether it consists of more than simply "subjective belief or unsupported speculation" (<u>id.</u> at 589) and "whether the reasoning or methodology underlying the testimony is scientifically valid and . . . properly can be applied to the facts in issue." <u>Id.</u> at 592-93. In making this determination, the court may consider the following (nonexclusive) factors: (1) whether the theory or technique can be (and has been) tested; (2) whether the theory or technique has been subjected to peer review or publication; (3) the known or potential rate of error and the existence and maintenance of standards controlling the technique's operation; and (4) general acceptance in the scientific community. <u>Id.</u> at 591-93. Other factors courts tend to take into account include: (a) the existence of standards controlling the technique's operation, (b) the relationship of the technique to methods that have been established to be reliable, (c) the qualifications of the expert witness, and (d) the non-judicial uses to which the method has been put. <u>In re Paoli R.R. Yard PCB</u>

Litig., 35 F.3d 717, 742 n.8 (3d Cir. 1994); Finley v. NCR Corp., 964 F. Supp. 882, 885 (D.N.J. 1996). Finally, the court must determine "whether the experts are proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have devolved their opinions expressly for purposes of testifying." Daubert v. Merrell Dow Pharms., Inc., 43 F.3d 1311, 1317 (9th Cir. 1995). The proponent of the expert's testimony bears the burden of establishing its admissibility by a preponderance of the evidence. Daubert, 509 U.S. at 593 n.10.

The Second Circuit has adopted a flexible interpretation of Daubert. In Borawick v. Shay, 68 F.3d 597, 610 (2d Cir. 1995), the court explained that:

> by loosening the strictures on scientific evidence set by Frye, Daubert reinforces the idea that there should be a presumption of admissibility of evidence. Second, it emphasizes the need for flexibility in assessing whether evidence is admissible. Rather than using rigid "safeguards" for determining whether testimony should be admitted, the Court's approach is to permit the trial judge to weigh the various considerations pertinent to the issue in question. Third, Daubert allows for the admissibility of scientific evidence, even if not generally accepted in the relevant scientific community, provided its reliability has independent support. Finally, the Court has expressed its faith in the power of the adversary system to test "shaky but admissible" evidence and advanced a bias in favor of admitting evidence short of that solidly and indisputably proven to be reliable.[1]

Moreover, in Kumho Tire v. Carmichael, 526 U.S. 137, 150 (1999), the Supreme Court emphasized that courts have "broad latitude" in deciding whether and how to apply the Daubert factors and that "the relevant reliability concerns may focus upon personal knowledge or

---

[1]  The court in Borawick discussed but did not apply Daubert directly because the issue of whether to admit or exclude the proposed expert, a hypnotist, was one of competence, not reliability. Borawick, 68 F.3d at 610.

experience."  In fact, "[i]n certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony."  FED. R. EVID. 702 advisory committee's note (2000). The Court in Kumho Tire also stressed that the Daubert elements are not a definitive checklist and that the trial court's gatekeeping inquiry must be "flexible" and "tied to the facts of a particular case."  Kumho Tire, 526 U.S. at 150.  See also Heller v. Shaw Indus., Inc., 167 F.3d 146, 152 (3d Cir. 1999) ("the district court's gatekeeper role is a flexible one and . . . the factors are simply useful signposts, not dispositive hurdles that a party must overcome in order to have expert testimony admitted.").  The primary objective is "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." Kumho Tire, 526 U.S. at 152.

Importantly, however, "[i]f the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached . . . and how that experience is reliably applied to the facts.  The trial court's gatekeeping function requires more than simply 'taking the expert's word for it.'" Thomas v. City of Chattanooga, 398 F.3d 426, 432 (6th Cir. 2005) (quoting FED. R. EVID. 702 advisory committee note) (rejecting expert's opinion that the number of lawsuits against the police department evidenced a "pattern" of excessive force, where expert failed to present data comparing and contrasting the number of excessive force complaints in Chattanooga with those in similarly-sized cities), cert. denied, 126 S. Ct. 338 (2005).  In other words, expert opinions are inadmissible if based on speculative assumptions.  See In re Air Disaster at Lockerbie Scotland on Dec. 21, 1988, 37 F.3d 804, 824 (2d Cir. 1994) (overruled on other grounds by Zicherman v.

Korean Air Lines Co., 516 U.S. 217 (1996), as recognized in Brink's Ltd. v. South African Airways, 93 F.3d 1022, 1029 (2d Cir. 1996)).  See also Kumho Tire, 526 U.S. at 157 ("Opinion evidence that is connected to existing data only by the *ipse dixit* of the expert" should not be admitted.).

A.  Katherine Falk, M.D.

According to her *curriculum vitae*, Dr. Falk earned a medical degree from the Mount Sinai School of Medicine and is board certified in psychiatry and neurology.  (See Declaration of Lisa Rabinowitz, dated June 22, 2005 ("Rabinowitz Decl."), Ex. A.)  She has been in the private practice of adult and adolescent psychiatry for approximately thirty years. (Id.)  In 1991, she founded a non-profit corporation called The Project for Psychiatric Outreach to the Homeless, Inc.; she served as the organization's medical director until June 2000 and as its president until April 2003.  (Id.)  She has also served as a Clinical Assistant Professor of Psychiatry at Columbia University College of Physicians and Surgeons since 1984, and is a Distinguished Fellow of the American Psychiatric Association.  (Id.)

Plaintiff intends to offer Dr. Falk's testimony to explain how the N.Y.P.D.'s "policies regarding [EDPs] affect people with mental illness."  (Plaintiff's Closing Argument on Defendants' Daubert Motion to Preclude Certain Testimony of Plaintiff's Proposed Expert Dr. Katherine Falk, dated June 23, 2006 ("Pl.'s Post-Hearing Mem."), at 1.)  Specifically, Dr. Falk is expected to explain (a) the nature of schizophrenia, (b) how "pain, fear, trauma, and suffering may be experienced by a person with schizophrenia," and (c) the "foreseeable consequences of the NYPD policies of encirclement and 'isolate and contain' when officers interact with persons with mental illness who are dangerous to themselves or others, and who are in states similar to

that of Kevin Cerbelli." (Id.)

The police defendants take issue with portions of Dr. Falk's proffered testimony concerning N.Y.P.D. practices and policy regarding EDPs. Specifically, the police defendants object to the following opinions in Dr. Falk's report:

- *The NYPD policy allowing encirclement and shouting commands at an EDP is irrational, and likely to cause harm to individuals. When officers surround, encircle, semi-circle, or otherwise close in on an EDP, and have multiple voices shout at the EDP, it is foreseeable that rather than gain compliance, the officers will make the situation worse and more dangerous.*

- *I take that as meaning that if the EDP is waiving his/her arms in the air and is not holding a weapon, that the police could legitimately decide that they are in danger and shoot the EDP. As for shooting someone, the police are instructed to aim at the EDP's body. They are absolutely not permitted to aim at the EDP's leg. Captain Lent sates, ". . . it's the center mass . . . the largest area of the body. When we aim at all times . . . . We are taught only one way to use a gun."[2] Kevin Cerbelli was killed in a police precinct. Apparently there is no policy in place for dealing with a mentally ill person inside a precinct.*

- *Often they come to the attention of the police. The policy of the NYPD to deal with EDPs is very lacking in any basic understanding of the nature of mental illness and how to form a relationship with someone this ill. I am using the word relationship because it is the relationship that is needed to gain his/her trust and cooperation. It would seem from Captain Lent's deposition that the police are frightened of the EDP. They consider the EDP to be unpredictable and therefore a threat. Because the police feel that the EDP is potentially a deadly threat, even if the emotionally disturbed person can't reach the police with a weapon or even if he/she is not holding a weapon, the police feel justified to use deadly force themselves and shoot the EDP.*

- *Overreaction by the police is not simply a New York City problem. Excessive violence by the police happens in other communities all over the country and some cities have found ways of solving this problem. For example, a program was developed in Memphis, Tennessee 17 years ago in response to an incident in which the police were called about a man who was trying to cut himself with a*

---

[2] Plaintiff has stipulated that Dr. Falk will not opine about N.Y.P.D. procedures with respect to shooting at center mass. (See Transcript of Daubert Hearing, dated June 1, 2006 ("Falk Tr.") at 75, 99.)

> *knife. The police shot him multiple times and killed him. Houston has also developed an extremely successful CIT [Crisis Intervention Team] program. Many police have been trained and they respond to calls concerning EDPs. While Memphis is a small city, Houston is quite large, with a large population, spread over a large area. . . .[3] The training provided to police officers in the CIT programs is more extensive than what is taught in the New York City Police Academy and, in my opinion, better prepares the police officer to deal with the EDP. The officers who have the CIT training do not seem to be afraid of the EDP, and interact with the EDP in a way that calms the EDP and the situation, rather than the NYC policy of encirclement, which often leads to escalation of the individual's anxiety, fear and agitation and at times to unnecessary violence.*

(See Rabinowitz Decl., Ex. B at 5-9.)

The police defendants argue that Dr. Falk is unqualified to testify regarding N.Y.P.D. practices and policy because she lacks experience, training and education in the field of police practices and procedures. It is undisputed that Dr. Falk has never worked in law enforcement, has never been trained by law enforcement personnel, and has never provided instruction to law enforcement officers about EDPs. Nor has Dr. Falk personally observed N.Y.P.D. officers employing the tactics of "encirclement" or "shouting with multiple voices" that she describes in her report. (Transcript of Daubert Hearing, dated June 1, 2006 ("Falk Tr.") at 21-22, 33.) Dr. Falk also conceded that she neither consulted nor relied on any qualitative studies, reports, data or literature in forming her opinion that the N.Y.P.D.'s policies or practices are likely to cause harm to EDPs or to escalate a situation involving an EDP. (Id. at 46-47, 84-85.)

Nonetheless, Dr. Falk does have extensive experience in treating and supervising the treatment of people with schizophrenia and other mental illnesses. As she testified at the

---

[3] Plaintiff has withdrawn Dr. Falk's opinion that "[t]he fact that this program works so well in Houston means that it could also work in New York City." (See Falk Tr. at 58-59.)

Daubert hearing, Dr. Falk began providing psychiatric services to homeless mentally ill people in 1985.  (Falk Tr. at 6-7.)  She initially founded The Project for Psychiatric Outreach to the Homeless, Inc. as a volunteer task force of the American Psychiatric Association; it was incorporated as an independent not-for-profit corporation in 1991.  (Id. at 8-9.)  In her capacities as president and medical director of that organization, Dr. Falk observed many encounters between N.Y.P.D. officers and EDPs, usually when she or a colleague called the police to transport an EDP to a hospital emergency room involuntarily.  (Id. at 9, 13-14.)

Dr. Falk also has a great deal of clinical and academic experience in her field.  She has authored a training manual for psychiatrists and has taught public psychiatry fellows at the New York State Psychiatric Institute about how to interact with homeless mentally ill people.  (Id. at 18.)  She has also conducted numerous presentations, lectures and training sessions for hospital residents and participants in meetings of the American Psychiatric Association and the Institute for Psychiatric Services.  (Id. at 19.)  In addition, Dr. Falk served on an advisory board for E.M.S. in New York City; in that capacity, she proposed changes to E.M.S. protocols regarding people with mental illness.  (Id.)

In preparation for rendering her opinion, Dr. Falk reviewed police training videos, manuals and patrol guides.  (Id. at 20.)  She described the N.Y.P.D.'s policy regarding dangerous EDPs as "isolation and containment."  (Id.)  She stated: "My understanding is that they encircle the EDP, enclose the EDP in a space, and that they're permitted to use loud voices and to shout commands at the EDP."  (Id. at 21.)   She opined that this is not an effective policy because

> If the emotionally disturbed person is psychotic, the likelihood is
> that they're hearing voices in their head that are very real to them.
> They're in a confused state.  It's very – they make no sense out of
> their world.  And to then have very loud voices shouting at them

can only make them more confused and escalate a bad situation;
making them more anxious, making them more agitated, not
calming them down, but escalating their anxiety and agitation.

(Id.) Dr. Falk further stated that she believes to a reasonable degree of medical certainty that

encirclement will lead to an increase of agitation and anxiety and
also multiple voices shouting will lead to an increase in agitation
and anxiety and will escalate the situation and make the person
more likely to do something than to calm the situation down and
get his cooperation.

(Id. at 25.)  As to whether such tactics are likely to lead to harm to the EDP or others, Dr. Falk

testified that

With encirclement, there's no way for the person to get out of the
circle except by going towards a police officer.  And what I
learned very early in my training as a psychiatrist is that I never
get between a patient [and] a door because if they want to go out,
they're going to hurt me on the way out.  They may not even want
to.  They may not even be aware that – but, it'll be guaranteed that
if they want to leave and I'm in the way, I'm going to get hurt.
And so, I don't get between the patient and the door.
And in here, they're – all of the police are between the EDP and an
exit out of the circle.  And if the person wants out, . . . it becomes a
terrible situation for the EDP because if he's got some kind of
weapon . . . the police then have to respond in a way that is terrible
for this person.

[Encirclement] will escalate the situation, . . . it will make the EDP
more agitated, more anxious, . . . and he'll want to run, or he'll
want to move.  He'll be agitated.  He's not going to be able to
stand still.

(Id. at 25-26, 28.)

Dr. Falk stated that, in her opinion, "encirclement" and "shouting" are never

effective ways for anyone to interact with an EDP.  (Id. at 28.)[4]  She based this opinion on "18

_____

[4]  Dr. Falk was careful to say that not every EDP will react identically to the same
(continued...)

years of working with homeless mentally ill people and . . . 30 years of psychiatric practice of seeing people who are very ill also." (Id. at 29.)  She also testified that she has read extensively about predicting dangerousness.  (Id. at 30.)

I find Dr. Falk competent to render an opinion about typical EDP behavior and how a dangerous EDP is likely to respond to specific types of police actions.  Her years of experience treating and directing the treatment of EDPs provide a reliable scientific basis for anticipating the likely results of particular police tactics with respect to EDPs.  As she made clear, her testimony is not specific to the N.Y.P.D., but would apply to anyone interacting with a violent EDP.  (Id. at 26.)  Although Dr. Falk has not herself observed examples of the "encirclement" or "shouting" she describes, her opinions on this topic are not speculative, but are founded on her thorough professional knowledge of schizophrenia and other mental illnesses.  All of the points raised in the police defendants' papers – i.e., that Dr. Falk did not rely on any empirical data and has no experience or training in the field of police practices and procedures – are fair ground for cross-examination.  These are questions of weight, not admissibility.[5]

---

[4](...continued)
situation.  Rather, she explained that EDPs are "predictable in their unpredictability," meaning that someone interacting with an EDP cannot "assume that [the EDP] will respond in any kind of a way that someone who doesn't have that kind of brain dysfunction would respond."  (Falk Tr. at 27.)  Based on her psychiatric expertise, however, Dr. Falk opined that "encirclement" and "shouting" have a probable outcome and that "once you set up that circle to begin with, you have started the process to where the outcome might be [the EDP's] death."  (Falk Tr. at 28-30.)

[5]  The court stresses that its limited role at this point is not to evaluate the merits of Dr. Falk's conclusions, but simply to determine whether her proffered testimony is scientifically reliable under Daubert.  See Amorgianos v. National R.R. Passenger Corp., 303 F.3d 256, 266 (2d Cir. 2002) ("In undertaking this flexible inquiry, the district court must focus on the principles and methodology employed by the expert, without regard to the conclusions the expert has reached or the district court's belief as to the correctness of those conclusions.").

The police defendants further argue that Dr. Falk is not qualified to render an opinion about EDP policies and training in other cities, such as Houston and Memphis, because those opinions are not based on any reliable methodology. Dr. Falk testified that she learned about the CIT program in Houston by speaking with the program's founder, Betsy Schwartz, and with the officer who trained Houston police officers in the CIT program. (<u>Id.</u> at 50-51.) She also reviewed a CIT training manual for the Houston program, although she no longer possesses a copy of that manual and did not produce it to the police defendants. (<u>Id.</u> at 51, 53.) She stated that she conducted this research prior to June 2001 and has not received or reviewed any updated training manuals from the Houston CIT program since then. (<u>Id.</u> at 52-54.) Dr. Falk testified that she did not know whether there had been any changes in the Houston program's policies or practices since 2001. (<u>Id.</u> at 54.) She also conceded that she had never attended any CIT training in any CIT jurisdiction and has no direct experience with the implementation of a CIT program. (<u>Id.</u> at 54-55.) In addition, Dr. Falk did not rely on any studies or statistics in reaching her opinion that Houston's CIT program is "extremely successful." (<u>Id.</u> at 60-62.) Rather, she based her opinion on "notes from conversations" with people in Houston. (<u>Id.</u> at 61, 66.)

Plaintiff argues that "[i]t will be natural for Dr. Falk to mention the [Houston] CIT program, and the programs of other states, when describing her experience, and the background context for some of her opinions on the policies and practices of the NYPD." (Pl.'s Post-Hearing Mem. at 1 n.1.) Plaintiff argues that this "'background'" information is simply offered as an "'aid to understanding'" Dr. Falk's testimony. (<u>Id.</u> (citing Fed. R. Evid. 401 advisory committee notes).

The court agrees with the police defendants on this point. Dr. Falk is not an

expert on the Houston CIT program or on any police policies or training in other cities.  Her

research consisted almost entirely of conducting a few telephone conversations and reviewing

training materials that may well be outdated.  Even were her information current, it is very

general, and her method smacks of developing an opinion expressly for purposes of litigation, a

practice upon which the courts frown.  Daubert, 43 F.3d at 1317.  Her knowledge about police

models in other states will not aid a fact-finder's understanding of her testimony.[6]  Accordingly,

Dr. Falk is not qualified to testify about the matters contained in the final paragraph above,

beginning with the sentence "Overreaction by the police is not simply a New York City

problem."

       B.  John S. Pritchard III

       According to his *curriculum vitae*, Commissioner Pritchard has over thirty-five

years of experience in law enforcement and criminal justice.  (Rabinowitz Decl., Ex. D.)  He

earned a B.A. in Behavioral Science from Fordham University and began his career as a

patrolman with the N.Y.P.D. in 1965.  Since then, he has held numerous positions of authority in

the N.Y.P.D., the Federal Bureau of Investigation, the Petroleum, Alcohol & Tobacco Bureau of

the New York State Department of Taxation and Finance, and the Metropolitan Transportation

---

    [6]  In 2000, Dr. Falk wrote a brief article in the American Psychiatric Association
newsletter, in which she described the Memphis CIT program and concluded, among other
things, that "[a]lthough it might not work to have outside CIT officers in New York City, . . . the
[N.Y.P.D.] sergeants could upgrade their training by getting this specialized training in the
management of EDPs and be the one in charge at the scene."  At the Daubert hearing, Dr. Falk
stated that, because Memphis is significantly smaller than New York City, she did not believe
that the Memphis program could "be translated to a situation in New York."  (Falk Tr. at 51.)  At
any rate, Dr. Falk did not include this article on her CV or list of publications, and she stated that
her "conclusions are not based on that article."  (Id. at 37.)  Accordingly, the article does not
affect this court's determination concerning Dr. Falk's testimony.

Authority, where he served as Inspector General for nearly five years.  (See id.)  Most recently, from July 1, 1998 to October 21, 1999, Commissioner Pritchard served as Inspector General and Deputy Police Commissioner for the County of Westchester, New York.  (Id.)  For two years prior to that, he was the Commissioner of Public Safety for the City of Mount Vernon, New York, and for approximately three months in 1995 he was the Acting Chief of the New York City Transit Police Department, having served as that department's Deputy Chief for the previous eleven months.  (Id.)  He has also taught as an adjunct professor at Marist College, John Jay College of Criminal Justice, and Mercy College.  (Id.)  He retired from law enforcement in 1999.  (Transcript of Daubert Hearing, dated Mar. 7, 2006 ("Pritchard Tr."), at 8.)

The police defendants do not challenge Commissioner Pritchard's qualifications or ability to describe the N.Y.P.D. policies and practices that were in place during his tenure with the department, or to assess police operations or training generally.  Rather, they take issue with specific portions of Commissioner Pritchard's proffered testimony concerning the N.Y.P.D.'s purported failure "to have effective systems for interacting with people with mental illness" because it does not employ a Crisis Intervention Team ("CIT") Model similar to that used by the City of Memphis Police Department and some other police departments in other jurisdictions.  (See Rabinowitz Decl., Ex. C, at 4-5, 9-10.)  Specifically, the police defendants object to the following opinions in Commissioner Pritchard's report:

> • *The Crisis Intervention Team (CIT) model first developed in Memphis, and now used in Houston and many other jurisdictions, is a different method for handling EDPs.  CIT has specially-trained officers respond immediately to the scene, who are trained to properly interact with people with mental illness.  In New York, the regular police officers must wait for the arrival of the ESU, and they often arrive too late to prevent the scene from escalating.  In New York, only the ESU is trained on a variety of non-lethal weapons that regular officers do not know how to use.  Based on the multiple duties of the ESU, (including, among other things,*

*duties similar to SWAT) and the small number of ESU units, they are often on
other assignments and cannot respond quickly enough.*

• *The NYCPD has refused to adopt a CIT model. The NYCPD attitude is displayed
in the City's testimony through the City's witness Captain Lent. The City claims
in that testimony, on pages 98 through 100, that the Memphis model was
somehow based on the NYCPD model after a visit to NYC, essentially because the
NYCPD is the "best." This is a misstatement by a City witness. The Crisis
Intervention Team (CIT) model first developed in Memphis in the 1980s and now
widely used across the country is different from the NYCPD model. In fact, the
CIT model has been rejected by the NYCPD.*

• *Given the flaws in the EDP policies of the NYCPD described above, it is
predictable that when officers encounter an EDP who is dangerous, the encounter
will be mismanaged and people will be unnecessarily harmed. The EDP policies
and practices of NYCPD described above were a proximate cause of Kevin
Cerbelli's death.*

(Id. at 4-5.)

The police defendants argue that these opinions are speculative and not grounded
in any identifiable methodology. As they point out, nowhere in his report does Commissioner
Pritchard discuss the relative success rates of the CIT programs he mentions versus the methods
used by the N.Y.P.D. or other jurisdictions that do not employ the CIT model. Nor does he
compare relative injury or death rates per capita of EDPs who interact with the police
departments of the CIT jurisdictions as opposed to the N.Y.P.D., or discuss the number of EDP
calls,[7] the population sizes or the demographics of the jurisdictions he is attempting to compare.[8]

_____

[7] Plaintiff contends that the N.Y.P.D. does not "keep statistics in this area" and argues
that "a statistical comparison between New York City and other jurisdictions for the relevant
time period is not possible." (Letter of Amanda Masters, Esq., dated Apr. 21, 2006, at 1.) In her
Notice to Admit, plaintiff requested "department-wide studies of EDP-police encounters,"
meaning any systematic reviews as opposed to reviews of individual incidents. The municipal
defendants responded that "[f]rom October 25, 1993 through October 25, 1998, the NYPD did
not document (i.e., reduce to writing), department-wide studies of EDP-police encounters."
(Response and Objections to Pl.'s Notice to Admit, dated Mar. 28, 2005.) This does not mean
(continued...)

-14-

Indeed, Commissioner Pritchard does not explain in his report whether or how a CIT program, or any other model, could effectively have been instituted in New York City at the time of Kevin Cerbelli's death. He has never written about CIT programs or about police interactions with EDPs, and he has never been qualified as an expert in a lawsuit involving a CIT program or an EDP. (Pritchard Tr. at 77-78.)[9] Nor has he ever attended a CIT training or worked for a police department that had a CIT program. (Id. at 78-79.)

Courts typically admit police expert testimony, based solely on the expert's professional experience, where it is offered to aid the jury's understanding of an area not within the experience of the average juror. See, e.g., United States v. McElveen, 129 Fed. Appx. 42, 43 (4th Cir. 2005) ("This court has allowed government agents and police officers to testify as drug experts in numerous cases based solely on their experiences."), cert. denied, 126 S. Ct. 298

_____

[7](...continued)
that the N.Y.P.D. maintained no records of incidents involving EDPs, or in which EDPs were injured or killed during police encounters; in fact, the municipal defendants have produced thousands of documents from the Civilian Complaint Review Board regarding EDP/NYPD interactions. In other words, some raw data exists from which an expert could reach conclusions. Nowhere in his report or in his testimony did Commissioner Pritchard describe his review of these documents or the conclusions, if any, he drew or was unable to draw.

[8] Commissioner Pritchard testified that he did not have any data concerning the number of EDPs killed or injured in police incidents in Memphis before or after implementation of the CIT program there. (Pritchard Tr. at 103.) Nor did he have any information about the number of EDPs who were injured by police in Houston or Albuquerque before or after institution of the CIT programs in those cities. (Id. at 129, 134, 136.) In addition, Commissioner Pritchard did not know how many EDPs had been injured or killed by police in New York City in the preceding five year period. (Id. at 156-57.)

[9] Commissioner Pritchard has testified as a police expert in at least one federal case, Lazaratos v. Port Auth., No. 00 Civ. 2221, 2003 WL 22283832 (S.D.N.Y. Sept. 30, 2003), a § 1983 action in which he opined that the defendant police officer did not properly arrest the plaintiff. Commissioner Pritchard's testimony in that case did "not speak to larger issues of [police] training" or policy. Id. at *4.

-15-

(2005); United States v. Thomas, 74 F.3d 676, 682 (6th Cir. 1996) ("This circuit has allowed police officers to testify as expert witnesses about criminal activity since '[k]nowledge of such activity is generally beyond the understanding of the average layman.'") (quoting United States v. Pearce, 912 F.2d 159, 163 (6th Cir. 1990)).  Clearly, police training, policies, and procedures are complex areas outside common experience.  Moreover, Commissioner Pritchard reached his conclusions by applying his experience, training and skills to the facts provided to him.  In formulating his opinions and drafting his report, Commissioner Pritchard also reviewed numerous materials, including the N.Y.P.D. deposition transcripts, the N.Y.P.D. training materials, videos, and EDP policies as reflected in the Patrol Guide, as well as documents outlining the elements of the CIT model in other jurisdictions.  (See Pritchard Tr. at 40-43.) While not a "formal, testable method," this is the type of approach often used by police practices experts and accepted by the courts.  Scheiber v. City of Philadelphia, No. CIV. A. 98-5648, 2000 WL 1843246, at *8-9 (E.D. Pa. Dec. 13, 2000) (finding police expert qualified to testify about city's failure to train regarding exigent circumstances for warrantless entry, based on his considerable experience in training officers and in law enforcement generally).

On the other hand, Commissioner Pritchard has very little direct experience with EDPs and has never had professional involvement with evaluating police interactions with EDPs or establishing policies or procedures with respect to EDPs specifically.  As a patrol officer in the 1960's, Commissioner Pritchard did respond to calls involving EDPs, which required some training in human behavior.  (Pritchard Tr. at 9, 33, 35, 76.)[10]  In addition, during his tenure with

_____

[10] Commissioner Pritchard could not recall how many EDPs he encountered as a patrol officer or detective, but he estimated that it was approximately 300 to 400.  (Pritchard Tr. at 82.)
(continued...)

the FBI's New York division, from approximately 1983 to 1987, Commissioner Pritchard was coordinator of the hostage negotiating unit, prior to which he received training in various aspects of hostage negotiating, including establishing a rapport with the hostage taker. (Id. at 23-27). Furthermore, as First Deputy Police Commissioner of the N.Y.P.D., from 1992 to 1993, Commissioner Pritchard had occasion to analyze the use of force in situations where someone was killed, shot or seriously injured. (Id. at 76.)[11] However, the bulk of his experience has been in the areas of labor racketeering, organized crime and domestic terrorism. (Id. at 11-19.) Commissioner Pritchard has conducted and overseen training for law enforcement personnel (id. at 57-58), but none of that training concerned interactions with EDPs. (Id. at 57, 84.)

Although Memphis has had a CIT program since 1988, Commissioner Pritchard conceded that he was not aware of any CIT program until after he retired from law enforcement. (Id. at 79.) Thus, he has never recommended implementation of a CIT program, or components of such a program, in any of his professional positions. (Id. at 78-79.) In fact, Commissioner Pritchard first learned of CIT programs when plaintiff retained him as an expert in this lawsuit. (Id. at 80.) He testified that his opinion as to the success and effectiveness of the Memphis CIT program was based largely on a telephone conversation with Sam Cochran, one of the founders of the Memphis CIT program, although he did not speak with Mr. Cochran prior to preparing his expert report. (Id. at 104, 183.)

---

[10](...continued)
Of those, he could only recall one violent incident (id. at 83), and he could not recall ever having been faced with deadly force by an EDP. (Id. at 229.)

[11] Commissioner Pritchard conceded that when he was First Deputy Commissioner of the N.Y.P.D. he made no effort to change the N.Y.P.D.'s policies or practices with respect to EDPs. (Pritchard Tr. at 245-46.)

Plaintiff argues that Commissioner Pritchard need not conduct any statistical analysis in order to opine that elements of the CIT model are transferable to New York City and would be preferable to the systems and policies presently in place.[12]  She contends that Commissioner Pritchard's thirty-four years in law enforcement have provided him with sufficient expertise to render these opinions.  (See id. at 172-73.)  As the police defendants stress, however, the crux of Commissioner Pritchard's opinion is that EDP-related programs in other police jurisdictions, including CIT programs, are more effective at reducing or avoiding death and injury to EDPs than the N.Y.P.D.'s alleged practices.  To be sure, Commissioner Pritchard's extensive law enforcement experience is impressive, but contrary to plaintiff's assertion, it does not make him an expert in this specific area and it does not give him the appropriate tools to compare the elements of CIT programs or other models with the ESU units used in New York City.  Other than having read the information in the materials that plaintiff's

_____

[12]  At the Daubert hearing, plaintiff's counsel repeatedly argued that Commissioner Pritchard's report does not attempt to establish a direct cause and effect between the N.Y.P.D.'s failure to institute a CIT program and Kevin Cerbelli's death.  According to plaintiff, Commissioner Pritchard  simply seeks to explain that "there are ways that you can enhance and increase response time and having officers that are trained and equipped to deal with emotionally disturbed persons" and that "[t]he City of New York has really chosen to diminish the value of the lives of [EDPs] by not devoting the resources and training that they're aware of to enhance[] and improv[e] response time."  (Pritchard Tr. at 204.)  It is true that in his report, Commissioner Pritchard merely describes the CIT programs in other jurisdictions as "different" from the N.Y.P.D.'s policies, which he claims are flawed.  Nonetheless, Commissioner Pritchard discusses CIT programs in his report and states that the N.Y.P.D. has rejected the CIT model, immediately before opining that the N.Y.P.D.'s policies will predictably cause unnecessary harm to EDPs.  He also testified at the Daubert hearing that "[a]ll of these other models in some fashion are superior to the methodology that's used in New York" (Id. at 244), and he agreed that it was his conclusion that a CIT program in New York City would have prevented Kevin Cerbelli's death.  (Id. at 77.  See also id. at 98 (testifying that "perhaps if [the CIT] model had been in existence, we would not be here today."))  A reasonable fact-finder could interpret those statements as suggesting a but-for cause or making a direct comparison between the programs in other jurisdictions and the N.Y.P.D.'s approach.

counsel provided, none of which he attempted to verify independently (id. at 126),

Commissioner Pritchard has no specific background in police practices or policies concerning

EDPs.[13] Nor is Commissioner Pritchard qualified to opine that it is "predictable that when

[N.Y.P.D.] officers encounter an EDP who is dangerous, the encounter will be mismanaged and

people will be unnecessarily harmed" or that "[t]he EDP policies and practices of [the N.Y.P.D.]

were a proximate cause of Kevin Cerbelli's death." Since Commissioner Pritchard does not have

a significant background in police practices as they concern EDPs, these opinions are not

sufficiently reliable to be admitted under Daubert.

      The police defendants also take issue with Commissioner Pritchard's opinions

concerning the effects of certain police practices on EDPs. Specifically, the police defendants

object to the following statements in Commissioner Pritchard's report:

> *Allowing and encouraging police officers to surround an EDP in crisis, with weapons drawn, while shouting commands at the EDP is a recipe for disaster. The EDP is likely to be frightened or made more anxious, and the risk of cross-fire is enormous . . . . Officers will already be stressed while interacting with an EDP in crisis; standing in a circle with weapons drawn will only make this worse. Increasing the danger for everyone by encircling the EDP with weapons drawn has a negative impact on safety for the EDP. . . . This policy of encirclement causes the situation to escalate, creates anxiety and fear for the EDP and officers, and exacerbates the danger in EDP situations. The policy contributed to the incident in question and the death of Kevin Cerbelli and should not be allowed to continue.*

> *Additionally, the officers confronting an EDP are allowed to yell at the EDP, and to engage in simultaneous shouting from many officers. The witnesses for the*

---

[13] Plaintiff cites Busch v. City of New York, 224 F.R.D. 81, 91-92 (E.D.N.Y. 2004), as a case in which a police procedures expert was permitted to testify at trial about police officers' training in dealing with EDPs. That decision provides no information concerning the expert's background or experience. At any rate, the expert apparently did not attempt to compare the N.Y.P.D.'s training with that provided in other jurisdictions. Busch is therefore of little relevance here.

> *City confirm this police behavior is within EDP policy. This is an extremely*
> *irrational and dangerous policy, and is counterproductive. Like encircling the*
> *EDP, shouting at him will lead to more anxiety and fear, and it is not reasonable*
> *to expect an EDP to respond reasonably to shouting commands. Notably, even in*
> *a hostage situation, which is different from a situation with a person who is*
> *mentally impaired, it is recommended that only one officer should speak one-on-*
> *one with the hostage taker, calmly and without shouting commands. This EDP*
> *policy that allows multiple officers to shout commands at an EDP also*
> *foreseeably contributed to the death of Kevin Cerbelli.*

(Rabinowitz Decl., Ex. C at 5-6.)

The police defendants object to these opinions on the ground that Commissioner Pritchard is not a psychologist and has no background or expertise in the field of mental illness. Plaintiff counters that Commissioner Pritchard has extensive training as a "street psychologist" and that his law enforcement background has provided him with substantial experience in assessing human behavior. She argues that these statements are based on Commissioner Pritchard's "common sense observations" as a police officer and law enforcement official.

It is true that Commissioner Pritchard's only direct experience with EDPs dates back approximately thirty years, and that he has no formal education or training concerning mental illness, other than a bachelors degree in behavioral science, which included one course in abnormal psychology. (Pritchard Tr. at 221.) Commissioner Pritchard also conceded at the Daubert hearing that he has no more than a lay persons's understanding of how EDPs with different types of mental illnesses, such as multiple personality disorder, depression or schizophrenia, might react to different types of stimuli. (Id. at 228.)

On the other hand, the court is mindful of the Supreme Court's direction to employ a flexible standard in evaluating expert opinions and to allow expert testimony that is grounded in personal knowledge and experience. See Kumho Tire, 526 U.S. at 150, 152.

Commissioner Pritchard has significant experience in assessing police policies in a variety of contexts and exhibits an understanding of effective crisis response and de-escalation that is derived both from his direct interactions with people in the field and from his high-level positions in law enforcement. He has meaningful experience in analyzing the use of force and in developing and implementing police procedures and policies designed to reduce crime and protect the safety of the public. As plaintiff points out, all of this experience has provided Commissioner Pritchard with broad knowledge of human behavior, institutional management, and law enforcement policy evaluation.

With this background, I find Commissioner Pritchard qualified to opine about what he describes as a "policy of encirclement" and "simultaneous shouting" at dangerous EDPs. His professional opinion that these techniques are likely to cause an EDP to experience fear and anxiety, to create the risk of cross-fire, and to cause the situation to escalate and become more dangerous for all involved are not speculative, but are based on his years of experience in law enforcement. That Commissioner Pritchard has no specific expertise in the field of mental illness is fair ground for cross-examination, as are the other points raised by the police defendants. See Daubert, 509 U.S. at 596 ("[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence"); Amorgianos v. Nat'l R.R. Passenger Corp., 303 F.3d 256, 267 (2d Cir. 2002) ("[O]ur adversary system provides the necessary tools for challenging reliable, albeit debatable, expert testimony.").

I do, however, have concerns about Commissioner Pritchard's conclusions that the purported policies of encirclement and shouting with multiple voices foreseeably contributed

to Kevin Cerbelli's death. Although Commissioner Pritchard can testify, based on his extensive experience, that he believes these tactics are likely to increase the risk of death or injury to EDPs or others in general, he presents no reliable basis for opining that these purported policies did contribute to the decedent's death in this particular case, or that the police defendants could or should have foreseen that outcome. See, e.g., Stasior v. Nat'l R.R. Passenger Corp., 19 F. Supp. 2d 835, 853 (N.D. Ill. 1998) (expert opinion as to foreseeability that plaintiff would develop carpal tunnel syndrome was not reliable under Daubert). In other words, these conclusions are based only on "subjective belief or unsupported speculation." Daubert, 509 U.S. at 590. Moreover, these are tantamount to legal conclusions, and the law in the Second Circuit is clear that although an expert may provide an opinion to help the jury or the judge understand a particular fact, the expert may not offer testimony stating ultimate legal conclusions based on those facts. Hygh v. Jacobs, 961 F.2d 359, 363 (2d Cir. 1992) (citations omitted). See also United States v. Duncan, 42 F.3d 97, 101 (2d Cir. 1994) ("When an expert undertakes to tell the jury what result to reach, this does not aid the jury in making a decision, but rather attempts to substitute the expert's judgment for the jury's.") United States v. Bilzerian, 926 F.2d 1285, 1294 (2d Cir. 1991) ("'As a general rule an expert's testimony on issues of law is inadmissible'" because the expert may not usurp the role of the jury in applying the law to the facts before it), overruled on other grounds, United States v. Mandanici, 205 F.3d 519 (2d Cir. 2000); Schieber, 2000 WL 1843246, at * 8 (precluding police practices expert from testifying that the City's failure to train its police caused a violation of the victim's constitutional rights). Whether or not Kevin Cerbelli's death was a foreseeable consequence of these purported policies is a

determination that is properly within the province of a fact-finder.[14]

        In short, the police defendants' motion with respect to Commissioner Pritchard is granted in part and denied in part. The sections of his report concerning CIT programs in other jurisdictions are precluded under <u>Daubert</u>, as are his conclusions that the purported N.Y.P.D. policies of encirclement and shouting with multiple voices foreseeably contributed to Kevin Cerbelli's death.

**CONCLUSION**

        For the reasons stated above, the police defendants' motion to preclude portions of the reports and testimony of Katherine Falk, M.D and John Pritchard III are granted in part and denied in part.

        SO ORDERED.

Dated: Brooklyn, New York
      September 27, 2006

                               /s/
                        ROBERT M. LEVY
                        United States Magistrate Judge

---

[14] This assumes the court finds a triable issue of material fact on this claim. At this point, the court takes no position on that question.