UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------X
LORETTA M. CERBELLI, as
ADMINISTRATRIX of the Estate of KEVIN
E. CERBELLI, deceased,

                              Plaintiff,

        -against-

THE CITY OF NEW YORK, THE NEW                           REPORT AND
YORK CITY POLICE DEPARTMENT,                            RECOMMENDATION
POLICE OFFICERS JAMES WILLIAMS,
PAUL VALDES, ROBERT EHMER,
LT. WILLIAM McBRIDE, SGT. MICHAEL                       99 CV 6846 (ARR) (RML)
BARRETO, and other yet to be identified
POLICE OFFICERS of THE CITY OF
NEW YORK POLICE DEPARTMENT,
THE NEW YORK CITY HEALTH AND
HOSPITALS CORPORATION, ELMHURST
HOSPITAL, MARY LOU PUERTOLLANO, M.D.,
MUKUNDAM VEERBATHANI, M.D.,
SANTHI S. RATAKONDA, M.D., ANTHONY
BOUTIN, M.D., JOHN DOE, M.D., MOUNT
SINAI SERVICES, and MOUNT SINAI
SCHOOL OF MEDICINE CITY UNIVERSITY
OF NEW YORK, INC.,

                              Defendants.
-------------------------------------------------------X

LEVY, United States Magistrate Judge:

            By order dated February 6, 2002, the Honorable Allyne R. Ross, United States

District Judge, referred all dispositive motions in the above-captioned case to me for Report and

Recommendation.  Plaintiff Loretta Cerbelli ("plaintiff"), as administratrix of the estate of Kevin

E. Cerbelli ("Cerbelli"), commenced this action in October 1999 pursuant to 42 U.S.C. § 1983

and state law.  She alleges that defendant police officers Robert Ehmer ("Ehmer"), James

Williams ("Williams"), Paul Valdes ("Valdes"), Lieutenant William McBride ("McBride"), and

Sergeant Michael Barreto ("Barreto") (collectively, "police officer defendants") killed Cerbelli

using excessive force in violation of his Fourth Amendment rights.[1]  (Complaint, dated Oct. 21,

1999 ("Compl."), ¶¶ 27-31.)  Plaintiff also challenges Barreto, McBride, and the City of New

York's ("the City"; together with police officer defendants, "municipal defendants") policies and

practices governing the New York City Police Department's ("NYPD") training, policies, and

practices for dealing with dangerous emotionally disturbed persons ("EDPs").[2]  (Compl. ¶¶ 40-

44.)  In addition, plaintiff asserts claims against police officer defendants for negligence and

assault and battery under New York law.  (Compl. ¶¶ 46-52.)  Finally, plaintiff seeks wrongful

death damages against municipal defendants.[3]  (Compl. ¶¶ 70-72.)  Municipal defendants now

move for summary judgment pursuant to Federal Rule of Civil Procedure 56(c).[4]  Briefing was

completed on January 25, 2008, and I heard oral argument on April 11, 2008.  For the reasons

given below, I respectfully recommend that municipal defendants' motion for summary

judgment be granted in part and denied in part.

_____

[1] Initially, plaintiff also brought suit pursuant to the Fourteenth Amendment (see Complaint, dated Oct. 21, 1999 ("Compl."), ¶ 28), although she conceded during oral argument that she has no actionable claim under the amendment.  (Oral Argument Transcript, dated Apr. 10, 2008 ("Tr."), at 4:17-21.)

[2] While plaintiff originally directed these claims against the NYPD (see Compl. ¶¶ 40-44), she now concedes that the agency is immune from suit.  (Tr. 134:21-23.)

[3] Plaintiff's complaint also alleges that unnamed police officers violated Cerbelli's Fourth Amendment rights when, after his death, they entered his apartment without a warrant or probable cause, destroyed his property, and removed several items without permission or authority.  (Compl. ¶¶ 33-38.)  However, plaintiff withdrew these claims during oral argument. (Tr. 134:12-20, 135:5-10.)

[4] The court will address plaintiff's claims against New York City Health & Hospitals Corporation, Elmhurst Hospital, Mukundam Veerbathani, M.D., Santhi S. Ratakonda, M.D., Anthony Boutin, M.D., Mount Sinai Services, and Mount Sinai School of Medicine City University of New York, Inc., in a separate summary judgment motion.

On December 31, 1988, his twenty-first birthday, Kevin Cerbelli was hospitalized after exhibiting compulsive and delusional behavior, and verbally and physically abusing his family. (Declaration of Jennifer Rossan, dated June 14, 2007 ("Rossan Decl."), Ex. J (50-H Hearing of Loretta M. Cerbelli, dated Oct. 14, 1999 ("Pl. Hr'g")), at 14:17-17:24, 25:10-15.) Doctors soon diagnosed him with paranoid schizophrenia. (See Pl. Hr'g 166:4-7; Declaration of Amanda Masters, dated Aug. 31, 2007 ("Masters Decl."), Ex. V at 132.) Over the next decade, Cerbelli was hospitalized repeatedly due to his psychiatric problems. (See Masters Decl. Ex. V at 131. See generally Pl. Hr'g 14:6-104:3.)

On the evening of October 25, 1998, police officers Williams, Valdes, Ehmer, Barreto, and McBride were on duty inside the NYPD's 110th precinct in Queens, New York. That night, Cerbelli, high on cocaine (see Masters Decl. Ex. V at 103, 110, 119, 129, 521, 528), entered the precinct with a knife[5] and made two forceful contacts with Barreto in the back.[6]

---

[5] It is disputed whether the Cerbelli wielded a screwdriver along with the knife, two knives, or just a screwdriver during the course of these events. (Compare Rossan Decl. Exs. C (Deposition of Michael Barreto, sworn to Oct. 24, 2000 ("Barreto Dep.")), at 41:21-42:2, D (Deposition of James Williams, sworn to Oct. 18, 2000 ("Williams Dep.")), at 44:5-6, E (Deposition of Robert Ehmer, sworn to Oct. 25, 2000 ("Ehmer Dep.")), at 73:18-23, 74:16-19, F (Deposition of Paul Valdes, sworn to Oct. 19, 2000 ("Valdes Dep.")), at 56:4-19, G (Deposition of William McBride, sworn to Oct. 20, 2000 ("McBride Dep.")), at 90:12-91:4, H (Deposition of Eric Shanley, sworn to Oct. 10, 2000 ("Shanley Dep.")), at 88:5-89:2, with Masters Decl. Ex. W (Interview by Peter Reese & Patricia Malloy, Assistant Dist. Att'ys, with Edgar Lopez, in Queens, N.Y. (Oct. 26, 1998) ("Lopez Interview")) at 28-29.) Police reports indicate that a knife and a screwdriver were found at the scene, although the subsequent fate of the screwdriver is unknown. (See Masters Decl. Ex. V at 99-100, 472-73, 522.) To preserve narrative consistency, I will assume that Cerbelli only held a knife, unless witnesses specify otherwise.

[6] Descriptions of the contact that Cerbelli made with Barreto vary widely. (See, e.g., Barreto Dep. 34:15-24 (stating that Cerbelli made physical contact with Barreto's upper back

(continued...)

According to Barreto, it felt as if someone slapped him "real hard," causing him to move "forward a little bit."  (Rossan Decl. Ex. C (Deposition of Michael Barreto, sworn to Oct. 24, 2000 ("Barreto Dep.")), at 34:15-37:6, 53:4-7.)  He further testified that it felt "like somebody punched [him] in [his] back, a big boom. . . . A strong hit, very hard."  (Barreto Dep. 35:14-20.)  Barreto suffered no injuries, possibly because Cerbelli did not use his weapon or because Barreto was wearing a bulletproof vest.[7]

---

[6](...continued)
and that contact felt like "real hard" slap), 111:12-14 (stating that Barreto saw small puncture wound in his shirt and bulletproof vest after incident); Ehmer Dep. 66:7-16, 73:12-15 (stating that Cerbelli made stabbing motion with his right hand toward Barreto's back multiple times); Shanley Dep. 80:3-5, 81:7-25 (stating that Cerbelli stabbed Barreto in back multiple times); Lopez Interview 14-16 (stating that Cerbelli thrust knife at Barreto); Masters Decl. Ex. AA (Declaration of Thomas A. Kubic, dated Feb. 8, 2005 ("Kubic Decl.")), ¶ 8 (concluding that "[t]here is no forensic evidence that [Cerbelli] or anyone else stabbed Sgt. Michael Baretto [sic] . . . with a screwdriver, knife or any other sharp object during the incident in question.").  Perhaps most vividly, Valdes recalls that Cerbelli

> was striking the sergeant [Barreto] . . . repeatedly like taking turns with each hand. . . . [H]e was alternating once with the left side and once with the right side in his back . . . . [a]t least eight times . . . . It was alternating like one/one, one/one, one/one, right/left, right/left, right/left . . . . He was trying to stick these objects into Sergeant Baretto [sic] with as much force as I think he could muster.  Saying the word stabbing doesn't even do it justice because a stab is like a poke.  This was not a poke.  It was like he was trying to disembowel Sergeant Barreto . . . . I mean, the knife was bending because it was hitting him in the back and the knife was bending, I mean, if you have ever seen something about this long bending almost in half and then coming back, that is how much force he was putting, you know.

(Valdes Dep. 58:17-61:10; see Valdes Dep. 56:8-19, 57:21-58:16.)

[7] It appears that all police officer defendants apart from Williams were wearing bulletproof vests.  (Compare Masters Decl. Ex. V at 72 (NYPD report stating that police officer defendants all "were wearing their Department issued bulletproof vests" during incident), with Williams Dep. 24:18-20.)

Most police officers present quickly identified Cerbelli as an EDP due to his abnormal behavior and incoherent screaming. (See Barreto Dep. 36:10-17, 42:11-13, 57:15-17; Rossan Decl. Exs. D (Deposition of James Williams, sworn to Oct. 18, 2000 ("Williams Dep.")), at 43:24-44:24, G (Deposition of William McBride, sworn to Oct. 20, 2000 ("McBride Dep.")), at 92:8-17, H (Deposition of Eric Shanley, sworn to Oct. 10, 2000 ("Shanley Dep.")), at 89:5-19. But see Rossan Decl. Ex. E (Deposition of Robert Ehmer, sworn to Oct. 25, 2000 ("Ehmer Dep.")), at 83:6-8.) To establish control over the situation, police officer defendants repeatedly ordered him to drop his weapons, but he did not comply. (Barreto Dep. 42:17-23; McBride Dep. 100:18-101:3; Williams Dep. 63:14-24; see Ehmer Dep. 79:11-13; Shanley Dep. 95:15-21, 96:22-97:3; Masters Decl. Ex. W (Interview by Peter Reese & Patricia Malloy, Assistant Dist. Att'ys, with Edgar Lopez,[8] in Queens, N.Y. (Oct. 26, 1998) ("Lopez Interview")) at 18.) According to some accounts, Cerbelli proceeded to pace around the precinct brandishing his weapon, while others stated that he remained still. (Compare Rossan Decl. Ex. F (Deposition of Paul Valdes, sworn to Oct. 19, 2000 ("Valdes Dep.")), at 83:7-85:23; Barreto Dep. 47:17-48:10, 61:11-12; McBride Dep. 92:3-7, 97:5-12, 103:4-9, 109:5-12; Shanley Dep. 84:4-5, 86:21-24; Lopez Interview at 18-19, with Williams Dep. 64:24-65:5.) Many witnesses also stated that he continued to scream during this period. (See Barreto Dep. 48:11-14, 21-23 (testifying that Cerbelli screamed "shoot me, shoot me" repeatedly); Ehmer Dep. 82:10-12 (recalling that Cerbelli shouted something like, "go ahead and shoot me, I want you to kill me, shoot me");

---

[8] When Cerbelli entered the precinct, civilian Edgar Lopez ("Lopez") was in the holding area, a room adjacent to the lobby, behind Valdes and Ehmer. Earlier that evening, officer Eric Shanley arrested him for disorderly conduct when Lopez became angry after receiving a parking summons. (Shanley Dep. 49:13-50:19.)

McBride Dep. 103:7-9 (stating that Cerbelli continued to yell incoherently).  But see Williams

Dep. 67:20-22 (testifying that he did not recall Cerbelli making any vocalizations).)

Nevertheless, all agree that Cerbelli eventually backed himself further into the building.

       While attempting to take cover to avoid the crossfire that he feared would erupt

because of the escalating situation, McBride found a Taser on a desk and fired it into Cerbelli's

back.  (McBride Dep. 110:9-14, 111:4-17; Barreto Dep. 61:12-18, 66:18-20; Williams Dep.

74:6-7, 75:12-24; Shanley Dep. 92:6-9, 93:10-12.)  Though the Taser made contact with and

temporarily stunned Cerbelli, he quickly recovered and began moving around the precinct again.

(See Williams Dep. 78:14-18; Barreto Dep. 82:24-83:3, 84:12-21; McBride Dep. 143:17-145:25;

Ehmer Dep. 101:5-12, 102:12-19, 103:19-25; Valdes Dep. 112:4-13; Shanley Dep. 95:15-21.)

Cerbelli continued to demand that the police officers "shoot him."[9]  (Barreto Dep. 82:24-83:3.)

       At this point, witnesses' recollections, particularly those of the police officers

who shot Cerbelli, diverge.  Because these accounts lie at the heart of the contested issues in the

current motion, I have related the narrative of each shooter individually and indicated the support

or disagreement that others' testimony provides in the citations.

### A. The Account of Officer Valdes

       Immediately after McBride used the Taser against Cerbelli, Valdes – alone among

the witnesses – recalls that Cerbelli ran toward officer Robert Consalvo ("Consalvo") carrying a

---

[9] Plaintiff's assertion that Cerbelli remained silent is unconvincing, since the evidence to
which plaintiff cites details only the moments following Cerbelli's entry into the precinct and
does not account for witnesses' testimony to the contrary.  (Compare Plaintiff's Counter-
Statement of Disputed Facts Pursuant to Local Civil Rule 56.1, dated Aug. 31, 2007 ("Pl.'s Rule
56.1 Statement"), ¶ 9, with Barreto Dep. 82:24-83:3; Valdes Dep. 62:20-22; Lopez Interview at
21.)

knife and a screwdriver, with his arms raised to eye level and his elbows bent in an attack

position. (Valdes Dep. 108:2-17, 112:4-6, 9-25, 117:19-21; Masters Decl. Ex. W (Interview by

Peter Reese & Patricia Malloy, Assistant Dist. Att'ys, with police officer Paul Valdes, in

Queens, N.Y. (Sept. 14, 1999) ("Valdes Interview")) at 6. Contra Barreto Dep. 84:8-11, 91:6-

13, 91:24-92:3, 93:9-15, 94:24-95:5; Williams Dep. 78:14-18, 79:12-14, 80:9-13; Ehmer Dep.

103:19-25, 104:20-105:14, 105:23-106:10, 108:7-9, 109:6-8; McBride Dep. 145:22-146:14;

Masters Decl. Ex. W (Interview by Peter Reese & Patricia Malloy, Assistant Dist. Att'ys, with

police officer Robert Ehmer, in Queens, N.Y. (Sept. 14, 1999) ("Ehmer Interview")) at 40;

Masters Decl. Ex. W (Interview by Peter Reese & Patricia Malloy, Assistant Dist. Att'ys, with

Sgt. Michael Barreto, in Queens, N.Y. (Sept. 14, 1999) ("Barreto Interview")) at 9; Masters

Decl. Ex. W (Interview by Peter Reese & Patricia Malloy, Assistant Dist. Att'ys, with police

officer Robert Consalvo, in Queens, N.Y. (Sept. 14, 1999) ("Consalvo Interview")) at 68.)

Cerbelli came within three to five feet of Consalvo, wielding the knife and screwdriver in a

"downward stab motion." (Valdes Dep. 112:16-21.) Valdes, purportedly fearing for Consalvo's

life, fired his gun once at Cerbelli. (Valdes Dep. 112:15-25; Valdes Interview at 5-6.) Valdes

asserts that this shot was the first of the eight fired that evening. (Valdes Dep. 116:24-117:3,

122:5-8.)

    Cerbelli then turned and began running toward Valdes, "waving" his weapons

around and leading Valdes to believe that Cerbelli would stab him. (Valdes Dep. 117:5-8,

118:9-11, 119:6-25, 122:10-13; Valdes Interview at 6.) As Valdes tried to back away from

Cerbelli, he fired a second shot. (Valdes Dep. 117:5-8, 119:9-14, 122:10-13; Valdes Interview at

6.) Valdes then stumbled and fell onto his back as Cerbelli continued to approach him. (Valdes

Dep. 134:6-9; <u>see</u> Barreto Dep. 103:21-23; Valdes Interview at 6-8.)  Cerbelli then stood directly over Valdes making stabbing gestures, so Valdes fired a third time, after which Cerbelli rushed toward Ehmer at "full speed."  (Valdes Dep. 135:5, 135:10-25, 138:13-22, 142:21-24; Valdes Interview at 8.)

Valdes believes that at this point Williams fired his weapon at Cerbelli.  (Valdes Dep. 148:13-20; 150:13-16; Valdes Interview at 8.)  Nevertheless, Cerbelli continued toward officer Ehmer.  Although Valdes could no longer see Ehmer, he knew that Ehmer had fallen onto his back because he could see Ehmer's boots.  (Valdes Dep. 150:21-151:5.)  Cerbelli reached Ehmer and stood over him making stabbing motions, so Valdes fired a fourth shot at him, after which Cerbelli "just dropped."  (Valdes Dep. 151:8-16; Valdes Interview at 8-9, 10; <u>see</u> Ehmer Dep. 116:8-16.)

### B. The Account of Officer Ehmer

According to Ehmer, when the Taser's effects subsided, Cerbelli "charged" toward him and Valdes, carrying his weapon at shoulder level with his arms slightly bent. (Ehmer Dep. 103:19-25, 104:20-105:14, 105:23-106:10, 108:7-9, 109:6-8, 134:15-23; Ehmer Interview at 40; <u>accord</u> Barreto Dep. 62:5-22, 91:6-13, 91:24-92:3, 93:9-15; Barreto Interview at 9; Williams Dep. 78:14-18, 79:12-14, 80:9-13; McBride Dep. 145:22-146:14; <u>see</u> Valdes Dep. 117:5-8, 118:9-11, 119:5; Consalvo Interview at 68.  <u>Contra</u> Valdes Dep. 112:4-6, 112:9-25, 117:19-21.)  In response, Ehmer retreated with his gun in one hand pointed at Cerbelli and mace in the other.  (Ehmer Dep. 106:23-107:3, 107:22-108:6, 110:17-20; <u>accord</u> Williams Dep. 81:3-11.)  When Cerbelli came within about eight feet of Ehmer, Ehmer fired a single round at Cerbelli.  (Ehmer Dep. 106:23-25, 108:7-12, 108:22-24.)  Ehmer recalls that he and Valdes, who

"was pretty much on [Ehmer's] left side the entire time" (Ehmer Dep. 112:2-5), began firing nearly simultaneously.  (Ehmer Dep. 110:7.  But see Valdes Dep. 116:24-117:3, 122:5-8.) Cerbelli continued his approach, so Ehmer continued to move backward and fired his gun again. (Ehmer Dep: 112:18, 113:4-9; see Williams Dep. 96:2-8.)  Ehmer then tripped as he continued his retreat.  Because the shots failed to halt Cerbelli, who now stood four to five feet from Ehmer, Ehmer fired a third time to protect himself.  (Ehmer Dep. 113:4-12, 115:14-15; see Williams Dep. 94:5-6.)  After falling on his back, Ehmer believed that Cerbelli would stab him, but Cerbelli suddenly collapsed at his feet.  (Ehmer Dep. 116:8-11; accord Valdes Dep. 150:21-151:5, 151:8-16; see also Williams Dep. 107:20-23.)  Ehmer discharged his gun three times in all.  (Ehmer Dep. 111:20-21.)

### C. The Account of Officer Williams

According to Williams, after Cerbelli was Tasered, Cerbelli yelled incoherently and ran toward Ehmer holding a knife and screwdriver.  (Williams Dep. 78:14-21,79:14, 80:9-13; accord Barreto Dep. 62:5-22, 91:6-13, 91:24-92:3, 93:9-15; Ehmer Dep. 103:19-25, 104:20-105:14, 105:23-106:10, 108:7-9, 109:6-8; Consalvo Interview at 68; see Valdes Dep. 117:5-8, 118:9-11, 119:5.  Contra Valdes Dep. 112:4-6, 112:9-25, 117:19-21.)  From his location, Williams saw Ehmer back away from Cerbelli with his gun pointed at Cerbelli as Cerbelli approached Ehmer.  (Williams Dep. 85:13-20, 88:2-23; accord Ehmer Dep. 107:3.)  Williams then drew his firearm and trained it on Cerbelli, because he feared for Ehmer's safety.  (Williams Dep. 89:6-18, 91:18-25, 92:10-25, 93:2-9.)  Willams believes that as Ehmer retreated, Ehmer tripped over a concrete slab or threshold dividing the lobby area from an adjacent hallway. (Williams Dep. 94:5-25.)  While Williams saw Ehmer stumble backward, he did not see him fall

-9-

to the ground.  (Williams Dep. 95:2-23.)  Cerbelli, however, moved closer to Ehmer's apparent

position, leading Williams to believe Ehmer's life to be in danger.[10]  (Williams Dep. 106:24-25.)

When Cerbelli reached a distance of two to four feet from Ehmer, Williams fired his weapon

once at Cerbelli, after which Cerbelli fell to the ground.  (Williams Dep. 93:25-94:3, 107:22-23;

see Valdes Dep. 148:13-20, 150:13-16; Ehmer Dep. 113:4-12, 115:14-15.)  Williams believes

that all of the police officers' shots were fired at or around the same time.  (Williams Dep. 102:9-

14; accord McBride Dep. 149:19-21; Shanley Dep. 106:19-107:10; Barreto Interview at 12, 20;

Consalvo Interview at 64.)

*     *     *

Having suffered five bullet wounds, four of which perforated his body, Cerbelli

died.  (Masters Decl. Ex. V at 87, 520-25.)  Plaintiff, as the administratrix of his estate, brought

suit in this Court on October 22, 1999, claiming, *inter alia*, that police officer defendants killed

Cerbelli by using excessive force in violation of his Fourth Amendment rights; that the policies

and practices of the City, the NYPD, Sgt. Barreto, and Lt. McBride governing police interactions

with EDPs promote constitutional rights violations; and that municipal defendants acted

negligently and committed assault and battery against Cerbelli.  (Compl. ¶¶ 1, 27, 51-53.)

Municipal defendants now move for summary judgment.

### STANDARD FOR SUMMARY JUDGMENT

A court shall grant summary judgment if "there is no genuine issue as to any

material fact and . . . the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

---

[10] Though plaintiff maintains that Williams never "believed Ehmer's life was in danger" (Pl.'s Rule 56.1 ¶ 16), Williams explicitly stated otherwise.  (Williams Dep. 106:24-25.)

56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  When deciding a summary

judgment motion, the court must view the evidence in the light most favorable to the non-

moving party and decide only whether there is any genuine issue to be tried.  Eastman Mach. Co.

v. United States, 841 F.2d 469, 473 (2d Cir. 1988).  "[T]he court is not to weigh the evidence, or

assess the credibility of the witnesses, or resolve issues of fact . . . . Resolutions of credibility

conflicts and choices between conflicting versions of the facts are matters for the jury, not for the

court on summary judgment."  United States v. Rem, 38 F.3d 634, 644 (2d Cir. 1994) (internal

citations omitted).  However, "[w]hen opposing parties tell two different stories, one of which is

blatantly contradicted by the record, so that no reasonable jury could believe it, a court should

not adopt that version of the facts for purposes of ruling on a motion for summary judgment."

Scott v. Harris, 127 S. Ct. 1769, 1776 (2007).  Further, "given the difficult problem posed by a

suit for the use of deadly force, in which the witness most likely to contradict [the  police

officer's] story – the person shot dead – is unable to testify[,] . . . . the court may not simply

accept what may be a self-serving account by the police officer."  O'Bert v. Vargo, 331 F.3d 29,

37 (2d Cir. 2003) (quotation marks & internal citations omitted) (brackets & ellipses in original).

The court "must also consider circumstantial evidence that, if believed, would tend to discredit

the police officer's story, and consider whether this evidence could convince a rational factfinder

that the officer acted unreasonably."  Id. (quotation marks omitted)

        A genuine factual issue exists if, taking into account the burdens of production

and proof that would be required at trial, sufficient evidence favors the non-movant such that a

reasonable jury could return a verdict in that party's favor.  Anderson v. Liberty Lobby, Inc., 477

U.S. 242, 248 (1986).  In other words, there must exist more than "a scintilla of evidence" to

support the non-moving party's claims, id. at 251; "assertions that are conclusory" will not

suffice.  Patterson v. County of Oneida, 375 F.3d 206, 219 (2d Cir. 2004).

DISCUSSION

**I. Plaintiff's Excessive Force Claims Against Police Officer Defendants**

To evaluate an excessive force claim brought pursuant to § 1983, the court first

must identify the specific constitutional right allegedly infringed and then assess the claim "by

reference to the specific constitutional standard which governs that right."  Graham v. Connor,

490 U.S. 386, 394 (1989).  In this case, the deadly force that police officer defendants used on

Cerbelli to restrain him constitutes a "seizure" under the Fourth Amendment.  See id. at 395

n.10; Tennessee v. Garner, 471 U.S. 1, 7 (1985).  Plaintiff's claim therefore alleges that police

officer defendants violated Cerbelli's right "to be secure . . . against unreasonable . . . seizures."

U.S. Const. amend. IV.  According to the Supreme Court, whether a seizure conforms to Fourth

Amendment standards hinges on the seizure's objective reasonableness.  Graham, 490 U.S. at

395.  Consequently, the court must evaluate the constitutionality of police officer defendants'

use of force against Cerbelli according to the objective reasonableness standard.  County of

Sacramento v. Lewis, 523 U.S. 833, 843 (1998) (citing Graham, 490 U.S. at 395).

To determine the reasonableness of a particular seizure, the court must balance

"'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against

the countervailing governmental interests at stake."  Graham, 490 U.S. at 396 (quoting Garner,

471 U.S. at 8) (quotation marks omitted); accord Scott, 127 S. Ct. at 1778.  Here, the court must

weigh the force that police officer defendants used on Cerbelli against the threat he posed to the

officers or others.  See Garner, 471 U.S. at 11.  In performing this balancing test, "a court must

-12-

examine 'the facts and circumstances of [the] case, including . . . whether the suspect pose[d] an immediate threat to the safety of the officers or others, and whether he [was] actively resisting arrest or attempting to evade arrest by flight.'" Salim v. Proulx, 93 F.3d 86, 91 (2d Cir. 1996) (quoting Graham, 490 U.S. at 396).  Moreover, the court must undertake this examination "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," since "police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving." Graham, 490 U.S. at 396-97 (quotation marks omitted); accord O'Bert, 331 F.3d at 36; Anderson v. Branen, 17 F.3d 552, 560 (2d Cir. 1994).  Ultimately, the question is whether the officers' actions were "objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." Graham, 490 U.S. at 397 (quotation marks omitted); accord Anderson, 17 F.3d at 558, 559.  Police officers will fail the objective reasonableness test only if their conduct was "so deficient that no reasonable officer could have made the same choice" in those circumstances.  Roy v. Inhabitants of the City of Lewiston, 42 F.3d 691, 695 (1st Cir. 1994); accord Thomas v. Roach, 165 F.3d 137, 143 (2d Cir. 1999); see Garner, 471 U.S. at 11 (quoting Malley v. Briggs, 475 U.S. 335, 341 (1986)); O'Bert, 331 F.3d at 37.

> With respect to the use of deadly force,
>
> [w]here the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force.  Thus, if the suspect threatens the officer with a weapon . . . , deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given.

Garner, 471 U.S. at 11-12; accord O'Bert, 331 F.3d at 36; Stevens v. Metro. Transp. Auth. Police Dep't, 293 F. Supp. 2d 415, 420 (S.D.N.Y. 2003).  Crucially, within the Second Circuit,

this inquiry depends "*only* upon the officer's knowledge of the circumstances *immediately* prior to and at the moment that he made the split-second decision to employ deadly force." Salim, 93 F.3d at 92 (emphasis added); accord O'Bert, 331 F.3d at 36-37, 40. "[E]vidence that [the officers] created the need to use [deadly] force by their actions prior to the moment of seizure is irrelevant . . . ." Salim, 93 F.3d at 92 (quoting Schulz v. Long, 44 F.3d 643, 649 (8th Cir. 1995)) (brackets & ellipses in original) (quotation marks omitted).

### A. Police Officers Valdes, Williams, & Ehmer

#### 1. Officer Valdes

Valdes's account of the Cerbelli shooting and those of other witnesses diverge at two crucial points, creating genuine issues of material fact as to the constitutionality of his use of lethal force against Cerbelli.[11] Valdes alone recalls that after recovering from the Taser, Cerbelli ran toward Consalvo and placed Consalvo's life in danger. Moreover, Valdes insists that his perception of this danger to Consalvo prompted him to open fire on Cerbelli. Other accounts, though, indicate that Cerbelli immediately ran toward Ehmer and Valdes after he recovered from the Taser – i.e., away from Consalvo. (See, e.g., Barreto Dep. 84:8-11, 91:6-13, 91:24-92:3, 93:9-15, 94:24-95:3; Williams Dep. 78:14-18, 79:12-14, 80:9-13; Ehmer Dep. 103:19-25, 104:20-105:14, 105:23-106:10, 108:7-9, 109:6-8; McBride Dep. 145:22-146:14; Ehmer

---

[11] Plaintiff stresses that witnesses disagree on the type and number of weapons that Cerbelli carried; as to whether police officer defendants used non-lethal means to restrain Cerbelli; whether the use of a Taser on Cerbelli aggravated him; and whether Cerbelli inflicted injuries on Barreto. (See Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment 15-16.) These factors are immaterial to the evaluation of Valdes's actions because they did not immediately precede Valdes's shooting Cerbelli. The proper inquiry is whether it was objectively reasonable for Valdes to believe himself or another to be in serious physical danger in the moments before he shot Cerbelli. See Salim, 93 F.3d at 92; O'Bert, 331 F.3d at 36-37, 40.

Interview at 40; Barreto Interview at 9; Consalvo Interview at 68; <u>see also</u> Masters Decl. Ex. GG at 3.)  Some record documents even indicate that Valdes once also averred that he saw Cerbelli charge in his direction and not toward Consalvo.  (Masters Decl. Ex. V at 50-51, 53-54.[12])  Construing these facts in the light most favorable to plaintiff, it appears probable that Cerbelli never moved toward, let alone threatened, Consalvo.  If this scenario were true, Valdes would have no objectively reasonable justification to have started shooting Cerbelli, as Valdes did not state that he fired the first shot to protect himself or Ehmer.

Valdes's recollection of the sequence of gun shots also contradicts the accounts of other witnesses, casting doubt on the lawfulness of his shooting Cerbelli.  He insists without reservation that his initial gun discharge, ostensibly fired to protect Consalvo, was the first shot fired that night.  (Valdes Dep. 116:24-117:3, 122:5-8.)  Other officers, however, consistently recall all shots occurring in a single, unparsable burst.  (<u>See, e.g.</u>, Williams Dep. 102:14; McBride Dep. 149:19-21; Shanley Dep. 106:19-107:10; Barreto Interview at 12, 20; Consalvo Interview at 64.)  This discrepancy further undermines the credibility of Valdes's insistence that he shot Cerbelli to protect Consalvo.  If one adheres to Valdes, Ehmer, and Williams's individual accounts of why they opened fire, the seven shots following Valdes's first shot would have occurred only after Cerbelli turned 180 degrees away from Consalvo and traversed the precinct lobby far enough to endanger Valdes and Ehmer, prompting Ehmer and Williams to open fire.

_____

[12] These record documents are firearms discharge and assault reports, NYPD documents that record and evaluate firearms discharges and the circumstances surrounding them.  Of the two documents cited, it is unclear which is Valdes's report.  The first identifies Ehmer as the reporting officer, although Valdes signed it as the reporting officer; the second lists Valdes as the reporting officer, though an officer named Zweigbaum signed as the reporting officer.  Nevertheless, both documents relate an identical narrative for the events surrounding Cerbelli's shooting.

The time that Cerbelli's movements would have taken likely would have created a perceptible gap between the sounds of the first and subsequent firearm discharges, just as Valdes testified. However, that only he recalls this pause in fire reasonably suggests that the above scenario did not occur. In light of others' testimony that all shots occurred together, it is more likely that Cerbelli never moved toward Consalvo and immediately headed toward Valdes and Ehmer after recovering from the Taser. Stated differently, Valdes may not have shot Cerbelli to protect Consalvo because Consalvo was never under threat. Because a jury must address the credibility of Valdes's reason for shooting Cerbelli, I recommend that the court deny summary judgment to Valdes with respect to plaintiff's excessive force claim. See Fed. R. Civ. P. 56(c); Anderson, 477 U.S. at 248; Rem, 38 F.3d at 644.

### 2. Officer Ehmer

When viewed in the light most favorable to plaintiff, the disputes of material fact that preclude summary judgment for Valdes – whether Cerbelli posed a threat to Consalvo and whether police officer defendants discharged their weapons at the same time – impugn Ehmer's role in Cerbelli's shooting as well. Ehmer contends that he and Valdes began shooting almost simultaneously (Ehmer Dep. 110:6-7), and various witnesses lend credence to this assertion. (See, e.g., Williams Dep. 102:9-14; McBride Dep. 149:16-21; Shanley Dep. 106:19-107:10; Barreto Interview at 12, 20; Consalvo Interview at 64.) When viewed in the light most favorable to plaintiff, this assertion exposes material inconsistencies between Valdes and Ehmer's accounts of the events.

As mentioned above, Valdes insists that he shot Cerbelli when Cerbelli lunged toward and threatened Consalvo, while Ehmer maintains that Ehmer fired at Cerbelli only after

Cerbelli charged toward him and Valdes. Because prior to the outbreak of gunfire Cerbelli stood in the middle of the precinct lobby, with Consalvo on one side of him and Ehmer and Valdes on the other, Cerbelli could not reasonably have posed a threat to Consalvo, Ehmer, and Valdes at the same time. Thus, if Valdes and Ehmer started shooting at the same time, as Ehmer insists, Valdes could not have fired to protect Consalvo just as Ehmer fired to protect Valdes and himself; one of their accounts necessarily would be false. The court cannot resolve this factual dispute without a jury and consequently cannot determine satisfactorily the reasonableness of Ehmer's decision to open fire at this time. I therefore recommend that Ehmer also not be granted summary judgment on plaintiff's excessive force claim. See Fed. R. Civ. P. 56(c); Anderson, 477 U.S. at 248; Rem, 38 F.3d at 644.

### 3. Officer Williams

The factual inconsistencies that preclude summary judgment for Valdes and Ehmer do not affect officer Williams. In the moments immediately before Williams fired his gun, Cerbelli, brandishing his weapon in an attacking posture, already had run toward Ehmer,[13] who had tripped and fallen backward onto the ground while retreating. (See Williams Dep. 94:22-25, 107:20-23; Ehmer Dep. 116:8-11; Valdes Dep. 150:21-151:5, 151:8-16.) A reasonable officer undoubtedly could have believed that Ehmer, who now lay exposed on his back with a demonstrably aggressive, armed EDP standing over him, was in immediate danger of serious physical harm. Under such circumstances, it was objectively reasonable for Williams to

---

[13] Apart from plaintiff's conclusory assertions to the contrary (see Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment 18), which the court need not take into account, it is undisputed in the record that Cerbelli ran toward Ehmer holding a weapon in an attacking posture. See Patterson, 375 F.3d at 219 (holding that "assertions that are conclusory" will not suffice to preclude summary judgment).

fire his gun at Cerbelli.  See Garner, 471 U.S. at 11; Roy, 42 F.3d at 695; Stevens, 293 F. Supp.

2d at 418, 421.  Therefore, I recommend that the court grant Williams summary judgment on

plaintiff's § 1983 claim.

### B.  Supervisory Liablity & Failure to Intervene

Although neither Lt. McBride nor Sgt. Barreto shot Cerbelli, plaintiff claims that

they are liable for the excessive force that other officers allegedly used against him.  Generally,

"[a] supervisor may not be held liable under section 1983 merely because his subordinate[s]

committed a constitutional tort."  Poe v. Leonard, 282 F.3d 123, 140 (2d Cir. 2002).

Nevertheless, a supervisory official "may be deemed to have personal involvement" in the use of

excessive force when he

> (1) directly participated in the infraction; (2) failed to remedy the
> wrong even after learning of a violation through a report or appeal;
> (3) created a policy or custom under which unconstitutional
> practices occurred, or allowed such a policy or custom to continue;
> (4) acted in a grossly negligent[14] manner in managing
> subordinates who caused the unlawful condition or event; or (5)
> demonstrated deliberate indifference[15] to the constitutional rights
> of the plaintiff by failing to act on information demonstrating that
> unconstitutional practices were taking place.

Smith v. Police Officer Canine Dog Chas, No. 02-6240, 2004 WL 2202564, at *10 (S.D.N.Y.

Sept. 28, 2004); see Poe, 282 F.3d at 140.  In addition, evidence also must "affirmatively connect

---

[14] Gross negligence, often equated with recklessness in the Second Circuit, is "the kind of
conduct . . . where [the] defendant has reason to know of facts creating a high degree of risk of
physical harm to another and deliberately acts or fails to act in conscious disregard or
indifference to that risk."  Poe, 282 F.3d at 140 n.14 (quoting Bryant v. Maffucci, 932 F.2d 979,
985 (2d Cir. 1991)) (quotation marks omitted) (ellipses & brackets in original).

[15] Deliberate indifference "describes a mental state . . . akin to criminal recklessness."
Geyer v. Choinski, No. 07-0190, 2008 WL 190504, at *2 (2d Cir. Jan. 23, 2008) (quotation
marks omitted).

-18-

the supervisor's conduct to the subordinate's violative act or omission."  Poe, 282 F.3d at 134 (quoting Camilo-Robles v. Hoyos, 151 F.3d 1, 7 (1st Cir. 1998) (quotation marks & citation omitted)).

Plaintiff asserts that McBride and Barreto are liable as supervisors for the alleged excessive force violation because they "failed to establish firearms control, as required by the [NYPD] Patrol Guide."  (Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment ("Pl. Opp'n") 22.)  Plaintiff also states, without support or explanation, that McBride's attempt to restrain Cerbelli with a Taser also renders him liable.  (Pl. Opp'n 23.) Both arguments fail.

### 1. Sufficiency of the Pleadings

Defendants note that plaintiff's complaint contains no indication of a claim against McBride or Barreto based upon their failure to establish firearms control, their failure to mitigate the reflexive firing phenomenon, or use of a Taser.  (See Municipal Defendants' Reply Memorandum of Law in Support of Their Motion for Summary Judgment ("Defs. Reply") 19; see also Compl. ¶¶ 39-44.)  Instead, she founds her claim on McBride and Barreto's alleged "policy, practice and custom of deliberate indifference to the rights, lives and liberty of the mentally ill . . . and a failure to properly train, instruct and supervise employee police officers in the care, handling and treatment of the mentally ill."  (Compl. ¶ 40.)

The Supreme Court recently held that "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  Bell Atl. Corp. v. Twombly, 127 S. Ct. 1955, 1964-65 (2007) (quotation marks omitted) (brackets in original).

Soon thereafter, though, the Court reiterated its traditional stance that "[s]pecific facts are not necessary" to comply with Federal Rule of Civil Procedure 8,[16] since a complaint need only "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." Erickson v. Pardus, 127 S. Ct. 2197, 2200 (2007) (quotation marks omitted).  The Second Circuit has interpreted these decisions to mean that the Court "is not requiring a universal standard of heightened fact pleading, but is instead requiring a flexible 'plausibility standard,' which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim *plausible*."  Iqbal v. Hasty, 490 F.3d 143, 157-58 (2d Cir. 2007), cert. granted sub nom., Ashcroft v. Iqbal, 128 S. Ct. 2931 (2008).

Because the arguments that plaintiff now asserts to support her claim have at most a tenuous connection to the claims set forth in the complaint, the complaint does not place McBride and Barreto on sufficient notice of the bases for this claim of supervisor liability.  On the other hand, leave to amend is freely granted under Federal Rule of Civil Procedure 15, and plaintiff could move to amend her complaint to plead this claim with more specificity.  In

---

[16] Rule 8 of the Federal Rules of Civil Procedures states in relevant part that
> A pleading that states a claim for relief must contain:  (1) a short and plain statement of the grounds for the court's jurisdiction, unless the court already has jurisdiction and the claim needs no new jurisdictional support; (2) a short and plain statement of the claim showing that the pleader is entitled to relief; and (3) a demand for the relief sought, which may include relief in the alternative or different types of relief.

Fed. R. Civ. P. 8(a).

addition, McBride and Barreto do not elaborate on how they would be prejudiced by having to respond to this claim on summary judgment. The court will therefore address the merits of this claim.

## 2. Supervisory Liability

Plaintiff's conclusory attempts to impute supervisory liability to McBride and Barreto do not withstand scrutiny. First, it is undisputed that they played no direct role in the alleged use of excessive force against Cerbelli. Second, the nature of the alleged violation, Cerbelli's death due to a rapid hail of bullets, precluded McBride or Barreto from remedying the harm through a "report or appeal." Third, nothing in the record indicates that either officer created a policy or custom that catalyzed the alleged unconstitutional behavior or that either allowed such a policy or custom to continue. Case law even teaches that McBride and Barreto do not rank high enough in the NYPD hierarchy to qualify as individuals responsible for creating policies and customs. See Anthony v. City of New York, 339 F.3d 129, 139 (2d Cir. 2003); see also Pembaur v. Cincinnati, 475 U.S. 469, 481 (1986) (holding that liability "attaches only where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered").

With respect to the fourth and fifth prongs of the supervisory liability test, plaintiff cursorily maintains that McBride and Barreto "failed to establish fire arms control, as required by the [NYPD] Patrol Guide."[17] (Pl. Opp'n 22.) As explained by Captain Michelle Lent ("Lent") of the NYPD, one of defendants' Rule 30(b)(6) witnesses, firearms control aims to

---

[17] The NYPD Patrol Guide contains many of the policies and procedures that "[a]ll NYPD officers, regardless of rank, are taught to follow." (Municipal Defendants' Memorandum of Law in Support of Their Motion for Summary Judgment ("Defs. Mem.") 18.)

ensure that officers do not go in with their weapons when they commence an operation to isolate and contain an individual. (Rossan Decl. Ex. K (Deposition of Captain Michele Lent ("Lent Dep."), dated July 27, 2003), at 17:8-18, 28:3-11.) The NYPD Patrol Guide ("Patrol Guide") states that establishing firearms control requires ranking police officers to "[d]irect members concerned not to use their firearms or use any other deadly physical force *unless their lives or the life of another is in imminent danger*." (Rossan Decl. Ex. M ("Patrol Guide Ex.") at 716 (emphasis added).) If a senior officer is not present or cannot directly establish firearms control due to other circumstances, officers must evaluate the situation and act in accordance with NYPD policy. (See Lent Dep. 28:12-16.)

In her argument, plaintiff fails to note that local agency-established policies, such as the Patrol Guide, do not establish constitutional standards. See Poe, 282 F.3d at 146. Holding otherwise would create varying liability standards in different localities and eviscerate the objective reasonableness test used to evaluate Fourth Amendment claims. See Whren v. United States, 517 U.S. 806, 815 (1996); Thompson v. City of Chicago, 472 F.3d 444, 454 (7th Cir. 2006); Febres v. City of New York, 238 F.R.D. 377, 389 (S.D.N.Y. 2006). Furthermore, the record demonstrates that even though McBride and Barreto did not affirmatively command police officer defendants to implement firearms control (Barreto Dep. 61:2-10, 90:6-91:5; McBride Dep. 147:7-14), firearms control already was in place until the moment before Valdes and Ehmer shot Cerbelli.[18] (Barreto Dep. 121:6-25; McBride Dep. 165:21-166:8, 166:23-167:9; see also McBride Dep. 169:13-170:9.) Finding McBride and Barreto liable for Valdes and

_____

[18] For purposes of this discussion, I assume that Valdes and Ehmer shot Cerbelli first and in an unlawful manner.

Ehmer's sudden breach of firearms control, particularly when McBride and Barreto had no reason to believe that Valdes and Ehmer would use lethal force unreasonably against Cerbelli, would not only impermissibly enshrine NYPD practice within the Fourth Amendment, but would construe the Constitution to require police supervisors to make boilerplate recitations of manual policies during crisis situations for no other purpose than to avoid liability. Because plaintiff has presented no evidence that McBride or Barreto acted with gross negligence or deliberate indifference in managing their subordinates, I recommend that the court grant them summary judgment on plaintiff's supervisory liability claim.

### 3. Failure to Intervene

McBride and Barreto also may be found liable for the alleged § 1983 violation if they (1) "observe[d] or ha[d] reason to know that: . . . excessive force [was] being used . . . [or] that any constitutional violation ha[d] been committed by a law enforcement officer" and (2) had "a realistic opportunity to intervene to prevent the harm from occurring" but failed to intercede. Smith, 2004 WL 2202564, at *9 (citing Anderson, 17 F.3d at 557); see Ricciuti v. N.Y.C. Trans. Auth., 124 F.3d 123, 129 (2d Cir. 1997) (holding that failure to intervene must occur "under circumstances making it objectively unreasonable for [an officer] to believe that his fellow officers' conduct did not" amount to excessive force). "Whether 'an officer . . . was capable of preventing the harm being caused by another officer is an issue of fact for the jury, unless, considering all the evidence, a reasonable jury could not possibly conclude otherwise.'" Smith, 2004 WL 2202564, at *9 (quoting Anderson, 17 F.3d at 557) (ellipses in original).

For this analysis, the court assumes *arguendo* that the first shot fired at Cerbelli qualified as excessive force. Before the shooting, McBride and Barreto had no duty to intervene

because no constitutional violation had occurred.  If the court assumes that they realized or had

reason to know that officers were violating Cerbelli's constitutional rights once Valdes and

Ehmer commenced shooting, fulfilling the first prong of the test, plaintiff still presents no

credible argument to satisfy the second prong.  Given the exceedingly compressed time frame

during which police officer defendants shot Cerbelli (see Williams Dep. 102:9-103:16; Ehmer

Dep. 109:22-110:7; McBride Dep. 149:12-21; Shanley Dep. 106:9-107:10; Barreto Dep. 96:23-

97:4, 99:9-16), McBride and Barreto could not reasonably have interjected themselves into the

situation during this window to prevent further unconstitutional firings.  Because no reasonable

jury could conclude that McBride or Barreto had a realistic opportunity to prevent alleged

constitutional violations subsequent to Valdes and Ehmer's first shots, I recommend that

summary judgment be granted to McBride and Barreto on plaintiff's failure to intervene claim.

## II. Qualified Immunity

Even though the court cannot grant officers Valdes and Ehmer summary

judgment on plaintiff's excessive force claim, defendants argue that they may be granted

summary judgment on the basis of qualified immunity.  Qualified immunity "'shields police

officers acting in their official capacity from suits for damages . . . unless their actions violate

clearly-established rights of which an objectively reasonable official would have known.'"

Jones v. Parmley, 465 F.3d 46, 55 (2d Cir. 2006) (quoting Thomas v. Roach, 165 F.3d 137, 142

(2d Cir. 1999) (ellipses in original)).  It is "'an entitlement not to stand trial or face the other

burdens of litigation.'  The privilege is 'an *immunity from suit* rather than a mere defense to

liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial.'" <u>Saucier v. Katz</u>, 533 U.S. 194, 200-01 (2001) (quoting <u>Mitchell v. Forsyth</u>, 472 U.S. 511, 526 (1985)); <u>accord</u> <u>Scott</u>, 127 S. Ct. at 1773 n.2.

In a suit against officers for an alleged constitutional rights violation, a two-part test determines whether the officers should receive qualified immunity and have the claims against them dismissed. <u>See</u> <u>Saucier</u>, 533 U.S. at 200. First, the court must determine "whether a constitutional right would have been violated on the facts alleged; second, assuming the violation is established, the question whether the right was clearly established must be considered." <u>Id.</u>; <u>accord</u> <u>Scott</u>, 127 S. Ct. at 1774; <u>Hope v. Pelzer</u>, 536 U.S. 730, 736, 739 (2002); <u>Moore v. Vega</u>, 371 F.3d 110, 114 (2d Cir. 2004). Irrespective of this test, however, the existence of a genuine issue of material fact precludes the court from granting summary judgment on the basis of qualified immunity since it becomes "impossible to determine whether the officers reasonably believed that their force was not excessive." <u>Smith</u>, 2004 WL 2202564, at *14 (quoting <u>Curry v. City of Syracuse</u>, 316 F.3d 324, 334 (2d Cir. 2003)); <u>accord</u> <u>Thomas</u>, 165 F.3d at 143, 144. Because of outstanding issues of material fact with respect to Valdes's and Ehmer's roles in Cerbelli's shooting, I recommend that the court deny them qualified immunity. <u>See</u> <u>Smith</u>, 2004 WL 2202564, at *14.

### III. Plaintiff's <u>Monell</u> Claims Against the City, Lt. McBride & Sgt. Barreto

Plaintiff claims that the City's policies, practices, and customs that regulate police interactions with EDPs violate the Constitution and that the City correspondingly has failed to train police officers in constitutionally acceptable policies. (<u>See</u> Compl. ¶¶ 40-43.) Specifically, plaintiff avers that:

1. The NYPD had an [unconstitutional] "encirclement" [isolate and containment] policy, where officers were permitted to form a semi-circle, and close in on a person with mental illness, with guns drawn and multiple officers shouting commands.

2. The NYPD engaged in a custom and practice of non-supervision by willfully ignoring the outcomes of interactions with people with mental illness.

3. The NYPD Patrol Guide custom and practice depended on the Emergency Services Unit (ESU) to handle difficult interactions, rather than preparing first responders to interact properly with people with mental illness.

4. The NYPD failed to train its officers how to properly interact with people with mental illness who pose [a] danger.

(Pl. Opp'n 23.)

Section 1983 liability attaches to municipalities "only if 'the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers'" or "is conducted 'pursuant to governmental "custom" even though such a custom has not received formal approval through the body's official decisionmaking channels.'" Anthony, 339 F.3d at 139 (quoting Monell v. Dep't of Soc. Servs., 436 U.S. 658, 690-91 (1978)); accord Jenkins v. City of New York, 478 F.3d 76, 93-94 (2d Cir. 2007) ("[A] municipality may be found liable under section 1983 only where the municipality itself causes the constitutional violation at issue."). The "policy or custom" requirement "is intended simply to distinguish acts of the municipality from acts of its employees, in order that municipal liability be limited to conduct for which the municipality is actually responsible."[19] Dangler v. N.Y.C. Off Track Betting Corp., 193 F.3d 130, 142 (2d Cir.

_____

[19] Plaintiff asserts her Monell claims against Lt. McBride and Sgt. Barreto as well as the City. (See Compl. ¶ 44.) These claims must fail, however, because NYPD officers of their rank do not qualify as policymakers. See Anthony, 339 F.3d at 139-40; see also Pembaur, 475 U.S. at 481-82. I therefore recommend that they be granted summary judgment on plaintiff's Monell

(continued...)

1999).  A municipality cannot be held liable based upon a theory of *respondeat superior*.

Monell, 436 U.S. at 691.

To succeed on a Monell claim that challenges a specific municipal policy or custom, "a plaintiff is required to plead and prove three elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." Batista v. Rodriguez, 702 F.2d 393, 397 (2d Cir. 1983).  Conversely, when attempting to prevail on a Monell claim by establishing a municipal policy of failing to train or supervise its police officers, a plaintiff must show that "'the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact.'"  Anthony, 339 F.3d at 140 (quoting City of Canton v. Harris, 489 U.S. 378, 388 (1989)); accord Jenkins, 478 F.3d at 94.  To demonstrate deliberate indifference, the Second Circuit has established a three-part test:

> First, the plaintiff must show that a policymaker knows 'to a moral certainty' that her employees will confront a given situation. . . . Second, the plaintiff must show that the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation. . . . Finally, the plaintiff must show that the wrong choice by the city employee will frequently cause the deprivation of a citizen's constitutional rights.

Walker v. City of New York, 974 F.2d 293, 297-98 (2d Cir. 1992) (internal citations omitted); accord Jenkins, 478 F.3d at 94; see Walker, 974 F.2d at 296 (holding evidence of single incident "without any proof relating to the nature of the training itself" insufficient to establish inadequate training because "plaintiffs must put forward some evidence that the City itself has acted or consciously not acted"); see also City of Los Angeles v. Heller, 475 U.S. 796, 799

---

[19](...continued)
claims.

(1986) (per curiam) (holding that if no unconstitutional injury occurred, mere presence of policy

that "might have *authorized*" unconstitutional injury does not render municipality liable). In

addition, at summary judgment, the plaintiff must "'identify a specific deficiency in the city's

training program and establish that that deficiency is closely related to the ultimate injury, such

that it actually caused the constitutional deprivation.'" Green v. City of New York, 465 F.3d 65,

81 (2d Cir. 2006) (quoting Amnesty Am. v. Town of W. Hartford, 361 F.3d 113, 129 (2d Cir.

2004)). That a given officer may have been poorly trained "will not alone suffice to fasten

liability on the city, for the officer's shortcomings may have resulted from factors other than a

faulty training program." Anthony, 339 F.3d at 140 n.6 (quoting Harris, 489 U.S. at 390-91)

(quotation marks omitted); accord Jenkins, 478 F.3d at 95.

### A. The NYPD's EDP Policies

To parse and analyze plaintiff's claims, the court first must identify the NYPD's

policies that guide police treatment of EDPs. The Patrol Guide's section on Mentally Ill or

Emotionally Disturbed Persons in relevant part states:

PURPOSE         To safeguard a mentally ill or emotionally disturbed person who
                does not voluntarily seek medical assistance.

SCOPE           The primary duty of all members of the service is to preserve
                human life. The safety of ALL persons involved is paramount in
                cases involving emotionally disturbed persons. If such person is
                dangerous to himself or others, necessary force may be used to
                prevent serious physical injury or death. Physical force will be
                used ONLY to the extent necessary to restrain the subject until
                delivered to a hospital or detention facility. Deadly physical force
                will be used ONLY as a last resort to protect the life of the
                uniformed member of the service assigned or any other person
                present. IF THE EMOTIONALLY DISTURBED PERSON IS
                ARMED OR VIOLENT, NO ATTEMPT WILL BE MADE TO
                TAKE THE EDP INTO CUSTODY WITHOUT THE SPECIFIC
                DIRECTION OF A SUPERVISOR UNLESS THERE IS AN

IMMEDIATE THREAT OF PHYSICAL HARM TO THE EDP OR OTHERS PRESENT. If an EDP is not <u>immediately</u> dangerous, the person should be contained until assistance arrives. If the EDP is unarmed, not violent and willing to leave voluntarily, uniformed member of the service may take such person into custody. When there is time to negotiate, all the time necessary to insure the safety of all individuals will be used.

<u>DEFINITIONS</u>

<u>EMOTIONALLY DISTURBED PERSON (EDP)</u> – A person who appears to be mentally ill or temporarily deranged and is conducting himself in a manner which a police officer reasonably believes is likely to result in serious injury to himself or others.

<u>ZONE OF SAFETY</u> – The distance to be maintained between the EDP and the responding member(s) of the service. This distance should be greater than the effective range of the weapon (other than a firearm), and it may vary with each situation (e.g., type of weapon possessed, condition of EDP, surrounding area, etc.). A minimum distance of twenty (20) feet is recommended. An attempt will be made to maintain the "zone of safety" if the EDP does <u>not</u> remain stationary.

. . . .

<u>PROCEDURE</u>

When a uniformed member of the service reasonably believes that a person who is apparently mentally ill or emotionally disturbed, <u>must</u> be taken into protective custody because the person is conducting himself in a manner likely to result in a serious injury to himself or others:

UNIFORMED MEMBER OF THE SERVICE

1. Upon arrival at scene, assess situation as to threat of <u>immediate</u> serious physical injury to EDP, other persons present, or members of the service. Take cover, utilize protective shield if available and request additional personnel, if necessary.

    a. If emotionally disturbed person's actions constitute immediate threat of serious physical injury or death to himself or others:

        (1) Take reasonable measures to terminate or prevent such behavior. Deadly physical force will be used <u>only</u> as a last resort to protect the life of persons or officers present.

<u>NOTE</u>

Damaging of property would <u>not</u> necessarily constitute an

-29-

immediate threat of serious physical injury or death.

      b.  If EDP is unarmed, not violent and is willing to leave voluntarily:

         (1) EDP may be taken into custody without the specific direction of a supervisor.

      c.  In all other cases, if EDP's actions do <u>not</u> constitute an <u>immediate</u> threat of serious physical injury or death to himself or others:

         (1) Attempt to isolate and contain the EDP while maintaining a <u>zone of</u> <u>safety</u> until arrival of patrol supervisor and Emergency Service Unit personnel.

         (2) DO NOT ATTEMPT TO TAKE EDP INTO CUSTODY WITHOUT SPECIFIC DIRECTION OF A SUPERVISOR.

2.  Request ambulance, if one has not already been dispatched.

      a.  Ascertain if patrol supervisor is responding, and, if not, request response.

<u>NOTE</u>        Communications Division will automatically direct the patrol supervisor and Emergency Service Unit to respond to scene in such cases. Patrol supervisors' vehicles are equipped with non-lethal devices to assist in the containment and control of EDPs, and will be used at the supervisor's direction, if necessary.

3.  Establish police lines.

4.  Take EDP into custody if EDP is unarmed, not violent and willing to leave voluntarily.

PATROL     5.  Verify that Emergency Service Unit is responding, if
SUPERVISOR    required.

      a.  Cancel response of Emergency Service if services not required

6.  Direct uniformed members of the service to take EDP into custody if unarmed, not violent, and willing to leave voluntarily.

. . . .

<u>WHEN AIDED IS ISOLATED/CONTAINED BUT WILL NOT LEAVE VOLUNTARILY</u>

7.  Establish firearms control.

      a.  Direct members concerned not to use their firearms or use any other deadly physical force unless their lives or the life of another is in imminent danger.

8.  Deploy protective devices (shields, etc.).

      a.  Employ non-lethal devices to insure the safety of all present (see ADDITIONAL DATA statement).

9.  <u>FOLLOW</u> "HOSTAGE/BARRICADED PERSON PROCEDURE," where appropriate (see Patrol Guide procedure

117-12)
10.  Establish police lines if not already done.
11.  Request response of hostage negotiation team and coordinator through Communications Division.
12.  Notify desk officer that hostage negotiation team and coordinator have been notified and request response of precinct commander/duty captain.
13.  Request Emergency Service Unit on scene to have supervisor respond.
14.  Request assistance of:
    a.  Interpreter, if language barrier
    b.  Subject's family or friends
    c.  Local clergyman
    d.  Prominent local citizen
    e.  Any public or private agency deemed appropriate for possible assistance.

NOTE    RANKING PATROL SUPERVISORY OFFICER ON SCENE <u>IS IN COMMAND</u> AND WILL COORDINATE POLICE OPERATIONS.  IF THE MENTALLY ILL OR EDP IS CONTAINED AND IS BELIEVED TO BE ARMED OR VIOLENT BUT <u>DUE</u> TO CONTAINMENT POSES NO IMMEDIATE THREAT OF DANGER TO ANY PERSON, <u>NO ADDITIONAL ACTION WILL BE TAKEN WITHOUT THE AUTHORIZATION OF THE PRECINCT COMMANDER/DUTY CAPTAIN AT THE SCENE</u>.

(Patrol Guide at 714-16.)

### B. Plaintiff's Objections to the "Encirclement" Policy

Among these EDP-related policies, plaintiff challenges as unconstitutional the "isolation and containment" and "zone of safety" policies, which she terms the "encirclement" policy; the possibility that multiple officers may issue commands to an EDP when implementing the "encirclement" policy; and the discretion allowed officers when employing the policy.  (<u>See</u> Pl. Opp'n 23-33.)  The court must therefore more closely examine the "encirclement" policy and how officers may behave when implementing it.

When asked to describe the "encirclement" policy, Captain Lent testified that:

> Wherever applicable, if possible . . . we like to isolate a person who is what we have deemed EDP, and when that's possible, we will try to maintain what we consider a zone of safety where the person can't hurt himself or someone else, and that we can still contain that person so he can't hurt someone else until we can get more assistance, so to speak. . . . Every police officer in our job has been [taught] about EDP, emotionally disturbed persons. And everyone is aware of trying to contain, analyze, isolate as much as possible.

(Lent Dep. 15:19-17:5.) She also stated that when enacting this policy, it "[c]ould be" appropriate for officers to encircle or surround a distressed EDP, "subject to the situation." (Lent Dep. 36:23, 163:16.) Officer LeRoy Williams ("LeRoy Williams"), another of defendants' Rule 30(b)(6) witnesses, concurred with Lent's characterization and testified that police training videos which depict officers surrounding an EDP accurately reflect the implementation of the "encirclement" policy. (Rossan Decl. Ex. L (Deposition of LeRoy Williams ("LeRoy Williams Dep."), dated June 26, 2003), at 24:11-28:11; see Rosan Decl. Exs. U (showing officers in training video standing in circle around bat-wielding EDP), DD (showing diagram of officers in semi-circle around EDP in still captured from Ex. U ).)

When asked whether it is ever appropriate for officers to yell at an EDP, particularly when attempting to isolate and contain him, LeRoy Williams and Lent responded that the decision is left to the discretion of officers on the scene. (LeRoy Williams Dep. 56:5-11; see Lent Dep. 37:7-38:3.) The NYPD trains its officers "to have one person give [an EDP] directions to ease confusion" once officers surround the EDP, but sometimes less-than-ideal circumstances lead to several officers' yelling directions. (LeRoy Williams Dep. 57:2-4, 57:7-13; see Lent Dep. 27:4-19 (noting that it is ideal for one person to speak and keep EDP as calm

as possible), 38:17-40:9 (testifying that "there are one hundred situations a day that go on like this. It's in the realm of possibility that under this policy it may be appropriate to have multiple police officers speaking with the EDP.").) LeRoy Williams explicitly acknowledged that an EDP's confusion may become more acute if multiple voices yell at him. (LeRoy Williams Dep. 57:14-17.) In sum, the NYPD trains officers that "an EDP may be under a great deal of stress when [he is] isolated and contained by a number of police officers" and that officers should interact with an EDP in "as calming a manner as possible." (LeRoy Williams Dep. 36:9-16; see LeRoy Williams Dep. 38:11-13 (explaining that officers are trained to use "a calming, non-threatening voice, if that works").) NYPD policy does not direct or require officers to encircle an EDP or shout commands, but it does not prohibit officers from doing so when they determine that such a response is necessary and appropriate under the circumstances.

To support her contention that the "encirclement" policy leads to rights violations, plaintiff cites the expert reports of Commissioner John S. Pritchard III, a law enforcement specialist, and Katherine Falk, M.D., a psychiatrist. In his report, Commissioner Pritchard states that the "policy of encirclement causes the situation to escalate, creates anxiety and fear for the EDP and officers, and exacerbates the danger in EDP situations." (Masters Decl. Ex. CC ("Pritchard Report") at 5.)[20] Similarly, Dr. Falk states that "[w]hen officers surround, encircle, semi-circle, or otherwise close in on an EDP, and have multiple voices shout at the EDP . . . the

_____

[20] In my Daubert decision, Cerbelli v. City of New York, No. 99 CV 6846, 2006 WL 2792755 (E.D.N.Y. Sept. 27, 2006), I ruled that Commissioner Pritchard presented no reliable basis for opining that the NYPD's purported policies specifically contributed to Cerbelli's death or that police officer defendants could or should have foreseen that outcome. Plaintiff nevertheless continues to press forward with these inadmissible opinions. (See, e.g., Pl. Opp'n 31.) However, I have omitted references to them in this discussion.

officers will make the situation worse and more dangerous."  (Masters Decl. Ex. BB ("Falk

Report") at 9.)  She further explains that

> [a]s part of encirclement, the policy requires that police officers
> speak with the EDP and the police officer(s) may shout commands
> to the EDP.  More than one police officer is permitted to speak at a
> time, and they are expected to use an authoritative, loud and
> forceful tone of voice.  In other words several police officers might
> be yelling commands at the EDP.  This can only serve to make the
> mentally ill individual more agitated and more frightened and more
> confused.  The individual with severe mental illness is unable to
> differentiate reality from fantasy.  He already may be hearing loud
> voices screaming commands or vicious statements at him.  That
> these voices are imaginary and not heard by anyone else does not
> make them any less threatening and terrifying.  Having the police
> shout commands at him will certainly terrify him and also increase
> his confusion.  This is not the way to get his attention or
> cooperation.  This policy of encirclement will certainly make
> him/her extremely frightened, will definitely increase his/her
> agitation and increase his confusion.  This is a policy guaranteed to
> fail.

(Falk Report at 6.)  Neither expert explicitly opines that "encirclement" or shouting at an EDP is

unwise in every possible situation.

More broadly, plaintiff argues that NYPD policy unconstitutionally grants

officers discretion to decide when to take cover, use barricade procedures, point a gun, use force,

yell directions, or discharge firearms when standing in a circle surrounding an EDP.  (Pl. Opp'n

28-30 (citing LeRoy Williams Dep. 49, 55, 60, 77-79, 93, 98, 121-23).)  By permitting such

leeway, plaintiff contends that NYPD policy "fails to guide officers in the crucial moments when

they must discern the immediacy of a threat" and therefore "leaves it entirely in the unguided

hands of the officer to determine whether an EDP has transgressed to the level of 'immediate'

dangerousness where deadly force may be used." (Pl. Opp'n 29.) In essence, plaintiff objects to NYPD policy because it gives officers discretion to take actions that could, in some situations, increase the likelihood that deadly force will be used.

Plaintiff sets forth only vague, conclusory arguments to contest NYPD policy toward EDPs. She asserts without legal or factual support that stripping officers of the discretion to decide when and whether to encircle, shout commands at, and fire weapons at EDPs would improve police training and prevent constitutional violations. This argument does not raise a triable issue of fact. See Harris, 489 U.S. at 391 (holding that municipal liability not established by proof that injury could have been avoided had officer received "better or more training, sufficient to equip him to avoid the particular injury-causing conduct"); Jenkins, 478 F.3d at 95; Anthony, 339 F.3d at 140. Plaintiff cites no cases in which courts found police policies or practices similar to the "encirclement" policy unconstitutional; in fact, no court in any jurisdiction has ever held an "isolate and contain" policy or a "zone of safety" policy unconstitutional. Nor does plaintiff cite a single precedent for the proposition that encircling or shouting at an EDP, with multiple voices or otherwise, is *per se* unconstitutional. Moreover, case law has long held that merely giving police discretion in the exercise of their duties does not offend the Constitution. See Pembaur, 475 U.S. at 481-82 ("The fact that a particular official – even a policymaking official – has discretion in the exercise of particular functions does not, without more, give rise to municipal liability based on an exercise of that discretion."); Washburn v. City of New York, No. 92 Civ. 4254, 1993 WL 361601, at *2 (S.D.N.Y. Sept. 15,

1993) ("The City's grant of discretion to the police to take into custody an apparently mentally ill person who poses a threat to herself or others does not, without more, support a finding of municipal liability."), aff'd, 28 F.3d 103 (2d Cir. 1994).

Certainly, the manifold circumstances that police officers routinely encounter allow one to imagine situations where officers may find it advisable or necessary to surround a dangerous EDP or use a raised voice to compel an EDP to drop a weapon. As plaintiff overlooks in her argument (see, e.g., Falk Report at 8 ("I never get between a patient and the door. Because I know that someone [like Cerbelli] feels safer if they know that they can get away if they want to. . . . The encirclement policy blocks every exit.")), police officers are required to protect the public at large and themselves as well as the EDP. (See Patrol Guide at 714; LeRoy Williams Dep. 13:20-21, 35:15-20, 37:20-24.) They cannot allow a seemingly violent EDP, such as Cerbelli, who was brandishing a weapon, to escape and possibly cause injury to others, even if preventing him from leaving may cause him to become more agitated. See Scott, 127 S. Ct. at 1778-79. Plaintiff has identified nothing facially unconstitutional about the "encirclement" policy or the other policies and customs that she tangentially contests. "[C]onclusory statements, conjecture, or speculation" will not save plaintiff's claim from summary judgment. Kulak v. City of New York, 88 F.3d 63, 71 (2d Cir. 1996); accord Davis v. New York, 316 F.3d 93, 100 (2d Cir. 2002).

Moreover, plaintiff has not shown "a direct causal link between the ["encirclement" policy] and [Cerbelli's alleged] deprivation of federal rights." Bd. of County Comm'rs v. Brown, 520 U.S. 397, 404 (1997). To demonstrate that police officer defendants used the "encirclement" policy when they shot Cerbelli, plaintiff relies on ballistics reports and

diagrams marked at police officer defendants' depositions.  (See, e.g., Masters Decl. Exs. V at 480, 483, GG at 1-9.)  However, the evidence does not support the conclusion that they actively or deliberately "encircled" Cerbelli.  At most, the reports and diagrams reveal the expected: Cerbelli ran into the center of the precinct and thereby surrounded himself with police officers already located in the precinct's lobby.  Even assuming that the officers deliberately encircled Cerbelli and shouted at him to drop his weapon, plaintiff fails to demonstrate that 1) the encircling and yelling caused Cerbelli to become more agitated, confused, anxious, or fearful, and thus 2) catalyzed his violent behavior toward others, which in turn 3) led police officer defendants to use excessive force against him.  Without establishing such a causal nexus, plaintiff's first Monell claim fails.  See Batista, 702 F.2d at 397.

### C. Plaintiff's Other Monell Claims

#### 1. Failure to Analyze Outcomes of EDP Encounters

Plaintiff contends that the City acted with deliberate indifference when it "failed to assess the information contained in . . . documents concerning EDP encounter outcomes," including Aided cards,[21] 911 records, SPRINT reports,[22] Unusual Occurrence Reports, CCRB reports,[23] and other NYPD records.  (Pl. Opp'n 40.)  The City admits that "from October 25, 1993 through October 25, 1998, the [NYPD] did not document (i.e., reduce to writing) any

---

[21]  Aided cards are completed when police interact with a person who requires medical attention.

[22]  SPRINT stands for "Special Police Radio Inquiry Network."

[23]  "CCRB" refers to New York City's Civilian Complaint Review Board.  In its reports, the CCRB "issues statistics about complaint activity, board dispositions, CCRB performance, and police action on substantiated complaints."  New York City Civilian Complaint Review Board, CCRB Reports, http://www.nyc.gov/html/ccrb/html/reports.html (last visited Aug. 11, 2008).

statistical analysis" of Aided cards, 911 records, SPRINT reports, Unusual Occurrence Reports, or CCRB records "with regard to EDP-police encounters." (Masters Decl. Ex. FF at 2.) It also admits that, during that five-year period, the NYPD "did not document (i.e., reduce to writing), department-wide studies of EDP-police encounters." (Masters Decl Ex. FF at 3.)

However, these admissions do not indicate, as plaintiff argues, that the City "ignored" all of the CCRB records of complaints involving EDP encounters or failed to review or investigate such incidents. (Pl. Opp'n 39-40.) In fact, during discovery the City produced thousands of CCRB records containing interviews with complainants, officers, and witnesses regarding EDP encounters. See Cerbelli v. City of New York, No. 99 CV 6846, 2006 WL 2792755, at *8 n.7 (E.D.N.Y. Sept. 27, 2006). Those voluminous productions in themselves reveal that the City investigated allegations of excessive force against EDPs. (See also Lent Dep. 139:2-10 (noting how police create report after every EDP encounter), 146:20-149:5 (describing how NYPD investigates excessive force claims).) Plaintiff's claim rests simply on the unsupported assertion that this system was "ineffective" because it failed to prevent alleged rights violations. (See Pritchard Report at 8 ("The City could have better collected and used anecdotal data about EDP encounters to develop policy changes, but it did not.").) Plaintiff cites no authority for the proposition that reviewing complaints on an individual basis, rather than conducting a statistical analysis or department-wide study, constitutes a "custom and practice of non-supervision" consciously enacted by the City. (Pl. Opp'n 33.) Mere suggestions that plaintiff's desired individual analyses would lead to better training and supervision or would allow the police to avoid using deadly force against dangerous EDPs carry no legal weight. See Davis, 316 F.3d at 100; Kulak, 88 F.3d at 71. Furthermore, plaintiff makes no attempt to

demonstrate how the City's treatment of its EDP records satisfies the deliberate indifference standard outlined in Walker, apart from reciting the elements of the test. (See Pl. Opp'n 39.)[24]

## 2. Failure of First-Responders to Deal Effectively with EDPs

Plaintiff cites Commissioner Pritchard's expert report for the proposition that CCRB reports placed the City on notice that the "'policy of waiting for ESU to arrive rather than properly training regular officers could lead to rights violations.'"[25] (Pl. Opp'n 38 (quoting Pritchard Report at 4).) To support this contention, plaintiff references six CCRB investigations in which first responders allegedly took improper action while waiting for the ESU to arrive. (See Masters Decl. Ex. JJ.) As a factual matter, defendants dispute plaintiff's characterization of those six CCRB investigations, arguing that the incidents they recount bear no similarity to Cerbelli's experience or do not evidence a failure by non-ESU officers to take proper action while waiting for the ESU to arrive. (See Defs. Reply 39-40.) Defendants are correct. None of the CCRB complaints that plaintiff cites concern the use of lethal force, and in two the complainant suffered no injury at all. (See Masters Decl. Ex. JJ at CCRB # 9802433, CCRB # 970995.)

In addition, plaintiff does not explain the differences in training between first responders and ESU units.[26] Nor does she explain how waiting for an ESU unit constitutes

---

[24]The court is aware that there is some debate about the effectiveness of the CCRB and the degree to which the NYPD considers and accepts its findings and recommendations. However, that controversy is not before the court in this motion and is not an issue in this case.

[25] To the extent that this contention challenges the training of non-ESU officers, it is indistinguishable from her argument, addressed below, that the City failed to train officers on how to interact properly with dangerous, mentally ill individuals.

[26] According to the City's website, the ESU provides "specialized equipment, expertise
(continued...)

deliberate indifference.  In fact, plaintiff does not attempt even to link her policy grievances with the <u>Walker</u> test that she must satisfy to prevail on her claim.  With nothing to buttress her legal argument, plaintiff's claim cannot survive summary judgment.  See <u>Davis</u>, 316 F.3d at 100; <u>Kulak</u>, 88 F.3d at 71.

### 3. Failure to Train

Plaintiff further alleges that the NYPD failed to train its officers how to interact properly with EDPs.  However, the record does not create a reasonable inference that the NYPD's training amounts to deliberate indifference toward EDPs.  Turning to the first prong of the <u>Walker</u> test, "that a policy maker knows to a moral certainty that her employees will confront a given situation," plaintiff maintains that the NYPD knows "to a moral certainty" that police officers will encounter EDPs.  (Pl. Opp'n 34.)  In the context of this case, I find this assertion overly broad.  For the purposes of this prong, plaintiff must demonstrate "to a moral certainty" that the City knows its officers will be confronted with *armed and dangerous* EDPs.  The extensive training that the NYPD devotes to handling EDPs, dangerous or otherwise, strongly suggests that the City indeed possessed such forewarning.  (<u>See, e.g.</u>, Lent Dep. 11:4-8, 20:17-22, 78:21-79:9, 101:2-106:3; LeRoy Williams Dep. 39:12-46:3, 49:3-54:8; Rossan Decl. Exs. N, O, P.)  With respect to the second prong, this same training also reasonably implies that police contacts with violent EDPs present officers with difficult situations for which they require

---

[26](...continued)
and support to the various units within the NYPD.  From auto accidents to building collapses to hostage situations, 'ESU' officers are called on when the situation requires advanced equipment and expertise."  (http://www.nyc.gov/html/nypd/html/pct/esu.html; <u>see also</u> Defs. Mem. 41 (describing ESU as equipped with certain non-lethal devices that patrol officers, sergeants, and lieutenants not trained to use).)

special skills.  For the third prong, though, plaintiff presents no evidence that police encounters

with dangerous EDPs frequently lead to constitutional rights deprivations.  She cites no

examples of other situations where police officers faced an armed, violent EDP, used deadly

force against him, and were found by a court to have violated the person's constitutional rights.[27]

Contrary to plaintiff's assertions, a series of complaints against the NYPD does not demonstrate

deliberate indifference.  Plaintiff still must show that the NYPD took no action when alerted to

---

[27] Plaintiff cites six CCRB complaints and seven lawsuits from incidents that took place between 1987 and 1997.  (See Masters Decl. Exs. HH, JJ.)  Though the City produced over 20,000 pages of CCRB files, representing "hundreds of EDP interactions"  (Pl. Opp'n 37), as explained above, none of the CCRB complaints that plaintiff cites concern the use of lethal force, and in two the complainant suffered no injury at all.  (See Masters Decl. Ex. JJ at CCRB # 9802433, CCRB # 970995.)

        Of the seven lawsuits, three do not indicate the involvement of an EDP.  The complaint in In re Bartlett, filed July 1988, alleges that police officers "encircled" and "surrounded" the unarmed decedent and "drew their service revolvers and fired at him," but it contains no allegation that the decedent was an EDP.  (See Masters Decl. Ex. HH.)  Likewise, there is no indication that Cromartie v. City of New York or Maldonado v. City of New York involved the use of force against an EDP.  (See Masters Decl. Ex. HH.)  The remaining cases, Edey v. City of New York, Gervacio v. City of New York, In re Ivey, and Matthews v. City of New York, involved the claimed use of excessive force against EDPs.  Edey involved an unarmed EDP shot and killed by police, but the complaint contained no allegations concerning "encirclement" or "shouting" at the decedent.  (See Rossan Decl. Ex. HH.)  In Gervacio, the complaint alleged that a private security firm improperly restrained the unarmed decedent and that responding police improperly handcuffed him and placed him in a prone position, leading to fatal asphyxiation.  There is no indication that police encircled, surrounded, or shouted at him.  (See Rossan Decl. Ex. HH.)  In In re Ivey, police allegedly used excessive force when they Tasered and blinded an unarmed EDP.  (See Rossan Decl. Ex. HH.)  Finally, in Matthews, the complainant alleges that police shot and killed an EDP, and that the NYPD acted with deliberate indifference with respect to its EDP policies.  The parties agreed to a stipulation before the case was tried on the merits.  (See Rossan Decl. Ex. HH.)

        Thus, of the thirteen incidents that plaintiff cites, only ten involved an injury to an EDP, and none found that officers acted unconstitutionally.  By comparison, during the same ten-year period, the NYPD responded to approximately 600,000 EDP calls.  (Defs. Reply 47.)  Most importantly, plaintiff makes no showing that when alerted to these incidents, the NPYD acted toward them with deliberate indifference.  See Fiacco v. City of Rensselaer, 783 F.2d 319, 328 (2d Cir. 1986).

alleged deficiencies in its practices.  Cf. Fiacco v. City of Rensselaer, 783 F.2d 319, 328 (2d Cir.

1986).  This dearth of evidence cannot support a conclusion that officers' faulty choices when

interacting with armed, dangerous EDPs "frequently" lead to constitutional violations.

          More generally, that the record contains copious NYPD training materials relating

to the mentally ill speaks against a finding of deliberate indifference by the City to the rights of

EDPs.  The NYPD has a detailed training policy that instructs officers how to interact with

dangerous or violent EDPs, and officers are not given "unfettered" discretion in their use of force

as plaintiff claims.  (See, e.g., Lent Dep. 11:4-8 (discussing when NYPD officers may use lethal

force, 20:17-22 (same), 78:21-79:9 (describing continuum of force taught to NYPD officers and

how officers apply it), 101:2-106:3 (elaborating on EDP training provided to different levels of

NYPD officers); LeRoy Williams Dep. 39:12-46:3 (detailing different EDP scenarios and

appropriate level of force to use when confronted with them), 49:3-54:8 (same); Rossan Decl.

Ex. O.)  Rather, the Patrol Guide directs that "[o]nly the minimal amount of force necessary to

protect human life should be used by uniformed members of the service" and that "[i]f [EDP]'s

actions constitute immediate threat of serious physical injury or death to himself or others, [the

officer should t]ake reasonable measures to terminate or prevent such behavior," with deadly

physical force used "only as a last resort to protect the life of persons or officers present."

(Patrol Guide at 715.)

          Moreover, during and prior to 1998, recruits undergoing instruction at the NYPD

Academy received extensive training on interacting with EDPs.  (See, e.g., Defs.' Rule 56.1

Statement ¶¶ 52-69; Lent Dep. 101:2-106:3; Rossan Decl. Exs. N, O, P, Q, S, T.)  The NYPD

Academy trained recruits through role playing and courses on various subjects, such as social

science, behavioral science, law, physical training, tactics, and firearms, each of which incorporates lessons on EDP interactions.  (See, e.g., Defs.' Rule 56.1 Statement ¶¶ 53-54; LeRoy Williams Dep. 61:21-63:25; Rossan Decl. Exs. N, O, P, Q, S, T, U.)  Recruits also received written materials regarding mental illness, including materials on schizophrenia and paranoia, and were shown videotapes depicting EDP situations.  (See, e.g., Defs.' Rule 56.1 Statement ¶¶ 58-59, 67-68; Rossan Decl. Exs. N, P, Q, S, T.)

The immediacy of danger during any given police-EDP encounter can only be determined on a case-specific basis, as only the officer facing a dangerous suspect is in a position to assess the risk.  Plaintiff provides no detail on how officers could or should be trained otherwise.  She does not identify a specific deficiency in NYPD policy that reflects a purposeful rather than negligent course of action, as required to prove deliberate indifference; rather, she lists vague, conclusory complaints about NYPD training.  "'[A] training program must be quite deficient in order for the deliberate indifference standard to be met: the fact that training is imperfect or not in the precise form a plaintiff would prefer is insufficient to make such a showing.'"  Reynolds v. Giuliani, 506 F.3d 183, 193 (2d Cir. 2007) (quoting Young v. City of Providence ex rel. Napolitano, 404 F.3d 4, 27 (1st Cir. 2005)) (brackets in original) (quotation marks omitted).  "Such inadequacy must reflect a deliberate choice among various alternatives, rather than negligence or bureaucratic inaction."  Id. (citing Pembaur, 475 U.S. at 483-84).  Plaintiff's claim for failure to train fails.  Therefore, I recommend that the court grant the City summary judgment with respect to all of plaintiff's Monell claims.

### IV. Plaintiff's State Law Claims

#### A. Assault & Battery

Plaintiff asserts claims of assault and battery against police officer defendants. (See Compl. ¶¶ 46-48.)  Under New York law, to succeed in an action sounding in assault, a plaintiff must establish that a defendant "intentional[ly] plac[ed] . . . another person in fear of imminent harmful or offensive contact."  United Nat'l Ins. Co. v. Waterfront N.Y. Realty Corp., 994 F.2d 105, 108 (2d Cir. 1993); accord Merzon v. County of Suffolk, 767 F. Supp. 432, 448 (E.D.N.Y. 1991).  Battery requires a plaintiff to demonstrate "(1) bodily contact, which is (2) harmful or offensive in nature, and (3) made with intent."  Merzon, 767 F. Supp. at 448; see United Nat'l Ins. Co., 994 F.2d at 108.

On the assault claim, record evidence, when construed in the light most favoring plaintiff, reveals that police officer defendants each engaged in behavior that may constitute assault, *e.g.*, pointed a gun at, shot, or Tasered Cerbelli.  See Williams v. Port Auth. of N.Y. & N.J., 880 F. Supp. 980, 994 (E.D.N.Y. 1995).  (See Barreto Dep. 93:23-25; Valdes Dep. 112:15-113:10, 138:13-22; Ehmer Dep. 106:23-25, 108:7-12, 108:22-24; Williams Dep. 94:2, 106:25, 107:22; McBride Dep. 110:9-14, 111:4-17.)  However, the parties dispute whether Cerbelli could apprehend harm or imminent threat from these actions.  According to police officer defendants, plaintiff has not established that Cerbelli "was even capable of believing that a harmful or offensive bodily contact was about to occur prior to his shooting," since he "refused to obey several direct orders from police to drop the knife and screwdriver in his hands and to remain still."  (Muncipal Defendants' Memorandum of Law in Support of Their Motion for Summary Judgment ("Defs. Mem.") 30.)  They conclude that "[s]uch actions are in sharp contrast to that of

an individual in fearful and imminent apprehension of harm." (Defs. Mem. 30.) Plaintiff, meanwhile, highlights record evidence that shows that Cerbelli at one point reacted to the officers by backing up. (See Ehmer Dep. 80:11-15.) In addition, plaintiff's psychiatric expert, Dr. Falk, will testify that schizophrenia may cause hallucinations, delusions, and erratic behavior, but does not make a person incapable of experiencing "pain, fear, trauma, terror, and consciousness of suffering." (Pl. Mem. 41 (citing Falk Report at 3-4).) Whether Cerbelli apprehended harm or imminent danger from police officer defendants' actions is thus a question of fact for a jury to resolve. Therefore, I recommend that the court deny police officer defendants summary judgment on this claim.

With respect to battery, plaintiff makes no demonstration that Barreto came into any physical contact with Cerbelli aside from when Cerbelli attacked him from behind after entering the precinct. Therefore, I recommend that the court grant Barreto summary judgment on the battery claim. In contrast, the testimony of Ehmer, Valdes, Williams, and McBride unequivocally shows that they intentionally made harmful bodily contact with Cerbelli. The former three shot him (see Valdes Dep. 112:15-113:10, 138:13-22; Ehmer Dep. 106:23-25, 108:7-12, 108:22-24; Williams Dep. 94:2, 106:25, 107:22), and McBride used a Taser on him. (See McBride Dep. 110:9-14, 111:4-17.) Consequently, the court cannot grant them summary judgment.

### B. Governmental Immunity

Police officer defendants argue that they are entitled to governmental immunity for their actions. "'[W]hen official action [of a police officer] involves the exercise of discretion of expert judgment in policy matters, and is not exclusively ministerial, [he] generally is not

answerable in damages for the injurious consequences of that action.'" Mon v. City of New York, 579 N.E.2d 689, 692 (N.Y. 1991) (brackets in original); accord Estate of Rosenbaum v. City of New York, 982 F. Supp. 894, 895-96 (E.D.N.Y. 1997). Discretionary acts generally "involve the exercise of reasoned judgment which could typically produce different acceptable results," while "ministerial act[s] envision[] direct adherence to a governing rule or standard with a compulsory result." Estate of Rosenbaum, 982 F. Supp. at 896 (quotation marks omitted). If the court determines that a defendant's actions were sufficiently discretionary to warrant immunity, it must then decide "whether the conduct giving rise to the claim is related to an exercise of that discretion." Mon, 579 N.E.2d at 692. If the court finds such a nexus, governmental immunity applies unless the court also finds that the exercise of discretion was unreasonable. See Jones v. Parmley, 465 F.3d 46, 64 (2d Cir. 2006); Hogan v. Franco, 896 F. Supp. 1313, 1315 n.2 (N.D.N.Y. 1995); McGowan v. State, 839 N.Y.S.2d 145, 147 (1st Dep't 2007). The court also will not grant governmental immunity where genuine issues of material fact relating to the governmental immunity defense remain. See Simpkin v. City of Troy, 638 N.Y.S.2d 231, 232 (3d Dep't 1996).

Plaintiff contends that police officer defendants did not plead the affirmative defense of governmental immunity in their answer as required by Federal Rule of Civil Procedure Rule 8. (Pl. Opp'n 42.) However, defendants' fourth affirmative defense, that "[a]t all times relevant to the acts alleged in the complaint, defendants acted reasonably in the proper and lawful exercise of their discretion," is sufficient to comply with pleading requirements and provided plaintiff with notice. (Rossan Decl. Ex. B ¶ 76.)

Police officer defendants' attempts to take Cerbelli into custody after he violently entered the precinct and threatened others with a weapon qualify as discretionary acts under New York law. The volatile, rapidly changing circumstances they faced necessitated that they "exercise [their] discretion [and] expert judgment" to contain Cerbelli; there existed no script with a compulsory outcome for them to follow. Mon, 579 N.E.2d at 692; see Estate of Rosenbaum, 982 F. Supp. at 896. Because police officer defendants' alleged acts of assault and battery arose from the discretionary choices they made when confronting Cerbelli, police officer defendants will receive governmental immunity unless their choices were unreasonable. See Hogan, 896 F. Supp. at 1315 n.2. As previously discussed in the Fourth Amendment context, I find that Williams acted reasonably when he shot Cerbelli. Likewise, I find that McBride reasonably exercised his discretion when he used a non-lethal Taser on Cerbelli and that all police officer defendants reasonably aimed their guns at Cerbelli to protect themselves and prevent him from harming others. Cf. Rincon v. City of New York, No. 03 Civ. 8276, 2005 WL 646080, at *5 (S.D.N.Y. Mar. 21, 2005) (holding that officers reasonably drew their guns when executing warrant because "[t]he warrant stated that the possibility of weapons in the apartment ma[de] it reasonable for the officers to draw their weapons for safety purposes"); Anderson v. United States, 107 F. Supp. 2d 191, 199 (E.D.N.Y. 2000) (stating that "there is nothing inherently unreasonable about an officer conducting a protective sweep with his or her weapon drawn" and that "it is [not] unreasonable to expect the officer to sometimes aim that weapon at an individual until an assessment can be made as to whether the individual poses a threat"), aff'd, 41 F. App'x 506 (2d Cir. 2002); Lewis v. City of Mount Vernon, 984 F. Supp. 748, 756 (S.D.N.Y. 1997) (holding that reasonableness of officers' drawing their guns evaluated "in light

of the nature of the criminal activity" alleged). (See Barreto Dep. 42:17-23, 61:12-18, 66:18-20; McBride Dep. 100:9-101:3, 111:4-17; Williams Dep. 63:14-24, 74:6-7; Ehmer Dep. 79:11-13; Shanley Dep. 92:6-9, 93:10-12, 95:15-21, 96:22-97:3; Lopez Interview at 18.) As noted earlier, only Valdes and Ehmer's decisions to open fire on Cerbelli constituted a possibly unreasonable use of physical force, and the court cannot resolve this dispute with respect to these two officers' shootings without a jury.

I therefore recommend that McBride, Barreto, and Williams receive governmental immunity on plaintiff's assault claim and that Valdes and Ehmer receive immunity on the assault claim only with regard to their pointing their guns at Cerbelli. I also recommend that McBride and Williams receive governmental immunity on plaintiff's battery claims. In parallel with plaintiff's Fourth Amendment excessive force claim, plaintiff's assault and battery claims against Valdes and Ehmer that stem from their decisions to open fire on Cerbelli cannot receive governmental immunity. Remaining issues of material fact necessitate that these claims proceed to a jury to determine the reasonableness of their actions. See Fed. R. Civ. P. 56(c).

### C. Negligence

Plaintiff claims that municipal defendants failed to use reasonable care in their seizure of Cerbelli because they did not adhere to "required" NYPD rules and regulations governing police interaction with EDPs. (See Compl. ¶¶ 50-53.) Specifically, she claims that McBride negligently used a Taser against Cerbelli; that Williams, Valdes, and Ehmer acted negligently when they shot Cerbelli; that Barreto and McBride behaved negligently as

supervisors by, *inter alia*, failing to establish firearms control; and that the City is negligently liable for allowing the "encirclement" policy to continue and for failing to supervise and train its officers.  (See Pl. Opp'n 43 & nn.9&10, 44.)

## 1. McBride, Ehmer, Valdes, and Williams and the Use of Force

Under New York law, police officers may be liable for negligently discharging a firearm if they "did not exercise the degree of care which would reasonably be required of [them] under similar circumstances."  Lubecki v. City of New York, 758 N.Y.S.2d 610, 616 (1st Dep't 2003) (citing McCummings v. N.Y.C. Trans. Auth., 613 N.E.2d 559, 560 (N.Y. 1993)). To determine whether a defendant acted with reasonable care, the court may turn toward departmental guidelines, such as the Patrol Guide, to discern the relevant duty of care required from a police officer.  Id. at 617.  Because negligence claims usually present significant material factual disputes, they "typically" are "not amenable to summary dismissal."  Id. at 616.

Even when construing the evidence in the light most favorable to plaintiff, I find that Williams, Valdes, and Ehmer fired their guns at, and McBride used a Taser against, Cerbelli intentionally.  (See Williams Dep. 89:6-16, 91:18-25, 92:10-25, 93:2-9; Ehmer Dep. 106:23-25, 108:7-12, 108:22-24; Valdes Dep. 112:15-113:10, 138:13-22; McBride Dep. 110:9-14, 111:4-17.)  In fact, plaintiff never claims otherwise.  Case law in New York has long held that "'once intentional offensive contact has been established, the actor is liable for assault and not negligence, even when the physical injuries may have been inflicted inadvertently.'"[28]  Oliver v.

---

[28] The progeny of McCummings have bifurcated into two distinct paths.  While a minority of courts, as in Lubecki, have accepted that McCummings provides a common law cause of action for a negligent intentional action, most have veered away from the logical inconsistencies within that case.  See,e.g., Hartman v. County of Nassau, No. 04 CV 1784, 2008

(continued...)

Cuttler, 968 F. Supp. 83, 92 (E.D.N.Y. 1997) (citing Mazzaferro v. Albany Motel Enters., Inc., 515 N.Y.S.2d 631, 632-33 (3d Dep't 1987); Locke v. N. Gateway Rest., Inc., 649 N.Y.S.2d 539, 540 (3d Dep't 1996)); see Busch v. City of New York, No. 00 CV 5211, 2003 WL 22171896, at *7 (E.D.N.Y. Sept. 11, 2003) (holding that caselaw in this circuit is clear that negligence claim will not stand where "a plaintiff asserts excessive force . . . claims which are premised upon a defendant's allegedly intentional conduct") (quoting Dineen v. Stramka, 228 F. Supp. 2d 447, 454 (S.D.N.Y. 2002)) (citation omitted); see also Black's Law Dictionary 1061 (8th ed. 2004) (defining "negligence" as "any conduct that falls below the legal standard established to protect others against unreasonable risk of harm, *except for conduct that is intentionally, wantonly, or willfully* disregardful of others' rights") (emphasis added). Given this factual record, no reasonable juror could determine that defendants negligently Tasered or shot Cerbelli. Hartman v. County of Nassau, No. 04 CV 1784, 2008 WL 1923127, at *15-16 (E.D.N.Y. Apr. 28, 2008); Brown v. Johnson, No. 04 CV 6074, 2007 WL 1034830, at *10 (W.D.N.Y. Apr. 4, 2007); Sylvester v. City of New York, 385 F. Supp. 2d 431, 439 (S.D.N.Y. 2005). Accordingly, I recommend that McBride, Ehmer, Valdes, and Williams be granted summary judgment on this negligence claim.

---

[28](...continued)
WL 1923127, at *15-16 (E.D.N.Y. Apr. 28, 2008); Brown v. Johnson, No. 04 CV 6074, 2007 WL 1034830, at *10 (W.D.N.Y. Apr. 4, 2007); Sylvester v. City of New York, 385 F. Supp. 2d 431, 439 (S.D.N.Y. 2005); Busch v. City of New York, No. 00 CV 5211, 2003 WL 22171896, at *7 (E.D.N.Y. Sept. 11, 2003); Dineen v. Stramka, 228 F. Supp. 2d 447, 454 (S.D.N.Y. 2002); Oliver v. Cuttler, 968 F. Supp. 83 (E.D.N.Y. 1997); Smith v. County of Erie, 743 N.Y.S.2d 649 (4th Dep't 2002); Locke v. N. Gateway Rest., Inc., 649 N.Y.S.2d 539 (3d Dep't 1996). Because New York State and federal courts have drifted away from the former reading of McCummings, this opinion will adhere to the prevailing trend.

## 2. Municipal and Supervisory Negligence

### a. The Pleadings

The City, McBride, and Barreto argue that plaintiff cannot assert a claim for municipal and supervisory negligence, since her complaint contains no such cause of action and therefore fails "to meet basic pleading standards." (Defs. Reply 54-55.) As previously explained, a pleading must "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." Erickson, 127 S. Ct. at 2200 (quotation marks omitted) (ellipses in original). Plaintiff's complaint alleges that municipal defendants "failed to use reasonable care in the manner in which they seized and utilized force against KEVEN E. CERBELLI, and *were otherwise negligent*." (Compl. ¶ 50 (emphasis added).) This broad statement suffices to render the claim "plausible" under Iqbal. 490 F.3d at 157-58.

### b. The Merits

To maintain a claim against a municipal employer for "negligent hiring, training, and supervision" of a tortfeasor under New York law, a plaintiff must show that the employee acted outside the scope of employment when committing the tort. Gurevich v. City of New York, No. 06 Civ. 1646, 2008 WL 113775 (S.D.N.Y. Jan. 10, 2008), at *6; accord Lubecki, 758 N.Y.S.2d at 617; see also Rowley v. City of New York, No. 00 Civ. 1793, 2005 WL 2429514, at *12 (S.D.N.Y. Sept. 30, 2005); Karoon v. N.Y.C. Transit Auth., 659 N.Y.S.2d 27, 29 (1st Dep't 1997). Officers act outside of the scope of their employment if they, for example, violates accepted police practice when they commit allegedly negligent acts. See Gurevich, 2008 WL 113775, at *6; Lubecki, 758 N.Y.S.2d at 617. Conversely, if the employee acted within the scope of his employment, the employer and the employee's supervisors may be held liable for

the employee's negligence only under a theory of *respondeat superior*.  <u>Colodney v. Continuum Health Partners, Inc.</u>, No. 03 Civ. 7276, 2004 WL 829158, at *9 (S.D.N.Y. Apr. 15, 2004). Plaintiff does not allege that McBride, Valdes, Ehmer, and Williams acted outside of the scope of their employment when they Tasered or shot Cerbelli.  Furthermore, as discussed above, McBride, Valdes, Ehmer, and Williams intentionally, not negligently, used force against Cerbelli.  For these two reasons, I recommend that the court grant the City, McBride, and Barreto summary judgment on plaintiff's claim for negligent training and supervision.

### D. Wrongful Death

Plaintiff, Cerbelli's mother and administratrix of his estate, seeks damages for the "loss of support, pecuniary loss, loss of pecuniary value of [Cerbelli's] services, society and comfort, care, guidance, and companionship, along with funeral and burial expenses and other such damages permitted by law."  (Compl. ¶ 71.)  According to plaintiff, Cerbelli "was a dedicated son who was capable of and did provide assistance to [her] in and around the home up until the date of his death."  (Pl. Opp'n 47.)  In her deposition, plaintiff testified that her son performed a variety of household chores for her until his death, including shopping, painting, assembling furniture, and taking out the garbage.  (<u>See</u> Masters Decl. Ex. X at 598-99.)  It is undisputed, however, that Cerbelli did not live with plaintiff, was unemployed, and did not provide her with economic support.  According to municipal defendants, the services and financial support that she provided Cerbelli were "far greater" than the value of any services he provided her.  (Defs. Reply 58.)

New York's wrongful death statute limits a parent's recovery to "'the pecuniary injuries resulting from the decedent's death.'"  <u>Garland v. Herrin</u>, 724 F.2d 16, 20 (2d Cir. 1983)

(quoting N.Y. E.P.T.L. § 5-4.3). In evaluating pecuniary damage awards to parents, New York courts tend to consider the adult child's day-to-day support and regular monetary contributions to the parent; the deceased's actual or prospective earnings; his age, character, and condition; and the value of his voluntary personal services to the parent. See, e.g., Moyer v. State of New York, 572 N.Y.S.2d 262 (4th Dep't 1991); Williams v. City of New York, 564 N.Y.S.2d 464 (2d Dep't 1991); James v. Eber Bros. Wine & Liquor Corp., 550 N.Y.S.2d 972 (4th Dep't 1990); Rowan v. County of Nassau, 456 N.Y.S.2d 418 (2d Dep't 1982). The value of Cerbelli's personal services to his mother, though not large, is a question of fact for a jury. Due to this unresolved question of material fact, I respectfully recommend that the court deny municipal defendants summary judgment on this issue.

CONCLUSION

For the reasons stated above, I respectfully recommend that municipal defendants' motion for summary judgment be granted in part and denied in part. Specifically, I recommend that police officer Williams receive summary judgment with respect to plaintiff's § 1983 claim, while police officers Valdez and Ehmer not receive summary judgment on this claim. Furthermore, I recommend that Lt. McBride and Sgt. Barreto be granted summary judgment on plaintiff's claims based upon supervisory liability and a failure to intervene. I also recommend that the City, Lt. McBride, and Sgt. Barreto receive summary judgment on plaintiff's Monell claims. In addition, I recommend that municipal defendants be granted summary judgment with respect to plaintiff's New York State law negligence claim. I also recommend that Lt. McBride, Sgt. Barreto, and Williams be granted summary judgment with respect to plaintiff's assault and battery claims, while Valdes and Ehmer be granted summary judgment on

the assault claim only with regard to their pointing their guns at Cerbelli. Correspondingly, I recommend that Valdes and Ehmer not be granted summary judgment on plaintiff's assault and battery claims that stem from their decisions to open fire on Cerbelli. Finally, I recommend that summary judgment for plaintiff's wrongful death claim be denied.

Dated:  Brooklyn, New York
        September 8, 2008


                                          _____/s/_____
                                          ROBERT M. LEVY
                                          United States Magistrate Judge