UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X
LORETTA M. CERBELLI, as
ADMINISTRATRIX of the Estate of KEVIN
E. CERBELLI, deceased,

                            Plaintiff,

     -against-

THE CITY OF NEW YORK, THE NEW
YORK CITY POLICE DEPARTMENT,           REPORT AND
POLICE OFFICERS JAMES WILLIAMS,      RECOMMENDATION
PAUL VALDES, ROBERT EHMER,
LT. WILLIAM McBRIDE, SGT. MICHAEL     99 CV 6846 (ARR)(RML)
BARRETO, and other yet to be identified
POLICE OFFICERS of THE CITY OF
NEW YORK POLICE DEPARTMENT,
THE NEW YORK CITY HEALTH AND
HOSPITALS CORPORATION, ELMHURST
HOSPITAL, MARY LOU PUERTOLLANO, M.D.,
MUKUNDAM VEERBATHANI, M.D.,
SANTHI S. RATAKONDA, M.D., ANTHONY
BOUTIN, M.D., JOHN DOE, M.D., MOUNT
SINAI SERVICES, and MOUNT SINAI
SCHOOL OF MEDICINE CITY UNIVERSITY
OF NEW YORK, INC.,

                        Defendants.
------------------------------------------------------------X

LEVY, United States Magistrate Judge:

              Plaintiff Loretta Cerbelli ("plaintiff"), as administratrix of the estate of Kevin E.

Cerbelli ("Cerbelli"), commenced this action on October 22, 1999.  By order dated February 6,

2002, the Honorable Allyne R. Ross, United States District Judge, referred all dispositive

motions in this case to me for Report and Recommendation.  Defendants New York City Health

and Hospitals Corporation ("HHC"), Mukundam Veerabathani, M.D., Santhi Ratakonda, M.D.,

Anthony Boutin, M.D., Erik Gunderson, M.D. (collectively, the "HHC defendants"),[1] and Mount Sinai School of Medicine now move for summary judgment pursuant to Federal Rule of Civil Procedure 56(c).[2]  For the reasons stated below, I respectfully recommend that the motion be granted.

BACKGROUND

On October 25, 1998, Kevin Cerbelli entered the 110th Precinct in Queens, New York, where the defendant police officers fatally shot him.  Although there are factual disputes as to what occurred inside the precinct, it is undisputed that Cerbelli was emotionally disturbed, shirtless, high on cocaine, and possessed a weapon.  (See generally Report and Recommendation, dated Sept. 8, 2008; see also Transcript of Oral Argument, dated June 25, 2008 ("Tr."), at 52 (plaintiff's counsel stating, "it's not disputed that [Cerbelli] was . . . in a psychotic condition at the time that he went into the precinct and was in that highly agitated state with a weapon or weapons in his hands, and was incoherent and did not have his shirt on.")  Plaintiff seeks to hold the HHC defendants liable for discharging Cerbelli from the hospital prematurely and failing to provide him with adequate outpatient psychiatric care.

Cerbelli's history of chronic psychiatric illness is long and detailed.  His first

---

[1]  Defendant Mary Lou Puertollano, M.D. died during the course of this lawsuit and the action was dismissed with prejudice with respect to her.  (See HHC Defendants' Statement of Undisputed Facts Pursuant to Local Civil Rule 56.1.1, dated Mar. 14, 2008, ¶ 10; So-Ordered Stipulation of Dismissal with Prejudice, dated Jan. 22, 2002, annexed as Ex. D to the Declaration of Gail Savetamal, Esq., dated Mar. 14, 2008 ("Savetamal Decl.").)

[2]  I addressed plaintiff's claims against the City of New York, police officers Robert Ehmer, James Williams, and Paul Valdes, Lieutenant William McBride, and Sergeant Michael Barreto in a separate Report and Recommendation, dated September 8, 2008, which Judge Ross adopted on September 30, 2008.

major inpatient hospital stay took place from February to May 1991,[3] when doctors at Elmhurst

Hospital Center diagnosed him with paranoid schizophrenia.  (Plaintiff's Counterstatement of

Disputed Facts Pursuant to Local Civil Rule 56.1.1, dated Apr. 28, 2008 ("Pl.'s Rule 56.1.1

Statement"), ¶¶ 12, 17.)  In the years that followed, Cerbelli was hospitalized repeatedly, both

voluntarily and involuntarily, due to his psychiatric condition.  (See HHC Defendants' Statement

of Undisputed Facts Pursuant to Local Civil Rule 56.1, dated Mar. 14, 2008 ("Defs.' Rule 56.1.1

Statement"), ¶ 11; Declaration of Gail Savetamal, Esq., dated Mar. 14, 2008, ("Savetamal

Decl."), Ex. E at 3-4.)  He also had a long history of substance abuse, including use of alcohol,

marijuana, cocaine, crack, PCP, LSD, and heroin (see Defs.' Rule 56.1.1 Statement ¶ 11;

Savetamal Decl., Ex. S at 1122, 1251), and exhibited a pattern of non-compliance with treatment

(see Report of Robert Lloyd Goldstein, M.D., dated Aug. 10, 2001 ("Goldstein Report"),

annexed as Ex. K to the Declaration of Carmen S. Giordano, Esq., dated Apr. 28, 2008

("Giordano Decl."), at 2, 4; Defs.' Rule 56.1 Statement ¶¶ 24, 33, 34, 40, 44, 46, 50, 66).  His

final psychiatric hospitalization began on July 24, 1998 and ended on August 26, 1998, when Dr.

Santhi Ratakonda certified him for discharge.  Cerbelli's last visit to Elmhurst Hospital took

place on September 24, 1998, when EMS found him wandering in the street disoriented and took

him to the Emergency Room.  (Defs.' Rule 56.1 Statement ¶¶ 83-85, 90.)  Although several

physicians examined Cerbelli during that visit, including Dr. Anthony Boutin, there was no

psychiatric evaluation and Dr. Erik Gunderson discharged him on September 25, 1998, one

---

[3] Cerbelli had an earlier involuntary hospital admission, in December 1988.  (See
Transcript of 50-H Hearing, dated Oct. 14, 1999, annexed as Ex. F to the Savetamal Decl., at 25-
31; Pl.'s Response to Defs.' First Set of Interrogatories, dated Aug. 17, 2000, at 3, annexed as
Ex. E to the Savetamal Decl.)  Records from that admission were not included in the parties'
exhibits.

month before Cerbelli's death.  (See Savetamal Decl., Ex. T at 298-307.)

STANDARD FOR SUMMARY JUDGMENT

A court shall grant summary judgment if "there is no genuine issue as to any material fact and . . . the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  When deciding a summary judgment motion, the court must view the evidence in the light most favorable to the non-moving party and decide only whether there is any genuine issue to be tried.  Eastman Mach. Co. v. United States, 841 F.2d 469, 473 (2d Cir. 1988).  "[T]he court is not to weigh the evidence, or assess the credibility of the witnesses, or resolve issues of fact . . . .  Resolutions of credibility conflicts and choices between conflicting versions of the facts are matters for the jury, not for the court on summary judgment."  United States v. Rem, 38 F.3d 634, 644 (2d Cir. 1994) (internal citations omitted).  A genuine factual issue exists if, taking into account the burdens of production and proof that would be required at trial, sufficient evidence favors the non-movant such that a reasonable jury could return a verdict in that party's favor.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  In other words, there must be more than "a scintilla of evidence" to support the non-moving party's claims, id. at 251; "assertions that are conclusory" will not suffice, Patterson v. County of Oneida, 375 F.3d 206, 219 (2d Cir. 2004).

DISCUSSION

**I.     Plaintiff's Section 1983 Claim Against the New
         York City Health and Hospitals Corporation**

Plaintiff asserts a claim against HHC under 42 U.S.C. § 1983 for alleged violations of Cerbelli's rights under the Fourth and Fourteenth Amendments.  Section 1983

-4-

liability attaches to municipalities[4] "only if 'the action that is alleged to be unconstitutional

implements or executes a policy statement, ordinance, regulation, or decision officially adopted

and promulgated by that body's officers'" or "is conducted 'pursuant to governmental "custom"

even though such a custom has not received formal approval through the body's official

decisionmaking channels.'"  Anthony v. City of New York, 339 F.3d 129, 139 (2d Cir. 2003)

(quoting Monell v. Dep't of Soc. Servs., 436 U.S. 658, 690-91 (1978)); see also Jenkins v. City

of New York, 478 F.3d 76, 93-94 (2d Cir. 2007) ("[A] municipality may be found liable under

section 1983 only where the municipality itself causes the constitutional violation at issue.").

The "policy or custom" requirement "is intended simply to distinguish acts of the municipality

from acts of its employees, in order that municipal liability be limited to conduct for which the

municipality is actually responsible."  Dangler v. N.Y. City Off Track Betting Corp., 193 F.3d

130, 142 (2d Cir. 1999).  A municipality cannot be held liable based upon a theory of respondeat

superior.  Monell, 436 U.S. at 691.

   To succeed on a Monell claim that challenges a municipal policy or custom, "a

plaintiff is required to plead and prove three elements: (1) an official policy or custom that (2)

causes the plaintiff to be subjected to (3) a denial of a constitutional right."  Batista v. Rodriguez,

702 F.2d 393, 397 (2d Cir. 1983).  The municipal policy, practice or custom at issue must have

been the "moving force [behind] the constitutional violation."  Sarus v. Rotundo, 831 F.2d 397,

400 (2d Cir. 1987) (quoting Monell, 436 U.S. at 694).  A municipal "policy" is a written

directive or regulation or an act by a municipal employee with final policymaking authority.  See

---

[4] HHC is a municipal entity subject to this analysis.  See Rookard v. Health & Hosps. Corp., 710 F.2d 41, 45 (2d Cir. 1983).

Warheit v. City of New York, No. 02 Civ. 7345, 2006 WL 2381871, at *12 (S.D.N.Y. Aug. 15, 2006), aff'd, 271 F. App'x 123 (2d Cir. 2008).  By comparison, a municipal "custom" is a practice so widespread and permanent as to have the force of law.  Id.

   Plaintiff argues that HHC "maintained customs, policies and/or practices regarding the discharge of psychiatric inpatients and the care and treatment of psychiatric outpatients" that caused a violation of Cerbelli's rights.  (Plaintiff's Memorandum of Law in Opposition to Defendants' (HHC) Motion for Summary Judgment, dated Apr. 28, 2008 ("Pl.'s Mem."), at 6.)  Specifically, she contends that HHC showed deliberate indifference to Cerbelli and others by failing to: (1) have a system "for continuity of psychiatric services and communication between the inpatient, outpatient and emergency departments," (2) supervise or train psychiatric outpatient caregivers to ensure that they consulted with inpatient psychiatrists prior to, at the outset of, or during outpatient treatment, (3) have criteria defining high-risk psychiatric outpatients or supervise or train case managers in defining such high-risk patients, (4) have a policy, practice or methodology for psychiatric outpatient caregivers to effectively monitor or determine whether chronically mentally ill patents, including high-risk patients, were taking their psychiatric medications during outpatient treatment, (5) train or supervise regarding missed outpatient appointments or have a follow-up system or established practice for such missed appointments, and (6) train or supervise regarding referrals to mobile crisis intervention or other outreach programs when outpatients, including high-risk outpatients, failed to appear for treatment or medication, or have a policy, procedure or practice for such referrals.  (Pl.'s Mem. at 14-15.)  Plaintiff contends that these alleged HHC policies and customs "collectively" caused Cerbelli to "decompensate, suffer and ultimately be shot [by police officers] while in a psychotic

state, resulting in his death." (Pl.'s Mem. at 16.)

Plaintiff offers no evidence of any written directive or regulation concerning these alleged policies or any act by a policymaking HHC employee that was a substantial factor in causing a rights violation. Nor does she attempt to show – through documents, deposition testimony or otherwise – that these alleged practices or customs were so widespread and permanent as to have the force of law. Indeed, other than Cerbelli, plaintiff presents no example of any patient who allegedly suffered a violation of constitutional rights because of HHC's policies, customs, or practices.[5] Plaintiff's speculative and conclusory allegations are insufficient. See Dwares v. City of New York, 985 F.2d 94, 100 (2d Cir. 1993) ("The mere assertion . . . that a municipality has such a custom or policy is insufficient in the absence of allegations of fact tending to support, at least circumstantially, such an inference."), overruled on other grounds, Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit, 507

---

[5] Plaintiff relies on a report by the New York State Commission on Quality of Care for the Mentally Disabled and the Mental Hygiene Review Board, dated November 1999 (see Giordano Decl., Ex. M), to show that "similar problems . . . were encountered in other HHC facilities." (Tr. at 49.) That report, entitled "In the Matter of David Dix," concerned a January 3, 1999 incident in which a mentally ill man pushed a young woman to her death in front of an oncoming subway train. (Giordano Decl., Ex. M at i.) Plaintiff does not address the admissibility of the report under the Federal Rules of Evidence. The report makes a number of recommendations for improving the quality of care for individuals, such as David Dix, whose serious and persistent mental illness represents a danger to themselves or others and results in frequent hospitalizations. (Id.) Among other things, it recommends that facilities discharging individuals with serious mental illness and a history of noncompliance with aftercare make efforts to ensure that such individuals receive the full array of services they need, and that case managers "be assigned and held responsible for monitoring compliance with clinical recommendations and prompting additional interventions as they become necessary." (Id. at ii; see also id. at 11-15.) The report focuses specifically on Mr. Dix's care and treatment; although it states that "the problematic issues reflected in the David Dix case are not uncommon," it does not describe the depth or extent of those problems. Nor does it conclude that HHC's policies, customs, or practices caused anyone to suffer a violation of constitutional rights.

U.S. 163, 164 (1993); Wicks v. Qualtere, Nos. 95-CV-425, 95-CV-426, 1997 WL 176338, at *6

(N.D.N.Y. Apr. 4, 1997) ("[C]onclusory allegations without evidentiary support or allegations of

particularized incidents do not state a valid claim.") (citing Kern v. City of Rochester, 93 F.3d

38, 44 (2d Cir. 1996)).

To the extent plaintiff's Monell claim is based on HHC's alleged failure to train

or supervise employees, or its failure to implement a policy or program responding to a problem

adequately, plaintiff must show that the alleged failure "amounts to deliberate indifference to the

rights of persons with whom the [municipal employees] come into contact." City of Canton v.

Harris, 489 U.S. 378, 388 (1989).[6]  The Second Circuit has established a three-part test for

demonstrating deliberate indifference:

> First, the plaintiff must show that a policymaker knows 'to a moral
> certainty' that her employees will confront a given situation. . . .
> Second, the plaintiff must show that the situation either presents
> the employee with a difficult choice of the sort that training or
> supervision will make less difficult or that there is a history of
> employees mishandling the situation. . . . Finally, the plaintiff must
> show that the wrong choice by the city employee will frequently
> cause the deprivation of a citizen's constitutional rights.

Walker v. City of New York, 974 F.2d 293, 297-98 (2d Cir. 1992) (internal citations omitted);

accord Jenkins, 478 F.3d at 94; see also Walker, 974 F.2d at 296 (holding evidence of single

incident "without any proof relating to the nature of the training itself" insufficient to establish

inadequate training because "plaintiffs must put forward some evidence that the City itself has

acted or consciously not acted").

---

[6] Plaintiff's complaint does not allege that HHC failed to train or supervise employees.
(See Complaint, dated Oct. 21, 1999, annexed as Ex. A to the Savetemal Decl., ¶¶ 55-60.)
Regardless, for the reasons explained herein, she cannot sustain such a claim.

With respect to the first <u>Walker</u> factor, plaintiff has presented no evidence that HHC knew "to a moral certainty" that its employees would confront "the given situation," namely, that an emotionally disturbed patient, decompensated due to improvident discharge from psychiatric commitment and inadequate outpatient care,[7] would engage in behavior that would result in the use of unconstitutional excessive force against him.  Notwithstanding plaintiff's assertion that the acts of the defendant doctors and police officers were all part of an "unbroken chain of foreseeable events" and were "concurrent causes" occasioning Cerbelli's shooting death (Pl.'s Mem. at 14), plaintiff cannot show that the events of October 25, 1998 were reasonably foreseeable to HHC.

Even if "the given situation" were defined more broadly, however, plaintiff has not attempted to satisfy the third <u>Walker</u> factor with evidence that the wrong choice by HHC employees will "frequently" cause the deprivation of psychiatric patients' constitutional rights. <u>See</u> <u>Green v. City of New York</u>, 465 F.3d 65, 80 (2d Cir. 2006) (explaining that courts will find deliberate indifference "where municipal employees in exercising their discretion, so often violate constitutional rights that the need for further training must have been plainly obvious to the city policymakers").  Again, plaintiff presents no example of anyone, other than Cerbelli, who allegedly suffered a deprivation of rights as a result of HHC's actions or failure to act.  The fact that Cerbelli had a long psychiatric history of decompensation and non-compliance does not alone demonstrate a deficiency in the training or supervision of HHC health care providers, or

---

[7]  As explained in more detail <u>infra</u>, defendants dispute the contention that Cerbelli decompensated at all, let alone as a result of early discharge or inadequate outpatient care.  (<u>See</u> Tr. at 6-8.)

that HHC policymakers had notice of and acquiesced in constitutional violations.

Moreover, even if plaintiff could show that HHC failed to train or supervise its employees, or failed to implement a policy or program responding to a problem adequately, she would not be able to demonstrate that such failure resulted in a deprivation of Cerbelli's Fourth or Fourteenth Amendment rights. The Fourth Amendment protects against "unreasonable searches and seizures," U.S. Const. amend. IV, including the use of excessive force.  See Graham v. Connor, 490 U.S. 386, 395 (1989); Tennessee v. Garner, 471 U.S. 1, 7 (1985). Plaintiff does not allege that HHC or its employees violated Cerbelli's Fourth Amendment rights directly, but that "the constitutional violation which occurred on the date of his death was in part caused by HHC's failures."  (Tr. at 5; see also Tr. at 19 ("Plaintiff draws a causal link between the failures outlined in the practices and customs [of HHC] and the death and the seizure under the Fourth Amendment.").)  In other words, plaintiff seeks to hold HHC accountable for the actions of the police officers who allegedly used excessive force against Cerbelli.  She cites no authority for the proposition that such an attenuated association implicates the Fourth Amendment.  Regardless, she cannot demonstrate that Cerbelli's shooting death was a natural consequence of his medical treatment and discharge.

The Fourteenth Amendment's Due Process Clause requires the State to assume responsibility for the safety and well-being of individuals in its custody.  See Deshaney v. Winnebago County Dep't of Soc. Servs., 489 U.S. 189, 199-200 (1989).  This responsibility extends to involuntarily committed psychiatric patients, who are entitled to adequate food, shelter, clothing, and medical care.  See Youngberg v. Romeo, 457 U.S. 307, 315 (1982). However, at the time of his death, Cerbelli was not in the custody of HHC.  Rather, he was a

voluntary private patient who went to the Elmhurst Hospital Center's outpatient clinic for psychiatric care.  Even though Cerbelli had been in HHC's custody, most recently for the July–August 1998 psychiatric admission, HHC did not have a constitutional duty to protect him or provide him with medical services once he was no longer in its custody.  See Deshaney, 489 U.S. at 201 ("The State does not become the permanent guarantor of an individual's safety by having once offered him shelter.").

A plaintiff may also establish a general substantive due process violation by showing that the defendant's actions, taken under color of state law, involved "conduct intended to injure [plaintiff] in some way unjustifiable by any government interest [and] . . . most likely to rise to the conscience-shocking level." County of Sacramento v. Lewis, 523 U.S. 833, 849 (1998); see also Johnson v. Newburgh Enlarged Sch. Dist., 239 F.3d 246, 252 (2d Cir. 2001) (explaining that, to shock the conscience, governmental conduct must be so extreme or outrageous that it can be viewed as "brutal" and "offensive to human dignity"); Lowrance v. Achtyl, 20 F.3d 529, 537 (2d Cir. 1994) (explaining that a due process violation exists where governmental action is arbitrary, conscience-shocking, or oppressive in a constitutional sense, not just incorrect or ill-advised).  Plaintiff does not allege or put forth evidence to prove that any defendant's care and treatment of Cerbelli was so extreme or outrageous that it can be considered intentionally harmful, "brutal," or "offensive to human dignity."

In sum, plaintiff's § 1983 claim against HHC fails.  I therefore respectfully recommend that HHC be granted summary judgment on plaintiff's Monell claim.

## II.     Plaintiff's Section 1983 and State Law Claims Against Mount Sinai School of Medicine and the Individual Defendants

At oral argument, plaintiff's counsel consented to dismissal of her § 1983 claims against Mount Sinai School of Medicine, sued here as "Mount Sinai Services and Mount Sinai School of Medicine City University of New York, Inc.," and the individual HHC defendants, doctors Mukundam Veerabathani, Santhi Ratakonda, Anthony Boutin, and Erik Gunderson. (See Tr. at 2-4.) Her submissions also make no mention of, or offer any specific evidence with respect to, any state law claims against Mount Sinai School of Medicine, Dr. Veerabathani, Dr. Boutin, or Dr. Gunderson. I therefore recommend that these claims be dismissed.

### III. Plaintiff's State Law Claim Against HHC and Dr. Ratakonda for Psychiatric Malpractice Relating to Cerbelli's August 26, 1998 Discharge from Elmhurst Hospital Center

Plaintiff asserts claims against HHC and Dr. Santhi Ratakonda under New York State law for psychiatric malpractice relating to Cerbelli's discharge from Elmhurst Hospital on August 26, 1998. It is well-established that New York courts will not impose liability for a mere error in professional medical judgment. O'Shea v. United States, 623 F. Supp. 380, 385 (E.D.N.Y. 1985) (collecting cases). Rather, for liability to attach, a plaintiff must show that "the provider's treatment decision was something less than a professional medical determination." Durney v. Terk, 840 N.Y.S.2d 30, 32 (1st Dep't 2007) (internal quotations and citations omitted). The mere fact that plaintiff's expert may have chosen a different course of treatment, without more, cannot sustain a prima facie case of psychiatric malpractice. Id. "When a psychiatrist chooses a course of treatment, within a range of medically accepted choices, for a patient after a proper examination and evaluation, the doctrine of professional medical judgment will insulate such psychiatrist from liability." Id. (citing O'Sullivan v. Presbyterian Hosp., 634 N.Y.S.2d 101, 103 (1st Dep't 1995)). On the other hand, "'[a] decision that is without proper

-12-

medical foundation, that is, one which is not the product of a careful examination, is not to be

legally insulated as a professional medical judgment.'" Fotinas v. Westchester County Med.

Ctr., 752 N.Y.S.2d 90, 92 (2d Dep't 2002) (quoting Bell v. N.Y. City Health & Hosps. Corp.,

456 N.Y.S.2d 787, 794 (2d Dep't 1982)).

   The line between the proper exercise of judgment and deviation from accepted

practice can be difficult to delineate, particularly in cases involving psychiatric treatment. Id.

As the court in Taig v. State, 241 N.Y.S.2d 495, 496-97 (3d Dep't 1963), famously observed :

> The prediction of the future course of a mental illness is
> a professional judgment of high responsibility and in some instances
> it involves a measure of calculated risk. If liability were imposed
> on the physician or the State each time the prediction of future
> course of mental disease was wrong, few releases would ever be
> made and the hope of recovery and rehabilitations of a vast number
> of patients would be impeded and frustrated. This is one of the
> medical and public risks which must be taken on balance, even
> though it may sometimes result in injury to the patient and others.

In other words, whether to release an institutionalized patient involves a risk of error, and a

psychiatrist "is not required to achieve success in every case." Schrempf v. State, 487 N.E.2d

883, 887 (N.Y. 1985) (citing Pike v. Honsinger, 49 N.E. 760 (N.Y. 1898); DuBois v. Decker, 29

N.E. 313 (N.Y. 1891)). Importantly, a facility may not continue to detain a mentally ill patient

involuntarily unless there is clear and convincing evidence that the patient poses an acute threat

of harm to himself or others. See N.Y. Mental Hyg. Law §§ 9.39, 9.40, 9.27, 9.01; see also In re

John P., 697 N.Y.S.2d 120, 121 (2d Dep't 1999).

   Here, plaintiff contends that Dr. Ratakonda, a psychiatrist, violated professional

standards by failing to review Cerbelli's medical records thoroughly or to consult with the

treating physician before authorizing his discharge. The record shows that Cerbelli was admitted

to Elmhurst Hospital for emergency psychiatric care on July 24, 1998.  On that day, Cerbelli

went to Elmhurst Hospital to visit a psychologist in the outpatient Community Options Program[8]

and began to act in ways that the admitting physician described as "bizarre, delusional,

grandiose, paranoid, and . . . threatening to his mother."  (Giordano Decl., Ex. A at 1229.)  Later

that day, Cerbelli assaulted a hospital staff member, breaking her nose.  (Savetamal Decl., Ex. S

at 1352-53, 1470.)  He also refused medication; as a result, the hospital obtained a court order to

medicate him over his objections.  (Savetamal Decl., Ex. S at 1244, 1275-76, 1235-36.)

On July 31, 1998, Dr. Ratakonda certified Cerbelli for further involuntary

psychiatric inpatient admission.  Dr. Ratakonda's notes from that evaluation state:

> 30 year old male with schizophrenia admitted for bizarre,
> threatening behavior and psychiatric symptoms.  P[atient] remains
> psychotic and delusional with poor impulse control, labile mood
> and poor judgment.  He needs continued hospitalization to
> minimize risk of danger to himself and others.

(Savetamal Decl., Ex. S at 1241.)  Dr. Ratakonda's notes relating to Cerbelli's discharge, on

August 26, 1998, reveal substantial improvement:

> Patient evaluated and chart reviewed. Mr. Cerbelli is scheduled for
> discharge today.  He has remained in good behavioral control and
> is compliant to taking his meds.  He reports no significant side
> effects. [Patient] reports he no longer hears voices, denies paranoid
> ideation, suicidal thoughts or aggressive impulses. [Patient] is
> willing to follow-up in out-patient clinic.  Mr. Cerbelli will be
> discharged back to his apt and will have follow-up at MHC
> [Mental Hygiene Clinic] starting 9-9-98.  D/C Meds.

(Giordano Decl., Ex. A at 1347.)  Dr. Ratakonda explained in his deposition that "D/C Meds"

_____

[8]  The Community Options Program is an outpatient program in the Elmhurst Hospital
Mental Hygiene Clinic for patients with prior psychiatric hospitalizations.  (Defs.' Rule 56.1
Statement ¶ 29.)

means that he prescribed several medications at the time of discharge, including Cogentin,

Depakote, and Prolixin.  (Deposition of Dr. Santhi Ratakonda, dated May 23, 2001, annexed as

Ex. H to the Savetamal Decl. ("Ratakonda Dep."), at 55.)  In addition, a psychiatric nurse

practitioner's discharge summary from the same date states:

> [Patient] is . . . alert, calm [and] appropriate.  Denies depressive,
> psychotic symptoms [and] none observed.  Health teaching done
> . . . No acute distress noted.

(Giordano Decl., Ex. A at 1348.)

In his deposition, taken in May 2001, Dr. Ratakonda recalled little about

Cerbelli's discharge nearly three years earlier.  He stated that he did not make the decision to

discharge Cerbelli.  That decision was made by Cerbelli's treatment team, and "the discharge

plan was already in place" when Dr. Ratakonda arrived.  (Ratakonda Dep. at 56-57.)  As the

psychiatrist who was called in to cover for Cerbelli's treating psychiatrist, who was out sick that

day, Dr. Ratakonda reviewed Cerbelli's chart to see whether there had been any significant

changes in the previous few days.  (Id. at 60.)  He explained that, if a chart indicated no recent

change in the patient's condition, he typically "would have no occasion" to speak with the

treating physician before discharging the patient.  (Id.)  He further stated that he evaluated

Cerbelli "to ensure that . . . there [had] been no gross change from the time that the decision was

made to discharge the patient . . . to the day of actual discharge."  (Id. at 66.)

Defendants' expert, Dr. Frank T. Miller, notes in his report that Cerbelli's

condition had improved considerably over the course of his hospitalization in July and August

1998.  (See Report of Frank T. Miller, M.D., dated Oct. 13, 2001, annexed as Ex. N to the

Savetamal Decl. ("Miller Report"), at 3).  Dr. Miller, a board certified psychiatrist, explains that

-15-

Cerbelli:

> went from requiring medication against his will, from being
> maintained in four-point physical restraint, from engaging in
> physical violence and intimidation, from manifesting an aggressive
> delusional stance, and from total medication refusal, to taking
> medication willingly and by mouth, engaging in "calm" and
> "friendly" interactions with staff and patients, and actively
> participating in ward life.  This trajectory is the embodiment of
> recovery from an acute psychotic episode.

(Id.)  He describes Cerbelli's care and treatment as "typical and ordinary" for a person with

schizophrenia (id. at 6) and states in a separate affidavit that "HHC and Dr. Ratakonda properly

treated Mr. Cerbelli during his July/August 1998 admission in all respects" since "Dr. Ratakonda

properly evaluated and examined Kevin Cerbelli, properly conferred with Elmhurst staff, and

reviewed Kevin Cerbelli's chart" (Affidavit of Frank T. Miller, M.D., sworn to Mar. 13, 2008,

annexed as Ex. P to the Savetamal Decl. ("Miller Aff."), ¶¶ 28, 32).  As Dr. Miller points out,

Dr. Ratakonda had previously examined Cerbelli on July 31, 1998 and was therefore familiar

with his condition and treatment.  (Id. ¶ 33.)

       Plaintiff argues that Dr. Ratakonda was wrong when he released Cerbelli and that

a more thorough review of Cerbelli's hospital records and a consultation with his treating

psychiatrist, Dr. Puertollano, would have pointed to a paranoid schizophrenic with a history of

noncompliance and psychotic behavior, whose condition was certain to deteriorate rapidly.  (See

Pl.'s Mem. at 23.)  To support this contention, plaintiff focuses on a handful of entries in

Cerbelli's hospital chart which, she asserts, demonstrate that he remained delusional, reclusive,

and religiously preoccupied at the time of his discharge.  (See id. at 25, 27.)  For example, a

record entry from August 20, 1998, five days before Cerbelli's discharge, describes him as "still

-16-

delusional, stating he is Jesus Christ."  (Giordano Decl., Ex. A at 1343.)  In addition, a nurse's

note dated August 24, 1998, two days before his release, describes Cerbelli as "seclusive" and

states that he remained in bed all day and "refuse[d] to participate in therapeutic dialogue." (Id.

at 1347; see also id. at 1346 (nurse's note from August 23, 1998, describing Cerbelli as

"religiously preoccupied" and preaching to other patients); id. at 1347 (nurse's note from August

25, 1998, stating that Cerbelli spent the entire day in bed).)

         However, numerous other entries from the same time period describe Cerbelli's

condition as greatly improved.  (See, e.g., id. at 1343 (note dated August 20, 1998, stating that

Cerbelli was "alert, calm and cooperative with unit routine," interactive, not aggressive, and

exhibiting good impulse control); id. at 1346 (note from August 22, 1998, stating that Cerbelli

"has been in a good disposition," is "friendly," "always happy," and exhibiting "no untoward

behavior"); id. (note from August 24, 1998, stating that there were "no agitated behaviors

noted").)  Despite his delusions, there is nothing in Cerbelli's medical record to indicate that he

was exhibiting violent or self-destructive conduct at the time of his discharge.

         Moreover, as Dr. Miller explains in his expert report, the presence of delusions is

typical for people with schizophrenia.  Indeed, Dr. Miller states that "nearly all schizophrenic

patients have delusional ideas most of the time" and "[i]t would be absurd to suppose that

schizophrenic patients are routinely discharged [from involuntary hospitalization] with their

delusions resolved."  (Miller Report at 4.)  He also explains that thought disorder is "the defining

symptom of schizophrenia" and that "the expectation that patients would stay hospitalized until

their thought disorders had cleared is unimaginable."  (Id.)  In addition, Dr. Miller notes that

fatigue is "a ubiquitous manifestation of the post-psychotic period" and that most schizophrenic

patients "experience fatigue for 6 to 12 months" upon their discharge from hospitalization.  (Id.)

Finally, Dr. Miller states that "[i]isolative behavior is sadly a core experience of the

schizophrenic patient" and "a major obstacle to treatment," but that no one in the field "would

state that a patient must remain in the hospital until this symptom resolves since to make this

claim would mean extending hospital stays by years (not merely by months)."  (Id. at 5.)

Although Dr. Ratakonda observed none of these symptoms at the time of Cerbelli's discharge,

Dr. Miller opines that "even if he did, the discharge still would have been appropriate as

schizophrenic patients routinely experience these symptoms as part of the disease of

schizophrenia" and "[p]atients would never be discharged if the standard of care required

complete resolution of these inherent symptoms of schizophrenia."  (Miller Aff. ¶ 34.)  He

concludes that, in the absence of clear and convincing evidence that Cerbelli posed an acute

threat of substantial harm to himself or others, Dr. Ratakonda "no longer had a legal or medical

basis to detain Mr. Cerbelli beyond the date of his discharge of August 26, 1998."  (Id. ¶ 32.)

            Plaintiff's expert, Dr. Robert L. Goldstein, does not challenge these conclusions

directly.  Although he maintains that Cerbelli's discharge from Elmhurst Hospital was

"premature and ill-advised" because Cerbelli was still delusional, was exhibiting a lack of

insight about his need for treatment, and had a long history of noncompliance (Goldstein Report

at 5-6), and he describes Dr. Ratakonda's certification of Cerbelli's discharge as a "deviation and

departure" from "good and accepted levels of psychiatric care and treatment" (id. at 11-12), Dr.

Goldstein does not suggest that Cerbelli was a danger to himself or others at the time of his

discharge.  Nor does he claim that Cerbelli's delusions and other symptoms were curable.

Rather, he contends that Cerbelli's later relapse was "entirely predictable and foreseeable."  (Id.

-18-

at 7.)  That is insufficient to raise a triable issue of fact as to whether Dr. Ratakonda's

certification was "less than a professional medical determination."  Even if it could be shown

that Cerbelli's noncompliance with treatment and return to illicit drug use were foreseeable and

would likely lead to his decompensation, Elmhurst Hospital was obligated to discharge Cerbelli

in the absence of clear and convincing evidence that he posed an acute threat of harm to himself

or others on August 26, 1998.  See N.Y. Mental Hyg. Law § 9.37(a); see also O'Connor v.

Donaldson, 422 U.S. 563, 575 (1975) ("A finding of 'mental illness' alone cannot justify a

State's locking a person up against his will and keeping him indefinitely in simple custodial

confinement" as there is "no constitutional basis for confining such persons involuntarily if they

are dangerous to no one and can live safely in freedom.")  Plaintiff does not explain how a more

thorough review of Cerbelli's chart or a consultation with his treating psychiatrist would have

changed Dr. Ratakonda's assessment in this regard.

Nor does plaintiff's own testimony raise a triable issue of fact on this point.

Loretta Cerbelli testified in her deposition that she told Dr. Puertollano that she did not believe

her son was ready to be discharged.  (Deposition of Loretta Cerbelli, dated Aug. 31 and Sept. 6,

2000, annexed as Ex. G to the Savetamal Decl. ("L. Cerbelli Dep."), at 485.)  According to Ms.

Cerbelli, her son was "emaciated" and "wasn't taking care of his personal hygiene."  (Id. at 486.)

She stated that she thought "[t]hey should have kept him there until he was well."  (Id.)

Unfortunately, however, Cerbelli was never going to be "well," insofar as schizophrenia is not a

curable disease.  Even if it could be shown that Cerbelli would have benefitted from a longer

hospital stay, that is not the relevant standard.

Plaintiff also complains that the August 24, 1998 treatment plan was inadequate

-19-

because it merely referred Cerbelli to the outpatient clinic and directed him to take medications.

Under New York's Mental Hygiene Law, which establishes accepted medical practice, a mental

health facility discharging a patient from involuntary hospitalization must prepare a written

service plan that includes the following:

> 1.    A statement of the patient's need, if any, for supervision, medication, aftercare services, and assistance in finding employment following discharge;
>
> 2.    A specific recommendation of the type of residence in which the patient is to live and a listing of the services available to the patient in such residence;
>
> 3.    A listing of organizations, facilities, including those of the department, and individuals who are available to provide services in accordance with the identified needs of the patient; and
>
> 4.    An evaluation of the patient's need and potential eligibility for public benefits following discharge or conditional release, including public assistance, medicaid, and supplemental security income.

N.Y. Mental Hyg. Law § 29.15(g).  Here, Dr. Puertollano prepared two Comprehensive

Treatment Plans, dated August 3, 1998 and August 10, 1998.  (See Savetamal Decl., Ex. S at

1364-68.)  Cerbelli's medical record also contains a number of Interdisciplinary Treatment

Plans, which document periodic goals throughout his July–August 1998 admission.  (See id. at

1374-79.)  Finally, Cerbelli was given an "Adult Discharge and After-Care Support Service

Plan," which he reviewed and signed, and which instructed him to take his medications and

follow up with the Elmhurst Mental Hygiene Clinic and with the Community Options Program.

(See id. at 1464-69, 1472.)  The plan indicated that Cerbelli had preexisting financial

arrangements, but it provided a social worker's name and telephone number in the event he

needed further assistance.  (Id. at 1465.)  It also noted that Cerbelli was scheduled for an

appointment with Dr. Puertollano on September 9, 1998.  (Id.)  There is no indication that

Cerbelli needed or requested assistance in finding employment or housing.

        In his expert affidavit, Dr. Miller opines to a reasonable degree of medical

certainty that this treatment plan satisfied the requirements of the Mental Hygiene Law and was

"within accepted standards of medical practice."  (Miller Aff. ¶ 36.)  Although plaintiff contends

that Cerbelli should have been offered an intensive case manager ("ICM"), as opposed to a

referral to the Community Options Program, Dr. Miller states that the decision not to assign one

did not deviate from the standard of care, since the assignment of an ICM, who provides close

follow-up care to psychiatric patients in the community, "works extremely well with house-

bound elderly patients who are fully accepting of the care," but "works poorly with paranoid

psychotic patients who are suspicious of the contact and fearful of the intimacy implicit in

having someone come to their home or residence, such as Kevin Cerbelli."  (Id. ¶ 37.)  He also

states that, in 1998, "ICM was in its infancy, partially regulated, and unlicensed," and "[m]ost

ICM providers had little clinical training and a minimum of actual clinical experience."  (Id.)  He

thus concludes that a professional decision not to provide an ICM "is not evidence of negligent

care."  (Id.)[9]

        Although plaintiff's expert, Dr. Goldstein, contends that Cerbelli's treatment plan

was "inadequate and doomed to failure" (Goldstein Report at 6), his statements are wholly

conclusory and, in some key instances, inaccurate.  He maintains that "there was no treatment

plan in the chart," which is belied by the medical record, and he ignores the fact that Cerbelli

---

   [9]  In her deposition, Loretta Cerbelli confirmed that the Community Options Program
social worker told her that her son was "not eligible for an intensive case manager."  (L. Cerbelli
Dep. at 518.)

was scheduled for a follow-up appointment with his treating psychiatrist two weeks after his

discharge.  (See id. at 6-7.)  Moreover, as explained, disagreement between professional experts

does not, alone, establish a prima facie case of psychiatric malpractice.  See Centeno v. City of

New York, 369 N.Y.S.2d 710, 710-11 (1st Dep't 1975), aff'd, 358 N.E.2d 520 (N.Y. 1976).  Dr.

Goldstein criticizes Cerbelli's treatment plan on the ground that Cerbelli had failed to appear at

the outpatient clinic as directed and had refused to take his medications in the past.  (Goldstein

Report at 6.)  He states that "[i]t was entirely predictable and foreseeable that, under the

circumstances, Mr. Cerbelli was virtually certain to be non-compliant yet again, leading

inevitably to a relapse of psychotic and violent behavior in the near future."[10]  (Id. at 7.)  Yet, he

does not address the Mental Hygiene Law or explain specifically what he believes the treatment

---

[10]  The parties disagree about whether Cerbelli's past behavior can be characterized as
violent.  As noted, there is evidence in the record that Cerbelli assaulted an Elmhust Hospital
staff member on July 24, 1998.  (Defs.' Rule 56.1 Statement ¶ 59.)  In addition, in 1994 he was
convicted of reckless endangerment for setting a fire in a group home in Queens (id. ¶¶ 15-17),
and hospital records from a February 1991 admission indicate that Cerbelli had been arrested for
assault and drunk driving (Giordano Decl., Ex. A at 218) and had been physically violent toward
his mother (id. at 214).  However, none of the expert reports speaks to the issue of whether past
violence is a predictor of future dangerousness, and in fact courts have recognized the difficulty
in predicting future violent behavior by the mentally ill.  See Heller v. Doe, 509 U.S. 312,
323-24 (1993) ("Manifestations of mental illness may be sudden, and past behavior may not be
an adequate predictor of future actions.  Prediction of future behavior is complicated as well by
the difficulties inherent in diagnosis of mental illness. . . . It is thus no surprise that many
psychiatric predictions of future violent behavior by the mentally ill are inaccurate.") (citing
Developments in the Law – Civil Commitment of the Mentally Ill, 87 Harv. L. Rev. 1190,
1242-43 (1974); Steadman, Employing Psychiatric Predictions of Dangerous Behavior: Policy
vs. Fact, in Dangerous Behavior: A Problem in Law and Mental Health 123, 125-28 (C.
Frederick ed., 1978)); Flores v. Johnson, 210 F.3d 456, 463 (5th Cir. 2000) ("The scientific
community virtually unanimously agrees that psychiatric testimony on future dangerousness is,
to put it bluntly, unreliable and unscientific.").

plan should have contained.  Accordingly, Dr. Goldstein's report does not raise a triable issue of fact regarding the adequacy of Cerbelli's discharge plan.  See Simmons v. United States, 88 F. App'x 435, 437-38 (2d Cir. 2004) (expert's conclusory statement that physician failed to meet the standard of care was "rightly regarded by the district court as insufficient to raise a genuine issue of material fact"); Kelsey v. City of New York, No. 03 CV 5978, 2007 WL 1352550, at *5 (E.D.N.Y. May 7, 2007) ("'Conclusory affidavits, even from expert witnesses, do not provide a basis upon which to grant or deny motions for summary judgment.'") (quoting  8 C. Wright, A. Miller & E. Cooper, Federal Practice & Procedure § 62:716).

        In sum, plaintiff does not put forth sufficient evidence to raise a triable issue of material fact as to whether Dr. Ratakonda and HHC departed from accepted psychiatric practice in discharging Cerbelli or in formulating his discharge plan.  I therefore respectfully recommend that defendants' motion for summary judgment be granted on this claim.

IV.     **Plaintiff's State Law Claim Against HHC for**
        **Negligence Relating to Cerbelli's Outpatient Care**

Plaintiff contends that, from August 26, 1998 to October 25, 1998, "HHC did

nothing to address [Cerbelli's] condition."  (Pl.'s Mem. at 17.)  She argues that HHC employees

should have done more to ensure that Cerbelli was compliant with his outpatient treatment plan

and was taking his medications, and that the failure to provide "medically appropriate outpatient

care" during that period "was grossly negligent."  (Id. at 34-37.)

To prevail on a claim of negligence under New York law, a plaintiff must prove

(1) a duty owed by the defendant to the plaintiff to use reasonable care, (2) the defendant's

breach of that duty, and (3) resulting injury to the plaintiff.  E.g., Engelhart v. County of Orange,

790 N.Y.S.2d 704, 707 (2d Dep't 2005).  In general, a psychiatrist or other mental health

professional has a duty to exercise "professional judgment" and to treat patients using a "proper

medical foundation."  Bell v. N.Y. City Health & Hosps. Corp., 456 N.Y.S.2d 787, 794 (2d

Dep't 1982).  In the voluntary outpatient context, however, the duty of psychiatric care providers

to control the actions of a patient who is a threat to himself or others is limited.  See Schrempf,

487 N.E.2d at 888  (because the patient in question "was a voluntary outpatient, the State's

control over him, and consequent duty to prevent him from harming others, is more limited than

in cases involving persons confined to mental institutions."); Lizardi v. Westchester County

Health Care Corp., 2008 N.Y. Slip Op. 52332(U), 2008 WL 4952453, at *2 (Sup. Ct.

Westchester County Nov. 13, 2008) ("[W]here voluntary outpatient treatment is involved, there

generally is no duty imposed upon the treating physician to control a patient's conduct," but

"liability may be imposed if the failure to place the patient on inpatient status resulted from

-24-

something other than an exercise of professional judgment.") (internal quotation marks and citations omitted); <u>Webdale v. N. Gen. Hosp.</u>, No. 111310/99, slip op. at 5 (Sup. Ct. N.Y. County June 13, 2000) (Savetamal Decl., Ex. GG) ("Where the individual involved is a voluntary psychiatric outpatient, the institution's control over the patient, and thus its duty to prevent the patient from harming others, is more limited. . . . However, the duty does not disappear, and the institution may be held liable if the failure to place the patient on inpatient status resulted from something other than an exercise of professional judgment . . . .), <u>appeal dismissed</u>, 734 N.Y.S.2d 527 (1st Dep't 2001). In short, although "no bright-line rule exists," outpatient health care providers generally owe their patients – and the public at large – a duty to take reasonable measures within their power to prevent foreseeable harm. <u>See</u> <u>Rivera v. N.Y. City Health & Hosps. Corp.</u>, 191 F. Supp. 2d 412, 417-19 (S.D.N.Y. 2002).

Plaintiff does not argue that Cerbelli's outpatient caregivers should have sought to have him involuntarily committed. Rather, she contends that Cerbelli's "deterioration and return to psychosis in the two months preceding his death" were reasonably foreseeable (Pl.'s Mem. at 38), as was the likelihood of resulting harm to Cerbelli, and that HHC employees should have done more outreach to ensure that Cerbelli visited the outpatient clinic and took his medications (<u>id.</u> at 35). Specifically, she complains that, even though Cerbelli did not keep any of his outpatient clinic appointments, and his case manager and other staff members knew or should have known that he was not taking his medications, no one went to visit Cerbelli. (<u>Id.</u> at 34-36.) She contends that there is "only one contemporaneous indication" in Cerbelli's chart regarding any attempt to contact Cerbelli between August 28 and October 25, 1998 (<u>id.</u> at 36), and she argues that Elmurst Hospital staff should have made efforts to "follow up on supportive living

-25-

arrangements," assign an intensive case manager, contact Cerbelli's family, or make a referral to the Mobile Crisis Unit ("MCU") (id. at 37-38).

It is undisputed that Cerbelli did not appear for any of his appointments at the Mental Hygiene Clinic or the Community Options Program after his August 26, 1998 discharge from Elmhurst Hospital.  However, there is evidence in the record that outpatient caregivers attempted to contact Cerbelli after his release.  Records from the Psychiatric Discharge Monitoring System indicate that Jill Kosches, a Koskinas worker[11] in the Elmhurst Hospital Center of Psychiatry, called Cerbelli on August 27 and 28, 1998, but he did not answer.  (See Savetamal Decl., Ex. Y.)  The records also show that Ms. Kosches sent Cerbelli a letter on August 28, 1998 reminding him of his clinic appointment.  (Id.)  In addition, telephone records from Elmhurst Hospital confirm that eleven telephone calls were made to Cerbelli's home number between September 9, 1998 and October 14, 1998, although it is unclear who at Elmhurst Hospital made those calls.  (Id., Ex. W.)  For unexplained reasons, the telephone records do not include calls placed after October 14, 1998.[12]

There is also evidence that social worker Joseph McGookin of the Community Options Program attempted to get in touch with Cerbelli.  McGookin sent Cerbelli a letter, dated September 29, 1998, stating:

> Dear Kevin:
> It has been some time since I have seen you in the Community
> Options Program.  In order for you to progress in your treatment, it

---

[11]  Koskinas v. Boufford, 567 N.Y.S.2d 594 (Sup. Ct. N.Y. County 1991), established that patients leaving inpatient psychiatric units operated by HHC are entitled to discharge planning that includes referral to appropriate housing and aftercare services.

[12]  The records also do not include incoming calls.  (Defs.' Rule 56.1 Statement ¶ 128.)

-26-

> will be necessary for you to call me for an appointment soon after
> you receive this letter.  My telephone number is 334-1392.  Please
> leave a telephone number where you can be reached and the best
> time to call you.  Thank you for your cooperation. . . . P.S. I hope
> all is well.  I wanted to speak to you in the chapel on September 9,
> but left before mass ended.  We have to know how you are
> maintaining yourself.  If we don't hear from you, we will have to
> send the crisis team to your home.  Please call me!  Thanks.

(Savetamal Decl., Ex. U. at 1746.)  That same day, McGookin entered a note in the Community

Options Program chart, memorializing his efforts to contact Cerbelli.  That entry stated:

> This CSW [certified social worker] reviewed [patient's] chart.
> [Patient] hasn't been seen in MHC for many months (5/98).
> [Patient] had been to [the Community Options Program] in 6/98,
> but had been readmitted to [the Elmurst Hospital psychiatric
> inpatient unit].  This CSW attempted many calls to [patient], but
> has seen him in [Elmhurst Hospital] chapel and in hallways.  This
> CSW sent [patient] a letter today asking him to make an
> appointment or to call.  If [patient] doesn't call this CSW within 1
> week, an MCU referral will be made to check on [patient.]

(Id., Ex. U at 1712.)

It is also undisputed that McGookin spoke with Loretta Cerbelli once or twice in

October 1998.  (See Defs.' Rule 56.1 Statement ¶¶ 129-31.)  In her deposition, Ms. Cerbelli

testified that McGookin called her in October 1998 to tell her that her son had missed an

appointment.  (L. Cerbelli Dep. at 515-16.)  Ms. Cerbelli stated that she asked McGookin "did he

speak to the doctor about the medication[?]; what about the placement[?]; what about the

intensive case manager[?]," and that McGookin "said that he will talk to the doctor about the

medication."  (Id. at 516.)

Beyond these attempts at contact, there is some dispute as to what, if anything,

McGookin did to help Cerbelli.  On October 26, 1998, after learning that Cerbelli had been

-27-

killed, McGookin entered the following note in the chart:

> This CSW spoke to [patient] on 10/06/98, after CSW made several
> attempts to call him.  [Patient] said he had received CSW's 9/29
> letter and had it in his shirt pocket, but didn't open it yet.  [Patient]
> remembered seeing this CSW in chapel in early 9/98.  [Patient]
> said he was "fine," denying [suicidal ideation or homicidal
> ideation,] psychotic [symptoms] or delusions.  [Patient] expressed
> no religious preoccupations.  [Patient] said he would come to see
> this CSW on 10/13 at 12 NOON and would try to attend group.
> [Patient] didn't appear for either appt.  This CSW tried to call
> [patient] on 10/13 later in the afternoon, but there was no answer.
> [Patient] refused to come into this CSW's office during week of
> 10/6 because he was "too busy."  [Patient] agreed to come into [the
> Community Options Program] or at least call to touch base with
> this CSW the following week.  [Patient] failed to touch base with
> this CSW on 10/13 and CSW tried to call [patient] on 10/14,
> 10/19, 10/20, 10/21, and 10/22, but there was no answer.

(Savetamal Decl, Ex. X.)   Telephone records confirm that calls were made from Elmhurst

Hospital to Cerbelli's home on October 13 and 14, 1998 (id., Ex. W), but because the records do

not include calls placed after October 14, 1998, there is no independent corroboration of

McGookin's claims regarding his attempts to call Cerbelli on October 19, 20, 21 and 22, 1998.

      According to McGookin's deposition testimony, the October 26, 1998 note

memorializes a "face-to-face meeting" with Cerbelli on October 6, 1998.  (Id., Ex. K at 132.)

McGookin stated that, because he had spoken with Cerbelli on October 6, 1998, it was

unnecessary to refer him to the MCU, as "they would have considered his being compliant and

they would not have accepted his case."  (Id. at 144.)

      McGookin further testified that he had composed a note on October 6, 1998,

concerning his meeting with Cerbelli, but that the original note was "missing" from the chart.

(Id., Ex. K at 126; see also id. at 147.)  He said he then re-wrote the note on October 26, 1998 to

-28-

document his recollection, although the second note, too, was missing from the chart.  (Id. at

129.)  McGookin testified that he found a copy of the October 26, 1998 note when he was

cleaning out his desk, and that he brought it to his attorney's attention the day before his

deposition.  (Id. at 129-30.)  Plaintiff argues that this note is suspect and that "this reinvention of

history should not be given any weight whatsoever."  (Pl.'s Mem. at 36.)

       Setting aside the parties' disagreement about the credibility of the October 26,

1998 note and McGookin's testimony regarding it, defendants argue that HHC was not negligent

in providing outpatient psychiatric care to Cerbelli after August 26, 1998, since there is no

indication that Cerbelli was in crisis or was a danger to himself or others at that time.  Nothing in

Cerbelli's medical records indicates whether he was taking his prescribed medications during

that period.  Loretta Cerbelli testified in her deposition that at the end of October 1998, her son

was "in the worst state [she] had ever seen him."  (L. Cerbelli Dep. at 511.)  She stated that:

> It was heartbreaking to see him.  It was just tearing us all apart.  It
> was so obvious, how bad he was.  To have your son come over to
> visit you, and you really don't want to sit near him because he
> smells. . . . This was not Kevin.  He was always very fastidious and
> neat, and always cared about his personal hygiene and his
> appearance.  It was like he was a different person.  It was just – it
> was so sad to see. . . . I could tell he just was somewhere else.  His
> mind was somewhere else.  I felt like I lost my son at that point.

(Id. at 511, 513.)  She further described Cerbelli as "withdrawn from the world" during that time.

(Id. at 506.)  However, she also testified that, on the morning of October 25, 1998, Cerbelli was

calm and composed.  She stated that Cerbelli went to church and then ate breakfast and watched

television at her house.  (Id. at 514.)  After she gave him his spending money for the week,

Cerbelli announced that he was going outside.  According to Ms. Cerbelli:

-29-

> [H]e was standing in the kitchen.  And he says to me, "Mom, it's a
> beautiful day out." And he says, "I'm going to go to the park and
> play chess.  It's beautiful out.  You don't mind do you?"  I said,
> "No, Kevin, I don't mind."  So then I says to him, "I will talk to
> you later."  And he kissed me goodbye, and I says, "I will call you
> later."

(Id. at 515.)  She described his appearance that day as "totally disheveled" and said "his clothes

were dirty" and he "had things in his beard."  (Id. at 527.)  She also said he had started smoking

for the first time in about ten years.  (Id. at 506, 527.)  Nonetheless, nothing about his behavior

concerned her enough to try to persuade her son to stay inside, or to contact any law enforcement

or mental health professional for assistance.[13]

Ms. Cerbelli further testified that, at approximately 8:30 that evening, her son

called her from his home and yelled "[y]ou are not my mother."  (Id. at 513, 535.)  She said that

"he was irrational, and he was talking from one topic to another" and he said he believed he was

"the devil's twin" and that "God was going to be angry with him" because he had smoked

marijuana in the park that afternoon.  (Id. at 536, 539-40.)  According to Ms. Cerbelli, he

"sounded like he was possessed."[14]  (Id. at 541.)  Ms. Cerbelli urged him to go to the hospital,

---

[13]  Ms. Cerbelli does not deny that she knew how to contact her son's care providers.  In
fact, all of the evidence shows that Ms. Cerbelli was a loving and devoted mother and was a
zealous advocate for her son when she believed he was not receiving adequate care and
treatment.  (See, e.g., Giordano Decl., Ex. A at 1710 (social worker's note, dated July 24, 1998,
stating, "[Patient's] mo[ther] called complaining no service by us for her non-compliant son.
Told her I've been trying to reach him by phone over the past few days. . . . Asked her to bring
him in; she says she can't due to work schedule. . . . [Social Worker] referred [patient] today to
Mobile Crisis. . . .");  L. Cerbelli Dep. at 518 (describing verbal complaints to Elmhurst
Hospital).)

[14]  Cerbelli's autopsy revealed high levels of cocaine in his blood and brain tissue,
indicating that he had taken a substantial dose of cocaine approximately one hour before he
entered the police precinct on October 25, 1998.  (See Report of Autopsy, dated Nov. 5, 1998,
(continued...)

-30-

but he refused.  (Id. at 536.)  She then told him to "calm down" and "go to bed."  (Id.)  She

testified that she did not call anyone because it was a Sunday night and she did not have his case

worker's home telephone number.  (Id. at 542.)  She also said that she declined to call 911

because she feared the police would respond and be physically abusive toward Cerbelli.  (Id. at

542-43.)  She said she planned to wake up early the next morning and apply for a court order to

have him involuntarily hospitalized.  (Id.)

   Notwithstanding Ms. Cerbelli's assertion that her son was "in the worst state [she]

had ever seen him," at no point in October 1998 did she call his doctor, one of his outpatient care

providers, or anyone else to express her concern that he was decompensating.  Nor does she

describe Cerbelli's behavior in October 1998 as violent or aggressive; to the contrary, she

testified that he was "withdrawn from the world."  Moreover, plaintiff's expert, Dr. Goldstein,

conceded that there is no evidence in Cerbelli's medical records  – including the records from his

September 28, 1998 Emergency Room visit – that he was experiencing delusions, paranoia, or

hallucinations in September or October 1998.  (Deposition of Robert L. Goldstein, M.D., dated

Dec. 7, 2002, annexed as Ex. M to the Savetamal Decl. ("Goldstein Dep."), at 121-25.  See

generally Giordano Decl., Ex. A.)

   Defendants' expert, Dr. Miller, states that in his professional opinion, a referral to

the MCU in this case "would have been overly zealous and unethical" since "[f]ailure to show up

for an appointment is not an indication for sending in the MCU to force the patient to come to

---

[14](...continued)
annexed as Ex. BB to the Savetamal Decl.; Miller Report at 5.)  This court will not speculate as
to whether Cerbelli was under the influence of cocaine when he made this telephone call to his
mother, but notes defendant's expert's opinion that Cerbelli's substance abuse often led to rapid
decompensation.  (See Miller Report at 5-6.)

the hospital." (Miller Report at 5.) In fact, Dr. Miller could not "find a single reason in the medical record" to send the MCU to Cerbelli's home. (Id.) As Dr. Miller explains, "[t]he deployment of the MCU can be a major undertaking with far reaching consequences" and "the process by which the MCU brings people to the hospital for evaluation and treatment" is "not easy, simple, or straightforward," but can be "savage." (Id.) Although plaintiff's expert, Dr. Goldstein, opines that there was a "clear-cut indication" for a referral to the MCU, and that Elmhurst Hospital's "policies and procedures call for consideration of and referral to the Mobile Crisis Unit in this type of situation" (Goldstein Report at 7-8), he does not explain what he believes the hospital's "policies and procedures" were. Nor does he contend that Cerbelli was exhibiting violent behavior at any time after his August 26, 1998 discharge from Elmhurst Hospital.

Defendants' expert also refutes the notion that Cerbelli should have been offered a placement in a community residence. As Dr. Miller points out, in 1994 Cerbelli was charged with arson and reckless endangerment for allegedly starting a fire in a group home in Jamaica, Queens, where he resided at the time. (See Miller Report at 5; Defs.' Rule 56.1 Statement ¶ 15; see also L. Cerbelli Dep. at 184-86.) In the eighteen months that followed, Cerbelli was first incarcerated at Rikers Island, then transferred to Kings County Hospital, and then sent to the Mid-Hudson Psychiatric Center. (Defs.' Rule 56.1 Statement ¶ 16.) He was acquitted on the arson charge but convicted of reckless endangerment. (Id. ¶ 17; L. Cerbelli Dep. at 334-35.) Dr. Miller states that "once a psychotic patient sets a fire in a group residence, and is incarcerated and convicted of the crime, . . . placement in a community group residence becomes impossible," as the patient is "at high risk to do it again." (Miller Report at 5.) Dr. Miller concludes that

"[o]nce a patient has set a fire in a group residence, he can never be placed in a group residence again." (Id. (emphasis in original).)  Plaintiff's expert does not dispute this assertion.

        To summarize, Cerbelli's outpatient caregivers knew that Cerbelli (a) was schizophrenic and had a history of substance abuse, (b) had been involuntarily committed numerous times as part of a longstanding pattern of noncompliance with treatment, (c) had recently been discharged from involuntary psychiatric hospitalization after a psychotic episode, during which he had injured a hospital staff member, and (d) had failed to appear for two scheduled outpatient appointments and could not be reached by telephone.  However, they also knew that (a) Cerbelli's treating psychiatrist considered his condition stable as of August 26, 1998, (b) his family members had not contacted his outpatient care providers seeking assistance, and (c) they had received no reports that Cerbelli was engaging in violent, aggressive, or suicidal behavior, or had threatened to do so.[15]  Under those circumstances, and given the limited nature of their duty and ability to control Cerbelli, no reasonable factfinder could conclude that Cerbelli's voluntary outpatient care constituted "something other than an exercise of professional judgment."  Webdale, No. 111310/99, slip op. at 5.  Even discounting McGookin's October 26, 1998 note, the evidence demonstrates that HHC employees made numerous attempts to contact

---

[15]  Of course, one can be deemed "dangerous to self" even if there is no foreseeable risk of intentional self-injury or suicide, "if for physical or other reasons [the person] is helpless to avoid the hazards of freedom either through his own efforts or with the aid of willing family members or friends."  O'Connor v. Donaldson, 422 U.S. at 574 n.9.  However, this standard is a high one, and a person cannot be involuntarily committed merely for lack of attention to personal hygiene, or even for experiencing delusions or refusing to take medications.  As the Supreme Court has explained, "while the State may arguably confine a person to save him from harm, incarceration is rarely if ever a necessary condition for raising the living standards of those capable of surviving safely in freedom, on their own or with the help of family or friends."  Id. at 575.

Cerbelli by mail and telephone.[16]

In addition, even if there were evidence that Cerbelli's outpatient care providers violated their duty to exercise professional judgment, plaintiff cannot establish that any departure from accepted practice caused or contributed to Cerbelli's injury or death.  There is simply no way to know whether assigning an ICM, making a referral to the MCU, or arranging for supportive housing would have prevented Cerbelli's acute cocaine intoxication, psychotic episode, and shooting death on October 25, 1998.  Speculation cannot defeat a motion for summary judgment.  Major League Baseball Props., Inc. v. Salvino, Inc., 542 F.3d 290, 310 (2d Cir. 2008) ("'Though we must accept as true the allegations of the party defending against the summary judgment motion, drawing all reasonable inferences in his favor, . . . conclusory statements, conjecture, or speculation by the party resisting the motion will not defeat summary judgment.'") (quoting Kulak v. City of New York, 88 F.3d 63, 71 (2d Cir. 1996)).

In light of what we all know now, one certainly wishes that Cerbelli's outpatient care providers had intervened more proactively to protect him.  His outpatient care may not have been perfect, but that does not make his caregivers' actions negligent, given what they knew or reasonably could have known at the time.[17]  I therefore respectfully recommend that defendants'

---

[16]  Under the guidelines of the Community Options Program at the time, Cerbelli's social worker was not permitted to visit him at home.  (See McGookin Dep. at 24.)  In 1999, New York enacted a statute known as "Kendra's Law," which requires directors of community services to investigate non-compliant patients and provides a legal mechanism for compelling patients to appear for assisted outpatient treatment.  See N.Y. Mental Hyg. Law §§ 9.47(b), 9.60.  Unfortunately, this statutory authority and duty did not exist at the time of Cerbelli's treatment at Elmhurst Hospital.

[17]  Plaintiff makes much of the fact that Elmhurst Hospital revised its discharge policy in 1999, after Cerbelli's death, to provide more comprehensive and coordinated discharge planning
(continued...)

-34-

motion for summary judgment be granted on this point.

> **V.     Plaintiff's State Law Claim Against HHC, for Negligence Relating to Cerbelli's Emergency Room Visit on September 28-29, 1998**

Plaintiff also contends that HHC employees' "failure to identify [Cerbelli] as a noncompliant Elmhurst psychiatric patient and properly treat [Cerbelli] upon his presentation to the Elmhurst Emergency Room on September 24, 1998 with an 'altered mental state' was a missed opportunity." She argues that this failure was "grossly negligent." (Pl.'s Mem. at 40.)

Records show that EMS brought Cerbelli to the Elmhurst Hospital Emergency Department on September 24, 1998, after he was found "wandering in [the] street lethargic." (Savetamal Decl., Ex. T at 298.) A triage note states that Cerbelli was "brought in by EMS for

---

[17](...continued)
and improved rules for MCU referrals. (See Giordano Decl., Ex. P; compare Ex. R.) Elmhurst Hospital apparently implemented those changes, at least in part, in response to a report by the New York State Commission on Quality of Care for the Mentally Disabled, containing the Mental Hygiene Medical Review Board's recommendations for improving the hospital's psychiatric inpatient and outpatient services in the wake of an investigation into Cerbelli's treatment and death. (See Giordano Decl. Ex. I.) Of course, evidence of subsequent remedial measures is inadmissible to prove negligence, but it may be admitted to show feasibility. Fed. R. Evid. 407. The HHC defendants do not argue that improvements were not feasible in 1998; rather, they argue that the actions of Cerbelli's outpatient care providers were not negligent and were not a substantial cause of his death. In fact, although the report identified a number of deficiencies in Elmhurst Hospital's inpatient and outpatient psychiatric programs generally, the Commission concluded that the psychiatric services provided to Cerbelli were largely adequate and that "the hospital's outreach efforts to engage him in treatment were substantial." (Giordano Decl. Ex. I at 1.) It also "recognized the difficulties in obtaining a suitable placement" for Cerbelli "given his legal history and non-compliance with treatment" and found that Cerbelli's "assaultive behavior at the 110th Precinct in Queens, N.Y. on October 25, 1998, at which time he was shot to death by police officers, could not have been predicted by the hospital." (Id.) In sum, to the extent they are admissible, the report and resulting remedial measures do not demonstrate that Cerbelli's outpatient care providers fell short of the applicable standard of care.

altered mental status"[18] and that he told Elmhurst hospital staff he had "been drinking."  (Id. at

302.)  The note further states that the patient refused to provide a medical history and denied

taking any medications, and it describes him as "drowsy" and "sluggish."  (Id. at 302.)

       In his initial evaluation, Dr. Boutin observed no visible trauma or distress, and he

noted that Cerbelli was "uncooperative" and "somnolent but arousable."  (Id. at 298.)  Later that

evening, Dr. Boutin noted that Cerbelli was "now cooperative" and that he had reported taking

small amounts of Cogentin, Depakote, and Prolixin for "entertainment purposes."  Dr. Boutin

found no sign of suicidal ideation.  (Id.)  Cerbelli did not volunteer that he was a psychiatric

patient at Elmhurst Hospital's Mental Hygiene Clinic, and there is nothing in the emergency

room records to indicate that he was psychotic or posed a danger to himself or others at that

time.  Dr. Boutin ordered blood tests for toxicology screening and alcohol levels.  (Id.)

       Dr. Gunderson began his shift at 7:00 that evening and first observed Cerbelli

sleeping on a stretcher.  He performed three examinations later that night, during which Cerbelli

was awake and lucid.  Cerbelli told Dr. Gunderson that he had purchased the Cogentin,

Depakote, and Prolixin on the street to get "high."  He specifically denied being prescribed these

medications, and he denied any psychiatric history.  (Id. at 300-03; Deposition of Erik

Gunderson, M.D., dated Jan. 9, 2001, annexed as Ex. I to the Savetamal Decl. ("Gunderson

Dep."), at 72-73.)  The toxicology screening and alcohol tests came back and were

unremarkable; the alcohol level was less than 10.0 mg/dl.  (Savetamal Decl., Ex. T at 307.)

       Cerbelli was discharged at 6:00 a.m., after having been observed for sixteen

---

[18]  According to defendants' expert in emergency medicine, this is a "general term and
does not imply any specific diagnosis."  (Declaration of John C. Rohe, M.D., sworn to Mar. 5,
2008, annexed to the Savetamal Decl. as Ex. Q, ¶ 8.)

-36-

hours.  (Savetamal Decl., Ex. T at 305.)  He was offered substance-abuse counseling, which he

declined.  In the discharge notes, Dr. Gunderson wrote that Cerbelli was alert and no longer

lethargic, and that his diagnosis was "drug intoxication" and questionable seizure.  (Id.;

Gunderson Dep. at 79-80, 98.)

            Defendants' expert, John C. Rohe, M.D., who is board-certified in emergency

medicine and is the Director of the Department of Emergency Medicine at Franklin Hospital in

Valley Stream, New York, opines to a reasonable degree of medical certainty that the actions of

the emergency room doctors were "objectively reasonable, appropriate, and not a departure from

good and accepted medical standards."  (Declaration of John C. Rohe, M.D., sworn to Mar. 5,

2008 ("Rohe Decl."), annexed to the Savetamal Decl. as Ex. Q, ¶ 6.)  According to Dr. Rohe, it

was reasonable for the physicians "to rely on [Cerbelli's] representations and treat him

accordingly," since he did not exhibit any signs of psychosis or any symptoms warranting

psychiatric consultation or treatment, or inpatient psychiatric admission.  (Id. ¶¶ 16, 17.)  As Dr.

Rohe points out, Cerbelli did not express suicidal or homicidal ideations; did not appear to be in

distress, aggressive, irrational, or depressed; did not have any delusions or hallucinations; and

did not appear to be a danger to himself or others.  (Id. ¶ 17.)  Rather, within hours of his arrival,

Cerbelli was "calm, alert, oriented, and cooperative."  (Id.)  Dr. Rohe also states that a

psychiatric consultation was unnecessary because the Emergency Department physicians "were

appropriately treating his condition, which was the recreational ingestion of small amounts of

medications that caused transient (lasting a few hours) lethargy and uncooperativeness which

required only observation for a few hours for the effects to wear off."  (Id. ¶ 18.)  In Dr. Rohe's

opinion, Cerbelli "clearly did not need psychiatric treatment, consultation, or involuntary

admission to the hospital." (Id.)

Dr. Rohe also addresses plaintiff's suggestion that the specific drugs Cerbelli took should have alerted the Emergency Department physicians that he was a psychiatric patient, since they knew that those were psychiatric medications. Dr. Rohe emphasizes that Cerbelli repeatedly denied a psychiatric history, denied regularly taking any medications, and denied being under the care of a psychiatrist. (Id. ¶ 19.) Moreover, Dr. Rohe states that it was objectively reasonable for the physicians to rely on Cerbelli's representation that he had purchased the drugs on the street and taken them for recreational purposes, "particularly since it is not uncommon for Emergency Department patients to present with drug intoxication from prescription medications purchased illegally off the street." (Id.) Dr. Rohe further states that, to the extent plaintiff argues that tests for Depakote, Prolixin, and Congentin should have been administered, that argument lacks merit because (a) Prolixin and Cogentin cannot be tested in the blood, and (b) although Depakote can be tested, the Depakote level "would not have changed Kevin Cerbelli's medical management because there is no way to reverse the effects of these medications other than to wait for them to be metabolized – that is, wait for the effects to wear off with time." (Id. ¶ 21.) Dr. Rohe explains that the doctors observed Cerbelli overnight, and "his symptoms were consistent with the low amount of drugs he allegedly took," the effects of which "wore off with time." (Id.)

Finally, in response to the contention that the Emergency Department physicians should have obtained Cerbelli's psychiatric records electronically, Dr. Rohe states that in 1998, it was "not the standard" for Emergency Department computers to be able to access psychiatric records, and that this "lack of computer capability is not evidence of negligence." (Id. ¶ 22.) In

-38-

any event, Dr. Rohe concludes that, "[e]ven if the hospital had the capability to look up Kevin

Cerbelli's psychiatric history electronically, it would not have made a difference in Mr.

Cerbelli's care and treatment as he was not psychotic, did not appear to be a danger to himself or

others, did not exhibit symptoms of decompensation, and involuntary psychiatric inpatient

admission would not have been justified."  (Id.)

        Plaintiff's expert, Dr. Goldstein, states that the failure of the Emergency Room

staff to identify Cerbelli "as one of their own psychiatric outpatients" and to "have a psychiatric

consult to evaluate him" was negligent and "led inexorably to Mr. Cerbelli's relapse of acute

psychosis and overtly violent behavior."  (Goldstein Report at 9.)  Although Dr. Goldstein is a

psychiatrist with years of experience in his field, he does not profess expertise in emergency

medicine standards of care, as he has had no formal training or experience in emergency

medicine beyond the training he received during his medical internship in 1966.  (Deposition of

Robert L. Goldstein, M.D., dated Dec. 7, 2001, annexed as Ex. M to the Savetamal Decl.

("Goldstein Dep."), at 126.)  Moreover, his report is wholly conclusory and speculative, and in

some instances inaccurate.  Although Dr. Goldstein states that the Emergency Room physicians

failed to consider or rule out "a mental illness or psychiatric condition such as schizophrenia,"

the medical records clearly demonstrate that the Emergency Department staff questioned

Cerbelli repeatedly about the medication he had ingested, whether he had a psychiatric history,

and whether he was being treated by a psychiatrist.  Cerbelli consistently denied having any

psychiatric condition and maintained that he had purchased the drugs on the street.  More

importantly, no reasonable factfinder could conclude that identifying Cerbelli as a psychiatric

patient and ordering a psychiatric consultation would have prevented the tragic events of

October 25, 1998.  Again, there is no evidence in the record to suggest that Cerbelli was

engaging in violent or aggressive behavior, was experiencing delusions or hallucinations, or

could have been hospitalized involuntarily.  If anything, the evidence suggests that Cerbelli was

taking his prescribed medications at that time.

          In sum, even viewing the facts in the light most favorable to plaintiff, there are no

genuine issues to be tried, and I respectfully recommend that defendants' motion for summary

judgment be granted on this point.

### VI.    Plaintiff's State Law Claim for Wrongful Death

          Finally, plaintiff asserts a state law claim for wrongful death under New York Est.

Powers & Trusts Law § 5-4.3.  To recover damages for wrongful death, the plaintiff must prove:

(1) the death of a human being; (2) a "wrongful act, neglect or default of the defendant" that

caused the decedent's death; (3) the survival of distributees who suffered pecuniary loss by

reason of the decedent's death; and (4) the appointment of a personal representative of the

decedent.  Habrack v. Kupersmith, No. 87 Civ. 4712, 1988 WL 102037, at *2 (S.D.N.Y. Sept.

23, 1988) (citing Chong v. New York City Transit Auth., 441 N.Y.S.2d 24, 25-26 (2d Dep't

1981)).  For all of the reasons explained above, plaintiff fails to sustain a negligence or medical

malpractice cause of action against the HHC defendants.  She therefore cannot prove the second

element of a wrongful death claim, and I accordingly recommend that summary judgment be

granted on this claim.

### VII.    Supplemental Jurisdiction

          The HHC defendants urge the court to decline to exercise supplemental

jurisdiction over plaintiff's state law claims.  Because I recommend that summary judgment be

granted on all of plaintiff's claims against the HHC defendants, it is unnecessary to address this argument.

**CONCLUSION**

For the reasons stated above, I respectfully recommend that the HHC defendants' motion for summary judgment be granted.  Any objections to this Report and Recommendation must be filed with the Clerk of the Court, with courtesy copies to Judge Ross and to my chambers, within ten (10) business days.  Failure to file objections within the specified time waives the right to appeal the district court's order.  <u>See</u> 28 U.S.C. § 636(b)(1).

Respectfully submitted,


_____/s/_____

ROBERT M. LEVY
United States Magistrate Judge

Dated:  Brooklyn, New York
         December 17, 2008